**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

340 BISCAYNE OWNER LLC

    Debtor.

Case No. 24-23025

Chapter 11

_____ /

In re:

BH DOWNTOWN MIAMI, LLC,

    Debtor.

Case No. 24-23028

Chapter 11

_____ /

**DECLARATION OF CRISTIANE BOMENY IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I hereby declare that the following is true based upon my personal knowledge of the business records of Debtors 340 Biscayne Owner LLC and BH Downtown Miami, LLC.

## I.    INTRODUCTION

1. My name is Cristiane Bomeny. I am over the age of 18 and am competent to testify. I am the President of Winterland Property LLC ("Winterland"), which serves as the Manager for 340 Biscayne Owner LLC ("340") and BH Downtown Miami, LLC ("BH") (collectively, "Debtors").

2. I do not have any equity interest in the Debtors and receive no compensation from the Debtors. Winterland was named Manager to assist with the Chapter 11 on December 2, 2024.

3. To minimize any adverse effects on the Debtors' businesses as a result of the commencement of these Chapter 11 cases, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief and are designed to, among other things: (a) continue the Debtors' operations

while in Chapter 11 with as little disruption as possible; (b) allow 340 to continue serving valued customers and operate its Hotel business pending a restructuring of Debtors' debt; and (c) establish procedures for the smooth and efficient administration of this case. The relief requested in the First Day Motions will be crucial to the success of the Debtors' efforts to facilitate an orderly reorganization to be effectuated through the contemplated restructuring of the Debtors' debts.

4. I submit this declaration (the "Declaration") in support of the Debtors' Chapter 11 voluntary petitions and the First Day Motions. As the President of Winterland, the Manager of the Debtors, I have personal knowledge of the Debtors' books and records, and the Debtors' financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees or advisors. In making the statements herein, I have relied upon the employees to accurately record, prepare and collect any such documentation and other information.

5. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion, except as otherwise noted. I am authorized to submit this Declaration on behalf of the Debtors.

## II. PRELIMINARY STATEMENT

### A. The Chapter 11 Filing

6. On December 13, 2024 (the "Petition Date"), Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). A motion for joint administration of these Chapter 11 cases will be filed.

7. As of the date hereof, no creditors' committee has been appointed in either case. In

addition, no trustee or examiner has been appointed.

8.     The Debtors are operating their business and managing their affairs as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**B.     Debtors' Corporate Structure, Description of Debtors' Business, Historical Financial Performance, Financial and Management Structure, and Reasons for Filing Chapter 11**

### i.     Overview of Debtors' Corporate Structure

9.     340 is a limited liability company organized under the laws of the State of Delaware.

10.    BH is a limited liability company organized under the laws of the State of Delaware and owns 100% of the outstanding membership interests in Debtor. BH's equity interest in 340 is BH's only asset.

### ii.    Property Ownership & Planned Redevelopment

11.    340 is titleholder to the real property located at 340 Biscayne Boulevard in Miami, Florida (the "Property") as well as the hotel located thereon, commonly known as Holiday Inn Port of Miami-Downtown, (the "Hotel").

12.    The Property is extremely desirable as the only remaining parcel on Biscayne Boulevard in downtown Miami on which a developer can construct a high-rise condominium. Over the past several years, Debtors have expended hundreds of thousands of dollars and worked diligently to secure the entitlements necessary to redevelop the Property to realize the Property's highest and best use. As a result of these diligent efforts, the Property is now fully entitled for the development of an 82-story mixed-use tower. Debtors intend to utilize this entitlement to develop a mixed-use project offering unparalleled views of Biscayne Bay, the Port of Miami, and Miami

3

Beach, featuring 374 luxury condominium units, a 120-key upscale boutique hotel, and other commercial uses (the "Redevelopment").

13. The Redevelopment is set to redefine the skyline of downtown Miami, and Debtors have gone to great lengths to ensure that this project is designed to meet the evolving demands of today's urban dwellers, blending luxury with functionality.  The incorporation of diverse income streams, including residential units, Class-A office spaces, and premium amenities, guarantees a sustainable revenue model that ensures the long-term financial stability and success of the Redevelopment.

