UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

BH DOWNTOWN MIAMI, LLC and
340 BISCAYNE OWNER LLC

    Debtors.
_____/

Case No. 24-23028-LMI

Chapter 11

(Jointly Administered)

BH DOWNTOWN MIAMI, LLC and
340 BISCAYNE OWNER LLC

    Plaintiffs,

CIRRUS 340BB LENDER LLC, and
CIRRUS REAL ESTATE FUNDING LLC

    Defendants.
_____/

Adv. Proc. No. _____
Chapter 11

**ADVERSARY COMPLAINT AND OBJECTION TO CLAIMS**

**IMPORTANT NOTICE TO CREDITOR:
THIS IS AN OBJECTION TO YOUR CLAIM**

**This adversary complaint includes an objection that seeks either to disallow or reduce the amount or change the priority status of the claim filed by you or on your behalf. Please read this objection carefully to identify which claim is objected to and what disposition of your claim is recommended.**

**If you disagree with the objection or the recommended treatment, you must file a written response within 30 days from the date of service of this objection, explaining why your claim should be allowed as presently filed, and you must serve a copy to the undersigned attorneys, OR YOUR CLAIM MAY BE DISPOSED OF IN ACCORDANCE WITH THE RECOMMENDATION IN THIS PLEADING.**

**If your entire claim is objected to and this is a chapter 11 case, you will <u>not</u> have the right to vote to accept or reject any proposed plan of reorganization until the objection is resolved, unless you request an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing your claim for voting purposes.**

**The written response must contain the case name, case number, and must be filed with the Clerk of the United States Bankruptcy Court.**

Plaintiffs, 340 Biscayne Owner LLC and BH Downtown Miami, LLC (collectively, "Plaintiffs" or "Debtors"), by and through undersigned counsel, hereby sue Cirrus 340BB Lender LLC ("Lender") and Cirrus Real Estate Funding LLC ("Agent") (collectively, Lender and Agent are "Cirrus"), and allege:

## NATURE OF ACTION

1. This is an adversary proceeding brought by the Plaintiffs pursuant to 11 U.S.C. §§ 502 and 1107(a), Federal Rules of Bankruptcy Procedure 3007, 7001, and 7007, and Local Rules 3007-1 and 7003-1, objecting to claim(s) asserted by Defendants and seeking affirmative relief for (1) violation of Florida Statutes Chapter 687, (2) breach of contract, and (3) breach of the covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§157 and 1334, and Administrative Order 2012-25 of the Southern District of Florida, referring proceedings to this Court.

3. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND, DEBTORS AND PARTIES

5. Plaintiff, 340 Biscayne Owner LLC, ("340") is a limited liability company organized under the laws of the State of Delaware and registered and authorized to transact its business in the State of Florida.

6. Plaintiff, BH Downtown Miami, LLC, ("BH") is a limited liability company organized under the laws of the State of Delaware and registered and authorized to transact its

business in the State of Florida.  BH owns 100% of the outstanding membership interests in 340. The membership interest in 340 is BH's only asset.

7. 340 and BH are the Debtors in the above-captioned Chapter 11 bankruptcy case.

8. Defendant, Lender, is a limited liability company organized under the laws of the State of Delaware.

9. Defendant, Agent, is a limited liability company organized under the laws of the State of Delaware and registered and authorized to transact its business in the State of Florida.

10. On December 13, 2024 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing this bankruptcy case (Case No. 24-23028-LMI).

11. Since the Petition Date, Debtors have operated as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

12. As of the date hereof, no creditors' committee has been appointed in these cases. In addition, no trustee or examiner has been appointed.

## FACTUAL ALLEGATIONS

**Cirrus Loan**

13. On or about April 24, 2023 (the "Loan Date"), 340 and Cirrus entered into a loan agreement (the "Loan Agreement").  A true and correct copy of the Loan Agreement is attached hereto and incorporated herein as **Exhibit "A."**

14. Pursuant to the Loan Agreement, 340 delivered to Cirrus that certain Consolidated, Amended, Restated, Increased, Extended and Superseding Promissory Note evidencing the loan (the "Loan") in the original principal amount of $70,000,000.00 (the "Note").  A true and correct copy of the Note is attached hereto and incorporated herein as **Exhibit "B."**

15. Prior to the closing on the Loan (the "Closing"), 340 contributed $4,000,000.00 cash to fund (a) the Interest Reserve that would be created under the Loan Agreement and used to pay interest due each month under the Loan and (b) other reserves (collectively, the "Reserves"). The Reserves were all held by Cirrus under its exclusive control under the Loan Agreement.