14. The Debtors have worked tirelessly for many years and invested substantial resources in getting this project ready for construction. On July 17, 2024, the Property was independently appraised by AppraisalFirst, LLC (the "Appraiser") at an estimated value of Two Hundred Million Dollars ($200,000,000). Once the Redevelopment is completed, the projected market value of the Property is 1.7 Billion Dollars ($1,700,000,000).

15. This is no small undertaking; a Redevelopment of this magnitude takes years to accomplish, and 340 is well on its way. To date, 340 has engaged architects, engineers, designers, attorneys, and other experts in furtherance of this Redevelopment, and most importantly, has obtained all of the entitlements it needs for the project.  As of the Petition Date, Debtors are mere months away from completing the final architectural and engineering plans to obtain condominium documents needed to move forward with construction.

16. The Debtors' equity group has a history of developing some of the most iconic structures in South Florida, including 1000 Museum and the Regalia Condominiums, in addition to projects in Abu Dhabi, Brazil, Nigeria, Portugal, and many other international locations, with the World Trade Center in Sao Paolo being one of their crown jewels.  Their ability to devise groundbreaking solutions, and their

reputation and input are critical to the Redevelopment. They receive no compensation from the Debtors for their participation, other than their equity interest.

### iii. Hotel Franchise Flag

17. 340 has owned and operated the Hotel since 2015. While going through the process of Redevelopment, 340 continues to operate the Hotel under the Holiday Inn flag, an IHG Hotels & Resorts Brand, pursuant to that certain License Agreement dated May 31, 2016 (the "License Agreement") entered into by and between Debtor and Holiday Hospitality Franchising, LLC (the "Licensor"), as amended.

18. Pursuant to the License Agreement, 340 pays the Licensor a monthly fee ("Franchise Fees") which includes, *inter alia*, a royalty on gross rooms revenue.

### iv. Hotel Finances and Management

19. 340 contracts with Aimbridge Hospitality Holdings, LLC ("Aimbridge" or the "Operator") to handle day-to-day operations of the Hotel, pursuant to that certain Hotel Management Agreement dated May 18, 2016 (the "Management Agreement").

20. 340 maintains two bank accounts for the Hotel operations. The Collection Account (the "Collection Account") receives all incoming payments, including all merchant payments, whether made online or in-person at the Hotel, and all payments from online booking services. The only transfers made from the Collection Account are transfers to the Operating Account (defined below) and limited direct payments to third parties to pay obligations of 340 related to the Hotel, such as insurance, real property taxes, payments pursuant to the Loan Agreement (defined below), legal fees and costs, costs associated with the Redevelopment efforts, and recertification costs. While the Operator has the ability to view the Collection Account and reconcile the transactions, only 340 has the ability to disburse funds from the Collection Account.

5

21. All other obligations of 340 are paid from the Operating Account. Pursuant to the Management Agreement, 340 is obligated to provide working capital to Operator for the Hotel, including, but not limited to, funds sufficient to operate, maintain, and equip the Hotel, including payroll. Upon request from the Operator, substantiated by an accounts payable aging report, 340 will transfer funds from the Collection Account to the Operating Account (the "Operating Account") from which Operator will pay those expenses which have come due.

22. Pursuant to the Management Agreement, all Hotel Employees ("Hotel Employees") are employees of the Operator, and all compensation of the Hotel Employees is an Operating Expense, borne by 340, and paid in advance to Operator upon demand.

23. The Hotel is fully insured, and property taxes are current.

v. **Hotel Operations**

24. The Hotel offers 200 rooms and over 2,000 square feet of meeting space, as well as onsite dining. The Hotel's proximity to the Port of Miami, Kaseya Center, and Downtown Miami makes it an attractive destination for business and leisure travelers. The Hotel has historically performed strongly in comparison to its STR[1] Report Competitive Set, primarily driven by this strategic location, and by carrying the long-established Holiday Inn name.

vi. **COVID-19, Resulting Chapter 11 Proceedings, and Successful Emergence from Reorganization**

25. At the onset of the COVID-19 pandemic, 340 owned the Hotel operations, but not the real property on which it is situated (the "Land"). 340 leased the Land from Kawa 340 Biscayne LLC ("Kawa") pursuant to a ground lease dated July 15, 2016 (the "Ground Lease"), which also gave 340 an Option to purchase the Land (the "Option"). Kawa's affiliate, 340

---

[1] STR provides premium data benchmarking, analytics and marketplace insights for global hospitality sectors and is well-known, and heavily relied upon, by hotels around the world.