16. At Closing, a total of $74,100,000.00[1] was disbursed by the closing agent for the Loan and allocated as follows:

| | |
|---|---|
| Payoff of Predecessor Loans: | $ 67,388,972.40 |
| Origination Fee: | $ 1,400,000.00 |
| Prepaid Interest: | $ 176,543.19 |
| Miscellaneous Expenses: | $ 10,000.00 |
| Structural Reserve: | $ 600,000.00 |
| Project Monitor Reserve: | $ 120,000.00 |
| Interest Reserve: | $ 3,298,246.06 |
| Title/Escrow Charges: | $ 223,767.36 |
| Other Disbursements: | $ 882,470.99 |

17. The Loan and the Note are secured by, *among other things*, (i) the lien of a first mortgage on the Property (as hereinafter defined), (ii) a Sole Member Guaranty, made by BH for benefit of Lender (the "Member Guaranty") guarantying the amounts due under the Loan Agreement and Note, and (iii) a Pledge and Security Agreement, made by BH for benefit of Lender (the "Pledge") securing the obligations of BH under the Member Guaranty (the Loan Agreement, together with the Note, the Pledge, the Member Guaranty, and all other documents evidencing or securing the Loan, as amended, modified, and assigned are collectively referred to herein as the

---

[1] Cirrus contributed $100,000 toward the Reserves.

4

"Loan Documents"). True and correct copies of the Member Guaranty and Pledge are attached hereto as **Exhibits "C"** and **"D**," respectively.

  18. The terms of the Loan provided, *inter alia*, as follows:

    a. The Loan was to bear interest based upon Adjusted Term SOFR plus a Margin of 8% (the "Interest Rate").

    b. Accrued interest and fees on the Loan were to be computed on the basis of a year of 360 days.

    c. If any principal, interest or any other sum due under the Loan Documents was not paid by 340 within ten (10) days of the date on which it was due, 340 was to pay to Cirrus, upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law.

  19. In the event of Default, the Loan called for a Default Rate (the "Default Rate") equal to the lesser of (i) the Maximum Legal Rate, or (ii) of 15% above the then effective Interest Rate.

**Cirrus' Acquisition of the Prior Loan**

  20. 340 is the fee simple owner of the real property located at 340 Biscayne Boulevard in Miami, Florida (the "Land") as well as the improvements located thereon (the "Building") (the Land and the Building are, collectively, the "Property"), which house a hotel, commonly known as Holiday Inn Port of Miami-Downtown, (the "Hotel").

  21. Prior to Closing on the Loan, 340 owned the Building, but held the Land as a ground lessee pursuant to a ground lease in favor of the then fee simple owner of the land ("Prior Lender"). At that time 340 was also the borrower under a loan with Prior Lender (the "Prior Loan") which was secured by, *inter alia*, the Building and the ground lease.

5

22. While 340 was a borrower under the Prior Loan, 340 and Cirrus began negotiating the terms of a loan whereby Cirrus would refinance 340's Prior Loan (the "Refinancing Negotiations"). As part of the Refinancing Negotiations, Cirrus had 340 pay for its due diligence and provide it with confidential information, subject to a non-disclosure agreement. Unbeknownst to 340, however, at the time, Cirrus was *simultaneously* negotiating with Prior Lender to *purchase* the Prior Loan *behind the back* of 340.

23. Ultimately, Cirrus (through a related entity) purchased the Prior Loan by buying the membership interests in Prior Lender and stepped into its shoes (the "Loan Acquisition"), leaving 340 in the precarious position of negotiating with Cirrus (now as 340's lender *and* ground lessor) without any alternative source of financing to pay-off the Prior Loan.

24. The relationship between – and relative negotiation positions of – Cirrus and 340 changed overnight as a result of the Loan Acquisition; Cirrus had placed itself in a position of power in the negotiation, execution, and consummation of the transaction. And, to add insult to injury, Cirrus took the due diligence and confidential information, ***paid for* and *provided by*** 340 as part of the Refinancing Negotiations, and used it against the Debtors in acquiring the Prior Loan.