Biscayne Lendco, LLC ("Prior Lender") held a promissory note evidencing a loan secured by the Property (the "Prior Loan").

26.  In September 2020, while the Hotel (and the entire world) was in recovery from COVID's limited operations, the Prior Loan matured. Prior to the maturity date, 340 sought an extension of the Prior Loan, but Prior Lender refused. Given the economic conditions at that time, the process to refinance was lengthy, and Debtor was unable to close on refinancing before Lender began foreclosure proceedings.

27.  Thus, in July 2021, 340 sought the protections of this Court in order to preserve the going concern value of 340's assets and operations, restructure the debt, and negotiate a plan of reorganization (the "Prior Chapter 11 Case").

28.  Nine months after the Petition Date, 340 emerged from the Prior Chapter 11 Case with an extension of the Prior Loan and payment in full to all of 340's creditors on the Plan's effective date.

### vii. Refinancing to Pursue Entitlements & Redevelopment; Recertification

29.  Pursuant to the Plan of Reorganization in the Prior Chapter 11 Case, 340, Kawa, and the Prior Lender extended the terms of the Ground Lease and the Prior Loan (the "Extension")

30.  Upon emergence from the Prior Chapter 11 Case, 340 began actively seeking a new lender that would enable 340 to (i) refinance the Prior Loan from Prior Lender and (ii) acquire fee simple interest in the Land. Such fee simple ownership was imperative for the Debtors' redevelopment plans for the Property.

31.  During the Extension, Lender (defined below) (or one of Lender's affiliates) purchased the debt and the Land from the Prior Lender and stepped into the shoes of Kawa and the Prior Lender (the "Debt Acquisition").

32. Once the Debt Acquisition was complete, 340 worked with Lender to complete the desired consolidation of the Hotel and Land ownership, which was a threshold requirement for 340 to begin the process of seeking entitlements for the planned Redevelopment.

33. While planning the Redevelopment, 340 also continues to work through the decennial recertification presently required of most buildings in Miami-Dade County built before 1994, a process colloquially known the "40/50 year recertification" (the "Recertification"). The Recertification Process can be long and arduous; even more so when operating an ongoing business – like a hotel, where customers are sleeping and vacationing – making it more costly and time consuming.

### viii. Cirrus Loan

34. On or about April 24, 2023, 340 and Cirrus 340BB Lender LLC ("Lender" or "Cirrus") entered into a Loan agreement (the "Loan Agreement"). Pursuant to the Loan Agreement, 340 delivered to Lender that certain Consolidated, Amended, Restated, Increased, Extended and Superseding Promissory Note evidencing the Loan (the "Cirrus Loan") in the original principal amount of $70,000,000.00 (the "Cirrus Note").

35. The Cirrus Loan and the Cirrus Note are secured by, *among other things*, (i) a Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Mortgage"); (ii) an Assignment of Leases and Rents (the "ALR"); (iii) certain UCC Financing Statements (the "UCCs"); (iv) a Pledge and Security Agreement, made by BH for benefit of Lender (the "Pledge"); (v) a Sole Member Guaranty, made by BH for benefit of Lender (the "Member Guaranty"); and (vi) Guaranties by Gilberto Bomeny (the "Bomeny Guaranties") (the Loan Agreement, together with the Cirrus Note, the Mortgage, the ALR, the UCCs, the Pledge, the Member Guaranty, the Bomeny Guaranties, and all other

8

documents evidencing or securing the Cirrus Loan, as amended, modified, and assigned are collectively referred to herein as the "Cirrus Loan Documents").

36. The primary purpose of the Cirrus Loan was to enable 340 to acquire fee simple title to the Land, which was crucial for the next stages of development. Both Debtors and Lender have long been aware of the ultimate intent to demolish the Hotel to prepare for future development of the Property, and the parties had specific discussions about the plans to do so.