25. But, because 340's acquisition of fee simple title to the Land was crucial for the next stages of development of the Property, and the Prior Loan was fast approaching maturity, 340 was left with no viable option but to continue its negotiations and refinance with Cirrus – except now 340 negotiated from a *much* weaker position.

26. Throughout the negotiations between Lender and Debtors, Lender was well aware of the Debtors' development plans and intent to demolish the Building to prepare for future development of the Property, the urgency of the demolition, and the planned use of the proceeds of the Loan for such purpose, and the parties had specific discussions about the plans, for example:

    a. The original Term Sheet for the Loan discussed the precursors for the demolition of the existing Hotel.

    b. As detailed, *infra*, as of March 2023 – prior to the Closing of the Loan – 340 was in negotiations with the owner of the neighboring property, PMG Downtown Developers LP ("PMG"), for an agreement whereby PMG or an affiliated entity (the "Demolition Partner") would, *inter alia*, fund the demolition of the Building (the "Demolition and Pre-Development Agreement" or "DPDA").

    c. On September 7, 2023 – almost eight months prior to the Maturity Date – 340 provided Lender with a draft of the Demolition and Pre-Development Agreement.

    d. In late 2023 – more than five months prior to the Maturity Date – 340 met with Lender's representatives to discuss the concept and branding of the proposed re-development of the Property, and funding of same.

**Concrete Restoration and Recertification**

27. While the Building is structurally sound, it is a 75-year-old building and therefore subject to recertification every 10 years pursuant to Miami-Dade County Code.

28. In 2022, 340 was involved in a series of hearings (the "Hearings") before the City of Miami Unsafe Structures Panel (the "Panel") related to remedial work necessary to recertify the building (the "Structural Work").

29. In April 2022, the Panel issued an order setting forth a timeline to complete the Structural Work (as amended, the "Unsafe Structures Order"). 340 subsequently secured a building permit and began the Structural Work.

30. The Loan Documents contemplated this Structural Work, and included, *inter alia*, provisions for the following:

    a. 340 agreed to pay the cost of a Project Monitor to help Cirrus oversee the Structural Work;

    b. Cirrus created a Structural Reserve, and, upon Closing, 340 was required to deposit – and did deposit – into the Structural Reserve $600,000.00 of Structural Reserve Funds for 340's use;

    c. Cirrus was to disburse the funds held in the Structural Reserve to 340 upon satisfaction of certain conditions specified in Section 6.3.2 of the Loan Agreement to pay or reimburse 340 for the Structural Work.

31. From the Loan Date through present, 340 has spent more than $700,000.00 on Structural Work.

32. In order to satisfy the requirements of the Unsafe Structures Order, 340 will need to undertake additional Structural Work at substantial cost to 340.

33. To date, despite being on notice of the Structural Work performed and anticipated to be performed, Cirrus has refused or failed to disburse any of the Structural Reserve Funds to 340.

**Demolition and Pre-Development Agreement**

34. In March 2023 – prior to the Closing of the Loan – 340 began negotiations with the Demolition Partner for the funding of the demolition of the Building pursuant to the Demolition and Pre-Development Agreement.

35. Pursuant to the DPDA, the Demolition Partner agreed to, *inter alia*, (i) pay the cost of the demolition of the Hotel, (ii) pay a fee to 340 in the aggregate amount of $10,000,000.00,

which included up to $2,000,000.00 for the costs of demolition of the Building (the "Owner Compensation"), (iii) prepare the Property, post-demolition, for use as a revenue-producing ground-level commercial parking facility, at no cost to 340, and (iv) set up a sales center across the street from the Property, so that 340 could market and sell the project it intended to develop, all at no cost to 340, with sufficient funds remaining to replenish the Interest Reserve and pay interest to Cirrus in full.

36. In exchange for the $10,000,000.00 of Owner Compensation and the other benefits under the DPDA, 340 would grant Demolition Partner access to, and use of, an agreed-upon portion of the Property for use as a construction staging area for up to two years, with the remaining portion of the Property to remain available for 340 to utilize as an income-generating surface parking lot.