37. On May 1, 2024, the Cirrus Note matured (the "Maturity Date").

38. Prior to the Maturity Date, Debtor and Lender had numerous discussions about demolition of the Hotel, funding of that demolition, and plans for continued revenue post-demolition (the "Demolition and Pre-Development Proposal").

39. On September 7, 2023, Debtor provided Lender with a draft of the Demolition and Pre-Development Proposal. In late 2023, 340 met with Lender's representatives to discuss the concept and branding of the proposed re-development of the Property, and funding of same.

40. Given the impending Maturity Date, in February 2024, 340 and Lender began discussing a Pre-Negotiation Agreement ("PNA"), which was executed on or about March 29, 2024.

41. The PNA included a "Standstill and Forbearance" provision which provided for period of sixty (60) days commencing as a of May 1, 2024, during which period, *inter alia*, Lender agreed it would not impose default interest, accelerate the Loan, or seek to foreclose upon the Loan (the "Forbearance Period"). Even after the termination of the Forbearance Period, 340 and the Lender continued to negotiate the terms of an extension of the loan.

42. Throughout the process, 340 endeavored to negotiate with Lender, in good faith, in an effort to come to terms on a new loan or extension of the existing Loan (the "Negotiations").

9

However, Lender did everything it could to sabotage 340's efforts. Among other things, Lender actively interfered with 340's attempts to obtain financing from other sources, declared a default in the middle of active negotiations, charged exorbitant fees and interest, and used bad faith tactics to put itself in a position to take all of the value the Debtors had added to the Property and all of the future upside. In short, they did everything they could to make the Debtors fail, so that they could gain ownership and control of the Redevelopment.

43. As part of the Negotiations, 340 requested release of certain reserves held by Cirrus that had been earmarked for work related to the Hotel's 40/50 Year Recertification. Despite the fact that 340 expended significant funds in performing work in furtherance of the Recertification, Cirrus refused to release any of these funds. Cirrus is currently holding $600,000 in reserves for the Recertification.

44. The total amount of debt due Lender under the Loan Agreement is $70 million plus interest.

45. I am not aware of any other creditor with a lien on the Hotel or the cash collateral.

### ix. Lender's Equity Cushion and Events Leading to Bankruptcy

46. There is no question that Lender is oversecured and adequately protected. The appraised value of the Hotel and the Land is $200 Million. The real property taxes and insurance are current. 340 has been in active negotiations with the Lender and others to refinance and is confident that it can refinance the Loan and pay Cirrus in full. Therefore, the Lender will not be adversely affected by the use of its cash collateral or the time it takes to file a plan of reorganization.

47. Prior to the Petition Date, Lender noticed the sale of BH's right, title and interest in and to its limited liability company interests of 340 at a public sale to be held on December 17,

2024, 340 challenged Lender's right to conduct the sale, resulting in Lender filing a Verified Complaint seeking declaratory relief that Lender's agent has the right to conduct the sale of the equity interest. The Complaint was recently filed and the response date has not yet passed. Lender has not commenced any foreclosure proceedings against 340.

48. Without a Chapter 11 filing, the Lender would foreclose upon BH's equity interest in 340, preventing the filing of Chapter 11 relief by 340, and realizing a windfall by gaining control over the Property.

49. As a result, Debtors have been left with no option but to file these Chapter 11 petitions in order to preserve the going concern value of Debtors' assets and operations, restructure debt as necessary to the operations of the Debtors' business, negotiate a plan of reorganization, and work with all of its existing creditors to pay them in full and retain the employees.

50. It is not surprising that Lender seeks to foreclose on the ownership of the Property. The appraised value of the assets securing the debt significantly exceeds the outstanding debt secured thereby, and by foreclosing on the debt, Lender gains control of both the Property and the Hotel, as well as the entitlements– a real windfall to the Lender.