37. Once executed, the DPDA would have allowed 340 to, *among other things*, (i) fund interest payments and replenish the Interest Reserve required by the Loan Documents to ensure payment of interest each month through the Maturity Date, (ii) minimize the Property's operating costs while maintaining a revenue stream from the surface parking lot, (iii) eliminate further capital costs associated with bringing the Building into compliance with the Unsafe Structures Order, (iv) open a sales center for the intended new project directly across the street from the Property at no cost to 340, and (v) obtain construction financing to move forward with the development of the Property after the demolition of the Building.

38. But first 340 needed approval from Cirrus for two reasons: (a) the DPDA required 340 to secure written acknowledgement from Cirrus outlining any terms and conditions Lender required for demolition, and (b) the Loan Agreement required Cirrus' prior approval in connection with any alterations to the Property.

9

39. Thus, without Cirrus' consent, 340 was unable to move forward with the DPDA.

40. On September 7, 2023 (the "DPDA Notice Date"), 340 provided the then-current draft of the DPDA (the "September 2023 DPDA Draft") to Cirrus, noting at that time that it was the "ideal window of opportunity" to close on the DPDA "and fund reserves" for the Loan.

41. The September 2023 DPDA Draft provided for the deposit of $10,000,000.00 in escrow by the Demolition Partner for the benefit of 340 to be paid as follows:

   a. Initial Payment: $2,000,000.00 to be transferred to 340's attorney and immediately released upon the execution of the DPDA (the "Initial Payment");

   b. Second Payment: $2,000,000.00 upon vacation of the Building, which was to be completed within 90 days of execution of the DPDA (the "Second Payment"); and,

   c. Final Payment: The remainder of $6,000,000.00, less the actual cost of the demolition work (including all softs costs, permitting costs, etc.) to be paid within ten days of the commencement of the demolition of the Building.

42. Had Cirrus approved the DPDA in a timely manner, 340 would have been able to pay the interest due each month without interruption and replenish the Interest Reserve with sufficient funds to make the interest payments through the Maturity Date.

43. Additionally, once the demolition was completed, the unused portion of the Property would be converted to a surface parking lot, with projected monthly income of approximately $500,000.00, with very little expense.

44. Fully aware of the urgency of the situation and the tremendous benefits of the DPDA, and despite the fact that Cirrus was familiar with the terms prior to the DPDA Notice Date,

Cirrus nonetheless took a week before providing a list of "concerns" regarding the DPDA. 340 promptly responded less than 24 hours later ("340's Response"). Thereafter, Cirrus fell silent.

45. Despite numerous requests, Cirrus failed or refused to reply to 340's Response until January 22, 2024 – **over four months later,** knowing that the time delay would kill the deal, which it did.

46. By Cirrus' delay and refusal to approve (or even discuss) the DPDA, Cirrus intentionally caused 340 to, *among other things*, (i) default under the Loan by cutting off the ability to replenish the Interest Reserve, (ii) lose an income stream from the parking lot that would have been constructed, (iii) incur additional costs for the maintenance of the Hotel and the Structural Work, and (iv) suffer further delays in development of the Property by blocking 340 from taking the first step of development, i.e., demolition of the Building, which in turn precluded 340 from obtaining construction financing. Most significantly, Cirrus' refusal caused 340 to lose precious time, leaving 340 at the mercy of Cirrus with no option but to attempt to negotiate a refinance of the Loan *with Cirrus*.

**Pre-Negotiation Agreement**

47. Due to Cirrus' refusal to accept the DPDA and depriving 340 of all the benefits thereunder, Cirrus prevented 340 from being able to pay the interest due under the Loan on October 1, 2023, and obtain new financing prior to the maturity date of the Note on May 1, 2024 (the "Maturity Date").

48. Given the impending Maturity Date, Cirrus' continued delays in substantive response to the DPDA, and 340's inability to pay interest due to Cirrus' bad faith delays, 340 continuously and persistently approached Lender to discuss the DPDA, the interest payments, the pending maturity, the possible extension of the Loan, and potential resolutions to these issues.