51. The Debtors have successfully operated a profitable enterprise for many years and are well known in the industry. 340 successfully emerged from the COVID-19 pandemic and the Hotel is operating full throttle. Efforts toward Redevelopment continue to this day, and Debtors are nearing the point in the Redevelopment Process at which they can begin preparing condominium documents, make final preparations at the property for development, and commence selling units. Absent protection from this Court, Lender will proceed with its foreclosure, and all ground gained by Debtors towards Redevelopment would be wiped-out to the detriment to the Debtors' estates, with Lender gaining all the benefit.

### III. FIRST DAY MOTIONS AND NECESSITY FOR EMERGENCY HEARING

52. As President of the Manager of each of the Debtors, I am generally familiar with the contents of each of the First Day Motions (including the exhibits thereto) described in further detail herein. Based upon that general familiarity and the information provided to me by other members of the Debtors' management team and my colleagues who report to me or provide information to me in the ordinary course of the Debtors' business, I believe that the relief sought in each of the First Day Motions is necessary to: (a) prevent additional loss of valuable employees; (b) enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity and value; (c) allow the Debtors to continue serving valued customers and operating the business pending a restructuring of its debt; and (d) prevent immediate and irreparable harm to the Debtors' businesses as a whole. Concurrently herewith, the Debtors have filed or will be filing the following First Day Motions for which the Debtor requests that the Court conduct a hearing as soon as possible after the commencement of the Debtor's bankruptcy case (the "First Day Hearing"):

   i. Debtors' Emergency Application for Approval of Employment of Linda Worton Jackson and the Law Firm of Pardo Jackson Gainsburg & Shelowitz, PL as General Bankruptcy Counsel for the Debtor-In-Possession Effective as of the Petition Date;

   ii. 340's Emergency Motion for Entry of an Order Authorizing the Debtor to Use Cash Collateral and Provide Adequate Protection;

   iii. 340's Emergency Motion for Entry of an Order: (I) Authorizing the Payment of Priority Pre-Petition Wages, Salaries, Earned Bonuses, and Employee Benefits; and (II) Authorizing the Debtor to Continue the Maintenance of Employee Practices and Benefit Plans and Programs in the Ordinary Course of Business;

   iv. 340's Emergency Motion for an Order Under Sections 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (iii) Limited Waiver of Section 345(B) Deposit and Investment Requirements; and (iv) Granting Related Relief; and,

   v. Debtors' *Ex Parte* Motion for Joint Administration.

(collectively, the "First Day Motions").

53. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical and necessary to the Debtors' ability to maximize the value of its assets for its creditors and equity holders, maintain its day-to-day operations, and generally maintain and preserve the going concern, enterprise value of the business.

**A. Debtors' Emergency Application for Approval, of Employment of Linda Worton Jackson and the Law Firm of Pardo Jackson Gainsburg & Shelowitz, PL as General Bankruptcy Counsel for the Debtor-In-Possession Effective as of the Petition Date**

54. The Debtors seek authority to retain, Linda Worton Jackson, Esq. ("Ms. Jackson") and the law firm of Pardo Jackson Gainsburg & Shelowitz, PL ("PJGS") as general bankruptcy counsel effective as of the Petition Date. The Debtor understands that Ms. Jackson and PJGS have extensive experience representing Chapter 11 debtors in this district and that they are well-qualified to serve as general bankruptcy counsel to the Debtors. The Debtors believe it is in the Debtors' best interests, and those of its creditors, that Ms. Jackson and PJGS be retained to serve as Debtors' general bankruptcy counsel in its Chapter 11 case.

55. To the best of the Debtors' knowledge, except as disclosed in the Declaration of Linda Worton Jackson, on behalf of Pardo Jackson Gainsburg & Shelowitz, PL, as proposed counsel for the Debtor, neither Ms. Jackson nor PJGS has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

56. I am aware that corporations may not appear in a Florida or Federal court within Florida pro se, and that only a licensed attorney may appear on their behalf. Because there is a myriad of relief that must be sought from the Court immediately, the Debtors will suffer immediate

and irreparable harm if they are unable to obtain the services of counsel. For example, 340 requires the Court's authorization for the use of cash collateral and to pay pre-petition wages. If 340 is unable to use cash or timely pay its employees. 340 will be unable to operate the Hotel and maximize the value of their assets for the benefit of the estate. It is, therefore, my belief that only with the granting of approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief has been granted in other Chapter 11 cases in this District, including in 340's Prior Chapter 11 Case. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, their estates and creditors to retain PJGS as its counsel.