49.     Rather than negotiate in good faith, once again, Cirrus took a more nefarious approach.  Recognizing the opportunity before it and perhaps realizing Cirrus' own exposure, Cirrus refused to engage with 340, and conditioned ***any discussion whatsoever*** about the DPDA, demolition of the Building, the maturity of the Loan, the extension of the Loan, 340's options, or any other matter related to the Loan – upon Debtors' agreement to a Pre-Negotiation Agreement ("PNA").  Cirrus made it very clear to the Debtors that if Debtors wanted any line of communication with Cirrus, they had to first yield to Cirrus' one-sided terms in the PNA. Otherwise, Cirrus would simply stonewall them and engineer a default under the Loan.

50.     The PNA Cirrus demanded was a heavy-handed document with substantial benefits to Cirrus, while the *only* benefit to the Debtors was the privilege of a conversation with Cirrus. The PNA provided no benefit to Debtors – other than an audience with Cirrus to "discuss" the Loan.

51.     The PNA gave the illusion of consideration by including a "Standstill and Forbearance" provision which provided for period of sixty (60) days commencing as of May 1, 2024, during which period, *inter alia*, Lender agreed it would not impose default interest, accelerate the Loan, or seek to foreclose upon the Loan (the "Forbearance Period") ostensibly to enable the parties to engage in discussions (the "PNA Negotiations").  However, in the event the PNA Negotiations were unfruitful – an outcome Cirrus all but ensured – Cirrus retained the right to retroactively charge default interest for the Forbearance Period.  So, the PNA did not provide any forgiveness of debt, only a short 60-day forbearance to conduct discussions during which Cirrus simply dragged its feet.

52.     In exchange for what amounted to nothing more than an opportunity ***to discuss the Loan***, the PNA shockingly required Debtors to agree, for the duration of the Forbearance Period,

12

1) not to seek protection of this Court, and 2) not to pursue any cause of action against the Lender. More appalling, though, was that Cirrus required Debtors to waive *all* claims and defenses against Cirrus.

53. Despite these onerous terms, Debtors had no choice but to sign the PNA in hopes of engaging with Cirrus; but the lines of communication remained non-existent.

54. Cirrus and Debtors executed the PNA on or about March 29, 2024.

55. By the terms of the PNA, the Forbearance Period began on May 1, 2024, and terminated June 30, 2024.

56. Even after the termination of the Forbearance Period, Debtors endeavored to negotiate with Lender, in good faith, in an effort to come to terms on a new loan or extension of the existing Loan or to seek alternatives, such as the DPDA, an alternative lender or equity partner (the "Negotiations").

57. Despite the Debtors' efforts, the Lender stalled the Debtors at every turn, failed to negotiate in good faith, used the time to put the Debtors further into a corner, causing them to lose precious time in looking for alternatives.

**Rejection of DPDA & Termination of Forbearance**

58. In mid-August 2024, well after the termination of the Forbearance Period, Cirrus – for the first time – informed Debtors that they wanted a wholesale change to the structure of the DPDA. However, by this time, the window of opportunity for the DPDA had closed.

59. At the same time, despite the clear terms of the PNA, and Cirrus' assurances to the Debtors that Cirrus and the Debtors were continuing to operate under the PNA and its forbearance provisions, Cirrus declared a maturity default on August 22, 2024 (the "Default"), and imposed default interest, late fees, legal fees, and other expenses, retroactively.

60. On or before October 22, 2024, Cirrus scheduled an auction of BH's membership interest in 340, which auction was to be conducted on December 17, 2024. The auction was stayed due to the filing of this Chapter 11 case.

**Cirrus' Claims**

61. On February 20, 2025, Cirrus filed four *virtually identical* proofs of claim as follows:

   a. In case 24-23028-LMI, Agent filed its Proof of Claim as to BH, asserting a secured claim in the amount of $98,525,616.99 ("Claim 3"). A true and correct copy of the Claim 3 is on file with the Court.

   b. In case 24-23028-LMI, Lender filed its Proof of Claim as to BH, asserting a secured claim in the amount of $98,525,616.99 ("Claim 4"). A true and correct copy of the Claim 4 is on file with the Court.

   c. In case 24-23025-LMI, Agent filed its Proof of Claim as to 340, asserting a secured claim in the amount of $98,525,616.99 ("Claim 10"). A true and correct copy of the Claim 10 is on file with the Court.

   d. In case 24-23025-LMI, Lender filed its Proof of Claim as to 340, asserting a secured claim in the amount of $98,525,616.99 ("Claim 11"). A true and correct copy of the Claim 11 is filed at on file with the Court.