**B.    340's Emergency Motion for Entry of an Order Authorizing the 340 to Use Cash Collateral and Provide Adequate Protection**

57.    340 seeks authorization to use cash collateral pursuant to a cash collateral budget prepared by 340 for the period from the Petition Date through January 12, 2025.

58.    In connection with 340's proposed use of cash collateral and in order to provide the Lender with adequate protection for the aggregate diminution of the cash collateral resulting from 340's use thereof, 340 has agreed, subject to approval of this Court, that the Lender, shall have, effective as of the commencement of this Chapter 11 case, replacement liens pursuant to section 361(2) of the Bankruptcy Code on and in all property of 340 acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of 340 securing the prepetition obligations to the Lender under the Pre-Petition Loan Documents.

59.    340 proposes to use the cash collateral for U.S. Trustee's Fees, Attorney's Fees, and Hotel operations in accordance with the terms of the Budget prepared by the Debtors. 340 also requests that it be authorized: (i) to exceed any line item on the Budget by an amount equal to ten

percent (10%) of each such line item; or (ii) to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.

60. Supplemental to the replacement liens provided to the Lender, 340 will furnish to the Lender monthly reporting on the collections and disbursements from the Hotel.

61. An immediate and critical need exists for 340 to be permitted access to cash collateral in order to continue to operate its business and preserve its ongoing, enterprise value. If 340 is not allowed to use cash collateral, its business operations will be substantially interrupted. This would result in a significant diminution in the value of 340's assets (including the cash collateral) to the detriment of the Debtors' creditors and interest holders and other harm to the Debtors' estates. The proposed use of cash collateral, therefore, is essential to sustain the 340 during this Chapter 11 case and to prevent irreparable harm to the Debtors' estates. The Budget provides adequate funds to pay anticipated administrative expenses during the pendency of this Chapter 11 case.

62. The proposed use of cash collateral is necessary, essential and appropriate for the continued operation of the Debtors' business, and the preservation of the assets of the estate. Given the circumstances of this case and of 340, the terms of the use of cash collateral are fair, reasonable and adequate, and in the best interest of the Debtors' estates. The use of cash collateral provides 340 with working capital pursuant to the Budget, pending approval of the use of cash collateral on a permanent basis at the Final Hearing. I submit that granting of the relief sought is necessary and appropriate and in the best interests of the Debtors, their creditors, their customers, and other parties in interest.

**C.  340's Emergency Motion for Entry of an Order: (I) Authorizing the Payment of Priority Pre-Petition Wages, Salaries, Earned Bonuses, and Employee Benefits; and (II) Authorizing the Debtor to Continue the Maintenance of Employee Practices and Benefit Plans and Programs in the Ordinary Course of Business**

63. 340 is requesting the entry of an order authorizing it to (a) pay various pre-petition wages, salaries, earned bonuses and employee benefits of 340's employees, and (b) continue 340's various pre-petition Employee practices, benefit plans and programs provided by 340 in the ordinary course of its business.

64. As of the Petition Date, the Debtor, through Operator, employed approximately sixty-seven (67) full and part time employees, including management, cleaning, repair/maintenance, waitstaff, and operations/administrative staff ("Employees").  The Debtor, through Operator, pays its employees every other week.  The most recently closed payroll cycle began on Sunday, November 17, 2024, and closed on Saturday, November 30, 2024.  UltiPro withdrew monies from the Operating Account for that payroll cycle on Wednesday, December 4, 2024, and Employees received their paychecks or direct deposit, as applicable, on Friday, December 6, 2024.  The payroll for the employees to be distributed on Friday, December 20, 2024, is for the pay period ending Saturday, December 14, 2024, which will include 12 days of pre-petition employee obligations, Sunday, December 1, 2024, through and including Thursday, December 12, 2024. The total amount of gross wages due to be paid to Operator for the pre-petition payroll is approximately $86,000.