(collectively, the "Claims").

62. Notably, the Claims do not provide any detailed calculation of the interest, late fees and charges Cirrus asserts in the Claims.

63. However, a review of the Claims shows that the effective annual interest rate Cirrus is charging on the Loan and Note is greater than 25% and that Cirrus intentionally overcharged the Debtors on the interest, late fees and other charges in violation of the terms of the Loan Documents.

64. Plaintiffs have engaged the undersigned counsel to bring this adversary proceeding and are obligated to pay reasonable attorneys' fees and costs.

**COUNT I – VIOLATION OF CHAPTER 687, FLORIDA STATUTES**

65. Plaintiffs reallege and incorporate paragraphs 1 through 64 as if fully set forth herein.

66. This is an action for damages brought pursuant to Florida Statute §§ 687.02, 687.03, 687.04, 687.071, and 687.147(1).

67. Lender, Agent, 340, and BH are all Delaware entities.

68. Agent, 340, and BH are registered and authorized to do business in the State of Florida.

69. All negotiations between the principals of Cirrus, 340 and BH regarding the Loan Documents took place in Florida.

70. The Property is located in Florida.

71. The principals of the Lender reside in Florida and conducted the business of Lender and maintained its relationship with 340 while in Florida.

72. Cirrus loaned money to 340, as set forth in the Loan Documents, and is thus a Creditor as defined in Florida Statute, § 687.071(1)(b).

73. 340 received an extension of credit from Cirrus and is thus a Debtor as defined in Florida Statute, § 687.071(1)(c).

74. The Loan Documents constitute a contract for the payment of interest upon a loan.

15

75. Pursuant to Florida statute § 687.03, it is unlawful to charge interest in excess of 25 percent per annum on an extension of credit that exceeds $500,000.

76. Pursuant to Florida Statute § 687.071(2), any person who charges interest at a rate exceeding 25% per annum on an extension of credit commits criminal usury.

77. Cirrus knowingly and willfully charged interest on the Loan at a rate exceeding 25% per annum, in violation of Florida Statute § 687.071(2).

78. Pursuant to Florida Statute § 687.04, a person who violates § 687.03 forfeits all such interest charged.

79. Pursuant to Florida Statute § 687.071(7), a criminally usurious contract is unenforceable.

WHEREFORE, Plaintiffs respectfully request the entry of a judgment (a) declaring the Loan usurious and unenforceable (b) denying Defendants the right to receive the principal and unpaid interest, fees and any other charges under the Loan Documents, (c) awarding 340 the amount of the interest, late fees and other charges already paid to Cirrus under the Loan Documents, plus interest, (c) awarding reasonable attorneys' fees and costs to Debtors, and (d) granting such other and further relief as is just and proper.

## COUNT II – BREACH OF CONTRACT

80. Plaintiffs reallege and incorporate paragraphs 1 through 64 as if fully set forth herein.

81. The Loan Documents constitute contracts between Cirrus and 340 and/or BH.

82. Pursuant to the Loan Agreement, Cirrus held $600,000.00 of Structural Reserve Funds in a Structural Reserve.

16

83. Upon request by 340, and submission of certain documentation, Cirrus was required to disburse the Structural Reserve Funds to 340 to pay for or reimburse 340 for the Structural Work.

84. 340 properly requested disbursement of the Structural Reserve Funds. However, Cirrus refused or failed to disburse the Structural Reserve Funds to or for the benefit of 340.

85. Cirrus intentionally charged excessive interest, charges and late fees, by failing to properly calculate and charge such interest, charges and late fees in accordance with the Loan Agreement and Note.

86. Cirrus breached the terms of the Loan Documents by, *among other things*,

   a. charging excessive interest, charges and late fees;

   b. failing to release the Structure Reserve to 340;

   c. failing to act reasonably under the Loan Documents; and

   d. failing to exercise fair dealing and act in good faith with the Debtors.