65. As part of the foregoing relief, 340 also seeks authorization to pay all federal and state withholding and payroll-related taxes relating to pre-petition periods including, but not limited to, all withholding taxes, Social Security taxes, and Medicare taxes, as well as all other withholdings such as life insurance and other employee deductions, if any.

66. The Operator has established various employee benefit plans and policies for the benefit of 340's employees which include health insurance, vacation pay, personal time off and other similar benefits (collectively, the "Employee Benefits"). 340 is obligated to pay these Employee Benefits pursuant to the Management Agreement. 340 seeks authority to honor these obligations in the ordinary course of business.

67. All regular, full-time hourly Employees are eligible to accrue paid sick and personal days. 340 seeks authority to honor in the ordinary course of business all liabilities to its Employees that arose under its vacation and personal day policies prior to the Petition Date. 340 anticipates that its Employees may utilize any accrued vacation time or personal days in the ordinary course of business without resulting in any material cash flow requirements beyond the 340's normal payroll obligations.

68. 340 has sufficient funds designated to pay the payroll costs of its Employees.

69. I believe that the relief requested in the Pre-Petition Wages Motion will enable 340 to maintain its current operations without interruption, thereby preserving the value of the business, and, at the same time, maintain employee morale. Without the relief requested, 340's ability to preserve the Debtor's going concern value and maximize the value of its assets for all creditors of its estate will be adversely affected, particularly if 340 is unable to retain its dedicated and loyal Employees.

**D.   340's Emergency Motion for an Order Under Sections 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (iii) Limited Waiver of Section 345(B) Deposit and Investment Requirements; and (iv) Granting Related Relief**

70. 340's Cash Management System facilitates the timely and efficient collection, management and disbursement of funds used in 340's business.

71. If the Bank Accounts were closed, 340 would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments into and out of 340's accounts, which would disrupt the flow of post-petition receipts and disbursements. In addition, closing the Bank Accounts would require 340 to cancel and reinstitute wire transfer instructions, which would be difficult to modify under exigent circumstances. This disruption would severely impact and could irreparably harm 340's ability to operate at this critical juncture. Opening a new bank account would require 340 and its Manager to obtain approval from the Operator, each of the credit card companies, travel sites and other payors, all of which require certain restrictions be placed on the account. This process could take several weeks, and in the meantime, 340 would not receive the funds from the payors until the process was complete.

72. I believe that the relief requested in the Cash Management Motion will enable 340 to maintain current operations without interruption, and preserve its relationships with critical vendors and customers, thereby preserving the value of the business.

**E.    Debtors' *Ex Parte* Motions for Joint Administration**

73. The Debtors are in the business of real estate. 340 is the title holder to the Property and operates the Hotel. BH is the sole member of 340 and its only asset is its membership interest in 340.

74. Lender has filed a declaratory action seeking confirmation of its authority to foreclose upon BH's interest in 340, which remains pending.

75. If Lender forecloses upon BH's interest in 340, Lender will control 340's assets.

76. For all of these reasons, the fates of the two Debtors are intertwined, and their cases should be administered jointly.

18

### IV. DEBTORS' OBJECTIVES IN THIS CASE

77. The primary purposes of the filing of this Chapter 11 Case is to, *among other things*: (a) continue 340's operations while in Chapter 11 with as little disruption as possible; (b) allow 340 to continue serving its valued customers and operate its business pending a restructuring of its debt; (c) allow the Debtors to continue their efforts in furtherance of the long term plan to redevelop the Property to its highest and best use, which will ultimately bring the most value to all interested parties; (d) establish procedures for the smooth and efficient administration of this case; and, (e) refinance the Loan. Through the motions described above and other motions and applications the Debtors may file later, the Debtors hope to minimize any adverse effects that this Chapter 11 case might otherwise have on their business, employees, and customers.

78. The Debtors anticipate filing a Plan of Reorganization within 120 days from the Petition Date that will provide for, *among other things*, payment in full of the Loan through an outside lender refinancing, and payment in full of the priority, administrative and general unsecured claims, with continued ownership of the Property and operation of the Hotel by 340.

79. For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

### 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 13th day of December 2024.

*/s/ Cristiane Bomeny*
Cristiane Bomeny