87. As a direct and proximate result of Cirrus' breaches, Plaintiffs suffered damages, including, *inter alia*, (i) the loss of $10,000,000.00 in Owner Compensation that would have provided funds for payment of interest and to replenish the Interest Reserve required by the Loan Documents along with other benefits under the DPDA, (ii) continued operating costs that would have been eliminated, (iii) costs associated with the Project Monitor, (iv) additional capital costs associated with bringing the Property into compliance with Unsafe Structures Orders, (v) default interest and fees charged as a result of the Default, and (vi) the need for this Chapter 11 case.

WHEREFORE, Plaintiffs respectfully request the entry of a judgment (a) finding Cirrus breached the Loan Documents, (b) awarding damages against Cirrus in favor of the Debtors, and (c) granting such other and further relief as is just and proper.

## COUNT III – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

88. Plaintiffs reallege and incorporate paragraphs 1 through 64 as if fully set forth herein.

89. Implicit in each of the Loan Documents was a covenant of good faith and fair dealing.

90. Cirrus violated this covenant by engaging in conduct that unfairly frustrated 340's ability to benefit from the Loan Documents, including but not limited to:

   a. Unreasonably withholding loan disbursements from the subaccounts;

   b. Imposing excessive fees; and

   c. Failing to act expeditiously and reaonably with regard to the DDPA and other matters.

91. Cirrus' bad faith conduct deprived Plaintiffs of the benefits reasonably expected under the Loan Documents.

92. From the DPDA Notice Date through present, 340 has spent more than $700,000 on Structural Work that would have been obviated upon execution of the DPDA.

93. From the DPDA Notice Date through present, 340 has spent a substantial amount of money on a Project Monitor that would have been rendered unnecessary upon execution of the DPDA.

94. As a direct and proximate result of Cirrus' breach of the implied covenant of good faith and fair dealing, Plaintiffs were damaged by, *among other things*, (i) the loss of $10,000,000.00 in Owner Compensation that would have provided funds for payment of interest and to replenish the Interest Reserve required by the Loan Documents along with other benefits under the DPDA, (ii) continued operating costs that would have been eliminated, (iii) costs

associated with the Project Monitor, (iv) additional capital costs associated with bringing the Property into compliance with Unsafe Structures Orders, (v) default interest and fees charged as a result of the Default, and (vi) the need for this Chapter 11 case.

WHEREFORE, Plaintiffs respectfully request the entry of a judgment (a), finding Cirrus breached the implied covenant of good faith and fair dealing, (b) awarding damages against Cirrus, and (c) granting such other and further relief as is just and proper.

## COUNT IV – OBJECTION TO CLAIMS

95. Plaintiffs reallege and incorporate paragraphs 1 through 64 as if fully set forth herein.

96. This is an objection to claims pursuant to 11 U.S.C. § 502(b)(1).

97. Plaintiffs object to the Claims because, *among other things*, (a) the Claims are duplicative of one another, (b) the Claims are based on an unenforceable loan and are facially criminally usurious, (c) Cirrus intentionally overcharged the interest, late charges, and fees in violation of accordance the terms of the Loan Documents, thereby overstating the Claims, (d) the Claims fail to attach proper documentation to support the Claims, (e) the Claims must be reduced by the amount of damages due to the Debtors, and (f) the Claims assert a security interest in the cash collateral of 340, which interest was never perfected prior to the Petition Date, and is therefore unenforceable, and for all the reasons stated in this Complaint.

98. Plaintiffs request that this Court disallow or reduce the Claims accordingly.

WHEREFORE, Plaintiffs respectfully request the entry of an order (a) sustaining Plaintiffs' objection to the Claims, (b) disallowing the Claims, and (c) granting such other and further relief as is just and proper.

Dated: April 1, 2025

    Respectfully submitted,

**Pardo Jackson Gainsburg & Shelowitz, PL**
*Counsel for Plaintiffs*
*BH Downtown Miami, LLC and 340 Biscayne Owner LLC*
100 Southeast 2nd Street, Suite 2050
Miami, Florida 33131
Telephone: (305) 358-1001
Facsimile: (305) 358-2001
Email: LJackson@pardojackson.com
       LLovell@pardojackson.com
       sramos@pardojackson.com

By: */s/ Linda Worton Jackson*
    Linda Worton Jackson
    Florida Bar No. 843164
    Linsey M. Lovell
    Florida Bar No. 121581