UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

BH DOWNTOWN MIAMI, LLC and
340 BISCAYNE OWNER LLC

Debtors.

_____ /

Case No. 24-23028-LMI

Chapter 11

(Jointly Administered)

**DEBTOR'S MOTION TO APPROVE (A) SALE OF ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(F) AND 105,
(B) AUCTION PROCEDURES, (C)  CLOSING OF HOTEL
OPERATIONS, (D) APPROVING FORM OF PURCHASE
AND SALE AGREEMENT; (E) SCHEDULING DATES TO CONDUCT
AUCTION AND HEARING TO CONSIDER FINAL APPROVAL
OF SALE AND (F) FOR RELATED RELIEF**

**[HEARING PREVIOUSLY SCHEDULED ON OCTOBER 20, 2025 AT 9:30 A.M.]**

Debtor, by and through undersigned counsel, pursuant to Bankruptcy Code Sections 363(f), 105 and 1146(c), and Bankruptcy Rules 2002, 6004 and 9014, and Local Rule 6004-1, hereby seeks or an order of the Court (a) authorizing the Debtor to sell the Debtor's assets, either by private sale or auction, free and clear of all liens, claims and encumbrances pursuant to Sections 363(f) and 105, (b) approving auction procedures, (c) allowing the Debtor to close the Hotel Operations, (d) approving the form of purchase and sale agreement, (e) scheduling dates to conduct auction and hearing to consider final approval of sale, and (f) for related relief,  pursuant to the conditions enumerated below.  In support of the Motion, 340 respectfully states as follows:

**RELEVANT FACTS**

1.    On December 13, 2024 ("Petition Date"), the Debtor filed a voluntary petition ("Petition") in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      The Debtor is operating its business and managing its affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      As of the date hereof, no creditor committee has been appointed. In addition, no trustee or examiner has been appointed.

4.      The Debtor is the sole fee simple owner of the real property located at 340 Biscayne Boulevard in Miami, Florida (the "Real Property") as well as the hotel located thereon, commonly known as Holiday Inn Port of Miami-Downtown, (the "Hotel").  The Debtor currently operates the Hotel as a Holiday Inn (the "Hotel Operations").

5.      The Debtor also holds certain tangible personal property that was acquired for or used in the operation of the Hotel, including but not limited to furniture, fixtures, computers, and other personal property located in the Hotel or on the Real Property (the "Tangible Personal Property") as well as certain intangible personal property held in connection with the Real Property and the Hotel, including but not limited to transferable development rights, consents, authorizations, variances or waivers, licenses, permits and approvals from various governmental or quasi-governmental agencies, departments, boards, commission, bureaus or other entities solely in respect of the Real Property and Hotel, all transferable warranties and guaranties, if any (the "Intangible Personal Property") (collectively, the Real Property, Tangible Personal Property, and Intangible Personal Property are the "Assets").

6.      The Claims bar date has passed, and, except for tax claims that will be paid at closing, Cirrus 340BB Lender LLC ("Lender") and Cirrus Real Estate Funding LLC ("Agent") (collectively, Lender and Agent are "Cirrus") is Debtor's only secured creditor[1] asserting a lien on the Assets.  The secured claim of Cirrus is disputed.

---

[1] The City of Miami also asserts a placeholder lien of record for $2,000 on the Property.

7.      The Debtor does not intend to transfer any personal identifying information.

8.      The Debtor filed a Plan of Reorganization [ECF 188] that provided for the sale of the Assets by private sale or auction pursuant to terms addressed by separate motion.  The hearing on confirmation of the Plan is scheduled for December 11-12, 2025.

9.      On the date hereof, the Debtor filed its Application to Retain Concierge Auctions, LLC (the "Auctioneer") as Auctioneer [ECF 196], which Application requested approval of the Auction Agreement between the Debtor and the Auctioneer, a copy of which is attached hereto as **Exhibit A** (the "Auction Agreement").  Bidder Terms between the Auctioneer and Bidders are attached to the Auction Agreement as Exhibit A (the "Bidder Terms").

10.      By this Motion, *among other things*, the Debtor seeks authority from this Court to sell the Assets in a private sale or auction and to approve auction procedures for an auction to be conducted between October and December 2025 (the "Auction").

**Relief Requested and Basis for Relief**

11.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. § 1409. The statutory bases for the relief sought herein are Sections 363, 1146 and 105 of the Bankruptcy Code.

12.      By way of this Motion and pursuant to Bankruptcy Code § 363(f) and 105, the Debtor requests authority to (a) sell the Assets, free and clear of all liens, claims, encumbrances and interests with any such liens or interests to attach to the net proceeds of the Sale, and (b) pay closing or other costs from the sale proceeds at closing as may be required.

13.      Bankruptcy Code § 363(f) provides, in pertinent part:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity

other than the estate, only if –

    (1)   applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    (2)   such entity consents;

    (3)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)   such interest is in bona fide dispute; or

    (5)   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (§ 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

       14.    Furthermore, a court may authorize the sale under Bankruptcy Code § 363(b) of substantially all of a debtor's assets as long as the debtor has articulated a sound business justification for such sale. *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983).

       15.    Courts have made it clear that a debtor's showing of a sound business justification need not be unduly exhaustive, but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

       16.    Here, Debtor seeks authority to sell the Assets through an auction and to approve the procedures by which the auction will be conducted (the "Sale Procedures").  It is noted that the Auction Agreement accommodates, as well, the possibility of pre-auction private sale if advantageous to the Debtor, subject to further motion approving the particular private sale.

       17.    The Sale Procedures are identified in the Sale Procedures attached hereto and incorporated herein as **Exhibit B**.

       18.    The Debtor believes, in its sound business judgment, that having authority to sell the Assets and conducting an auction pursuant to the Sale Procedures will enable the Debtor to sell

the Assets for the highest possible price.

19.    Pursuant to Local Rule 6004-1, some of the highlights of the Auction Agreement, the Sale Procedures and the Bidder Terms, are as follows:[2]

a.  The Auction will be conducted by Concierge Auctions/Sotheby's (the "Auctioneer"), a nationally and internationally recognized auction house with a stellar reputation for the most prestigious properties

b.  The Auction will be conducted live in Abu Dhabi, Dubai and New York, and simulcast in Miami, as well as through Auctioneer's online digital platform.

c.  The Auction will be conducted over a period of time beginning on November 30, 2025 and ending on December 17, 2025.

d.  The winning bidder will be announced at the conclusion of the live Auction on December 17, 2025, and if there is a back up bidder, it will also be announced at the conclusion of the Auction.

e.  The Winning Bidder shall execute the Asset Purchase Agreement immediately following the Auction, and post the required non-refundable Deposit (10%) within two days of the Conclusion of the Auction;

f.  Closing will occur with the Winning Bidder on the later of 45 days after the signing of the Asset Purchase Agreement, and 11 days after entry of an order approving the sale (the "Sale Order"), unless the parties agree to a sooner closing date.

g.  The buyer will pay a Buyer's Premium to the Auctioneer equal to 6% of the gross purchase price, subject to certain terms in the Auction Agreement. The Buyer's Premium will cover auctioneer fees, and the buyer's and seller's broker fees.  The

---

[2] Reference is made to the Auction Agreement, the Sale Procedures and the Bidder Terms attached hereto, for all of the specific terms and conditions of the proposed Auction.

Debtor will reimburse the Auctioneer for marketing and advertising costs up to $150,000.

h.  There is no stalking horse and no break up fee.

i.  The Debtor and Auctioneer will determine incremental bids at the Auction.

20.  The Debtor has been actively and diligently marketing the Assets for sale prior to and during the course of this case.  And, the Debtor and Auctioneer believe that selling the Assets by auction will allow the Auctioneer to attract buyers who are ready, willing and financially able to close forthwith on a purchase of the Assets at the highest and best price.

21.  The Debtor requests that the Sale Order provide, among other things,  (a) for a sale pursuant to 11 U.S.C. § 365(f) free and clear of all liens, claims and encumbrances, with all liens, claims and encumbrances to attach to net sale proceeds; (b) for a finding of good faith sale pursuant to 11 U.S.C.§ 363(m); (c) that the sale is exempt from transfer taxes pursuant to 11 U.S.C § 1146; (d) for payment of all closing costs, including without limitation, all brokers fees, real property taxes, recording fees, and documentary stamps (if any), and (e) payment to escrow in an amount equal to (i) the Cirrus Claim Reserve as determined by the Court, or (ii) in the event Cirrus' Claim has been allowed, the allowed Cirrus Claim (the "Cirrus Escrow Funds"), as defined in the Plan.

22.  Upon the announcement of the winning and back up bids, execution of the Asset Purchase Agreement, and delivery of the non-refundable Deposit, the Debtor will file a motion with the Bankruptcy Court to approve the sale and the buyer(s).  Upon closing on a sale, the Debtor will file a notice of sale closing with the Court and verification that the Cirrus Escrow Funds were deposited with an escrow agent (if applicable).

23.  The sale will be for the Assets only, and will not include the Hotel Operations.  The Debtor will begin the process of closing the Hotel Operations between the date of execution of the

Asset Purchase Agreement and receipt of a non-refundable Deposit, and the closing date. The buyer will purchase all of the Assets, except the Hotel Operations, and all of the income or liabilities associated with the Hotel Operations will remain with the Debtor. The Hotel Operations will be closed by the closing date on the sale.

24.     The Debtor shall notify Holiday Hospitality Franchising, LLC ("HHF") of the anticipated closing date within one business day after filing the Motion to Approve the Sale, and will notify HHF of any revised closing date thereafter, and HHF may rely on such notifications with regard to the modification and shut down of the reservation system. The Debtor will work with HHF for an orderly shutdown of the reservation system. The Debtor believes that the Hotel Operations can be closed on 30 days' notice.

25.     The Auctioneer will be paid by the Winning Bidder at closing from the Buyer's Premium, which is more fully described in the Auction Agreement.

26.     In the event that Cirrus requests and is granted a credit bid, the Bid Procedures provide for credit bid procedures and a fee to the Auctioneer in the amount of $750,000, subject to the terms of the Auction Agreement.

1.      The Debtor believes in its sound business judgment that the terms of the Auction are fair and reasonable and in the best interest of the estate. The "business judgment" test is the proper test for the court to apply in ruling on a trustee's sales motion. *See In re Diplomat Const., Inc.,* 481 B.R. 215, 218 (Bankr. N.D. Ga. 2012) (citing *Equity Sec. Holders v. Lionel Corp. (In re Lionel),* 722 F.2d 1063 (2d Cir. 1983). The business judgment rule proscribes judicial second guessing of the trustee's "judgment on the sale and the procedure for the sale" so long as the trustee has met the burden of taking the action in good faith and in the exercise of honest judgment. *Id.* ("The Trustee is responsible for the administration of the estate and his judgment on the sale and the procedure for the sale is entitled to response and

deference from the Court, so long as the burden of giving sound business reasons is met.").

27.    Accordingly, the Debtor  requests that this Court approve (a) the Auction Agreement, the Bidder Terms and the Sale Procedures, attached hereto; (b) a sale pursuant to 11 U.S.C. § 365(f) free and clear of all liens, claims and encumbrances, with all liens, claims and encumbrances to attach to net sale proceeds; (c) the closing of the Hotel Operations upon receipt of a fully executed Asset Purchase Agreement and a non-refundable deposit without further Court order; (d) a finding of a good faith sale pursuant to 11 U.S.C.§ 363(m); (e) that the sale is exempt from transfer taxes pursuant to 11 U.S.C § 1146; (f) payment of all closing costs, including without limitation, all brokers' fees, real property taxes, recording fees, and documentary stamps (if any); (g) payment to escrow in an amount equal to (i) the Cirrus Claim Reserve as determined by the Court, or (ii) in the event Cirrus' Claim has been allowed, the allowed Cirrus Claim (the "Cirrus Escrow Funds"), as defined in the Plan; (h) the form of purchase and sale agreement, (i) dates to conduct the auction and hearing to consider final approval of sale, and (j) for related relief.

**WHEREFORE**, the Debtor requests that the Court enter an order approving (a) the Auction Agreement, the Sale Procedures and the  Bidder Terms, attached hereto; (b) a sale pursuant to 11 U.S.C. § 365(f) free and clear of all liens, claims and encumbrances, with all liens, claims and encumbrances to attach to net sale proceeds; (c) the closing of the Hotel Operations upon receipt of a fully executed Asset Purchase Agreement and a non-refundable deposit; (d) a finding of a good faith sale pursuant to 11 U.S.C.§ 363(m); (e) that the sale is exempt from transfer taxes pursuant to 11 U.S.C § 1146; (f) payment of all closing costs, including without limitation, all brokers' fees, real property taxes, recording fees, and documentary stamps (if any); (g) payment to escrow in an amount equal to (i) the Cirrus Claim Reserve as determined by the Court, or (ii) in the event Cirrus' Claim has been allowed, the allowed Cirrus Claim (the "Cirrus Escrow Funds"),

as defined in the Plan; (h) the form of purchase and sale agreement, (i) dates to conduct the auction and hearing to consider final approval of sale, and (j) for related relief.

Dated: October 10, 2025

Respectfully submitted,

**Pardo Jackson Gainsburg & Shelowitz, PL**
*Counsel for Debtors*
*BH Downtown Miami, LLC and 340 Biscayne Owner LLC*
100 Southeast 2nd Street, Suite 2050
Miami, Florida 33131
Telephone: (305) 358-1001
Facsimile: (305) 358-2001
Email: LJackson@pardojackson.com
        LLovell@pardojackson.com
        sramos@pardojackson.com

By: */s/  Linda Worton Jackson*
        Linda Worton Jackson
        Florida Bar No. 843164
        Linsey M. Lovell
        Florida Bar No. 121581

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via the Court's CM/ECF system upon those registered to receive electronic service and U.S. Mail to all secured creditors, all unsecured creditors, the US Trustee, all interested parties, and the parties listed on the Court's mailing matrix on the 10th day of October, 2025.

By: */s/ Linda Worton Jackson*
        Linda Worton Jackson

**EXHIBIT A**
**AUCTION AGREEMENT**



# CONCIERGE AUCTIONS

## AUCTION AGREEMENT

| | | |
|---|---|---|
| **PROPERTY ADDRESS:** | 340 Biscayne Boulevard, Miami, Florida | (the "***Property***") |
| **DEBTOR'S LEGAL NAME**: | 340 Biscayne Owner LLC | ("***Debtor***") |

| **CURRENCY:** | **AUCTION PROCESS TIMELINE:** |
|---|---|
| USD | From Concierge Retention Order – December 22, 2025, subject to Bankruptcy Court approval |

| **MORTGAGES/LIENS:** | **IF YES, DESCRIPTION & CURRENT BALANCE/PAYOFF:** | **FURNISHED?** |
|---|---|---|
| X YES | Sale will be free and clear of all liens, claims and encumbrances, pursuant to Section 363(f) of the Bankruptcy Code and to Bankruptcy Court Order. | ☐ YES |
| ☐ NO | | X NO |

This Auction Agreement (including those terms set forth above and any attached exhibits, the "***Agreement***") is effective as of the later of the dates on which the following conditions occur (such latest date, the "***Effective Date***"): (a) the last party's signature between Concierge Auctions, LLC, a Delaware limited liability company, with offices at 228 Park Avenue S, Suite 70835, New York, NY 10003 ("***Concierge***"), and the Debtor; and (b) the entry of an order by the Bankruptcy Court (defined below) authorizing the Debtor to employ Concierge as auctioneer for Debtor pursuant to the terms of this Agreement (the "***Concierge Retention Order***"). During the term of this Agreement, the Debtor engages Concierge to market the Property for sale via auction (the "***Auction***") on an "as-is, where-is, with all faults" basis, on the terms and conditions set forth in this Agreement, and as set forth in Concierge's standard bidder terms and procedures attached hereto as Exhibit A, as modified by the bidding procedures approved by the Bankruptcy Court (the "***Approved Bid Procedures***"; and such sale, the "***Sale***"); *provided, however, that* if the Approved Bid Procedures conflict with any Bankruptcy Court Order, the terms of such Bankruptcy Court Order shall govern.

Concierge and the Debtor (collectively, the "***Parties***," and each a "***Party***") acknowledge that the Debtor has filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida Miami Division (the "***Bankruptcy Court***"). The Debtor's bankruptcy case is being jointly administered as Case No. 24-23028-LMI (the "***Bankruptcy Case***"). The Parties agree and acknowledge that this Agreement and Concierge's professional employment are subject to approval by the Bankruptcy Court. Concierge shall have the prior right to approve in advance any application for employment filed with the Bankruptcy Court, in its reasonable discretion. If the Bankruptcy Court does not approve Concierge's employment on the terms set forth herein for any reason, including Debtor's withdrawal of the application for employment before an order granting the same is entered by the Bankruptcy Court, this Agreement shall be immediately null and void.

**1.     AUCTION FORMAT.** Notwithstanding the foregoing, nothing contained herein shall affect the protections that may be available to the high bidder for the Property at Auction (a "***High Bidder***") through any order entered by the Bankruptcy Court with respect to a sale of the Property. The Auction shall be conducted through Concierge's digital bidding platform (the "***Digital Bidding Platform***") with no reserve price (unless otherwise agreed upon by the parties) but subject to Bankruptcy Court approval. The Property shall be offered for sale through Auction in the format described herein, as amended by the Approved Bid Procedures; *provided, however,* that nothing set forth herein shall prevent Debtor from accepting an offer and consummating a Private Sale for the Properties outside of

1

the Auction, subject to the Private Sale Deadline and as otherwise provided herein. The Debtor shall be obligated to sell the Property to the highest bidder who has executed and adhered to the Approved Bid Procedures, together with all other documents required by Concierge to be adhered to and executed and delivered prior to or in connection with placing a bid on any property (such bidder, a "***Qualified Bidder***") at the Auction (or back-up bidder as described below), regardless of price, subject to Bankruptcy Court approval.

2.      **AUCTION PROCESS AND TIMELINE**.

_Pre-Auction Private Sale:_ Notwithstanding anything to the contrary herein, the Debtor shall be permitted to agree to sell the Property outside of the Auction to any one of the three parties previously disclosed in writing to Concierge prior to the Effective Date (such party, a "***Carveout Private Sale Party***", and any such private sale, a "***Private Sale***"), provided that the motion requesting the Bankruptcy Court to approve any such private sale must be submitted to the Bankruptcy Court on or before 11:59 p.m. eastern on November 15, 2025, with Bankruptcy Court Approval provided by 11:59 p.m. eastern on November 25, 2025 (the "***Private Sale Deadline***"). After the Private Sale Deadline, the Auction shall be the exclusive venue and process for any offer and acceptance with respect to the purchase and sale of such Property with respect to any Carveout Private Sale Party.

The Auction process shall commence on the later of the following dates (such date, the "***Auction Commencement Date***"): (i) October 20, 2025; (ii) the date that the Bankruptcy Court shall have entered the Concierge Retention Order, or (iii) as soon as reasonably practicable thereafter. Beginning on the Auction Commencement Date, Concierge, along with a local broker Concierge shall engage at Concierge's sole cost and expense, for the purpose of marketing the sale of the Property (the "***Listing Broker***"), shall, together, exclusively market the Property through the Auction process, with such marketing materials to be approved by Debtor by the Auction Commencement date (such marketing materials, the "***Marketing Materials***", and such approval date, "***Marketing Material Approval Date***").

_Starting Bid Incentive:_ The amount of any Registered Bidder's starting bid submitted on or before 11:59pm ET on November 30, 2025 (the "***Cutoff Date***"), is a "***Starting Bid***". To encourage Starting Bids, each Registered Bidder that submits a Starting Bid shall be entitled to a credit against the Buyer's Premium (as defined below) in the amount equal to one-third (33.33%) of the portion of the Buyer's Premium applicable to such Starting Bid (the "***Starting Bid Incentive Credit***") which amount, in the event that such Registered Bidder is the Winning Bidder at the Auction or in the event there is a Preemptive Sale (defined below) to a successful offeror, shall be credited against the amount of Buyer's Premium due in connection with such purchase of the Property; _provided that_, for the avoidance of doubt, the Starting Bid Incentive Credit shall only apply with respect to the amount of the Starting Bid. To the extent that the Winning Bid exceeds the amount of the Starting Bid, the Winning Bidder or successful offeror will pay the full Buyer's Premium on the portion of the Winning Bid or successful offer that exceeds the Starting Bid or starting offer.

Bidding registration will open on the Auction Commencement Date, and the auction will remain open to bidders through the Digital Bidding Platform until the Auction Close (defined below). All bids will be unveiled via live auction at Sotheby's Abu Dhabi on December 1, 2025. The Property will again be featured at live auction in Dubai on December 5, 2025, The Auction will conclude when the gavel falls on December 17, 2025 (the "***Auction Close Date,***" and the point at which the gavel falls, the "***Auction Close***") at a live auction at Sotheby's Breuer Building in New York City, which will simulcast live in Miami, Florida.

Notwithstanding the foregoing, excepting any Carveout Private Sale Party (to which the Private Sale provisions of this Agreement shall govern) if Debtor receives an offer that Debtor determines will be the highest and best offer outside of Auction, they may seek a Sale Order to sell the Property to such offeror prior to the Auction Close Date. In such event, the Sale Order must provide that Concierge shall terminate the Auction (a "***Preemptive Sale***"). In the event of a Preemptive Sale, the purchaser of the Property shall owe the Buyer's Premium provided in Section 9(a)(i) hereunder, subject to the Starting Bid Incentive Credit, if a timely Starting Bid was submitted, or if the initial offer to purchase was provided to Debtor in writing, in either case as of the Cutoff Date.

2

*Sale Order:* The sale of the Property at Auction shall be subject to an order by the Bankruptcy Court approving the sale (the "**Sale Order**").

**3.      BIDDING PROCEDURES; CREDIT BIDS.**   The Auction will be conducted pursuant to the Approved Bid Procedures. Concierge shall, in consultation with the Debtor (as may be practical) in its reasonable discretion, be permitted to implement other reasonable terms and conditions to regulate the Auction Process so long as such other terms and conditions do not conflict with the Approved Bid Procedures. For the avoidance of doubt, any party whose secured creditor status and priority position has been determined by the Bankruptcy Court through a final, non-appealable order (each, a "**Secured Creditor**"), shall be permitted to credit bid at the Auction up to the full amount of such secured creditor's secured debt against the Property as determined by the Bankruptcy Court ("**Credit Bid**").

**4.      DUTIES OF THE DEBTOR.** Debtor agrees to cooperate with Concierge in good faith and in all ways consistent with this Agreement. If the Debtor does not have recent survey of the Property acceptable to the Title Company (defined below), a title commitment, and a comprehensive property inspection (collectively, the "**Diligence Materials**"), then immediately following the execution of this Agreement, the Debtor shall directly procure, or alternatively will promptly cooperate with Concierge, at Debtor's sole cost and expense,  for Concierge to procure the Diligence Materials in order for Concierge to provide them to prospective bidders so that they may conduct their due diligence prior to bidding.  The Debtor will allow Concierge, its agents, the Listing Broker, and Qualified Bidders to access to the Property at reasonable times and upon reasonable notice to Debtor and shall provide and maintain utilities, grounds and other administration vital to the functioning of the Property throughout the term of this Agreement. It is understood and agreed that the Property contains a fully operational hotel and, as such, any such access granted hereunder shall be undertaken in a manner specifically calculated to avoid any disruption to hotel guests on the Property.

Beginning on the Auction Commencement Date and continuing through the Auction Close, the Debtor will promptly notify Concierge or any inquiries regarding the Property and/or the Auction and shall instruct any such person(s) to contact Concierge. The Debtor will not enter into any agreement to sell or otherwise transfer all or any portion of the Property other than at Auction except in accordance with a Private Sale by the Private Sale Deadline or in the event of a Preemptive Sale. The Debtor agrees to promptly notify Concierge of any agreement to sell the Property pursuant to a Private Sale or Preemptive Sale.

The Debtor agrees to take such other actions and to execute such documents consistent with the terms of this Agreement as may be reasonably requested by Concierge and/or the Title Company to conduct the Auction and to complete the Sale of the Property, including, without limitation, preparing an "as-is" purchase contract for the purchase and sale of the Property (the "**Purchase and Sale Agreement**"), which shall require the following: (a) no conditions or contingencies (other than Debtor's obligation to deliver good and marketable title and the entry of the Sale Order by the Bankruptcy Court); (b) buyer to pay the Buyer's Premium in accordance with Section 9 hereunder; (c) (i) the Debtor to pay all costs associated with title searches, title insurance commitments, and escrow fees of the Escrow Agent (defined below), and (ii) the buyer to pay for Title Company's issuance of an owner policy of title insurance, together with all other costs associated with the transfer of the Property and the closing of the sale, unless contrary to applicable law; (d) the closing of the sale to occur forty-five (45) days following the Auction Close Date, or such later date as may be ordered by the Bankruptcy Court; and (e) that the Property be conveyed by special warranty deed (the "**Deed**").   The Debtor shall not (x) collude with any bidder or bid, (y) instruct or permit any other person to bid on the Debtor's behalf at the Auction; or (z) interfere in any manner with the conduct of the Auction. The Debtor agrees to use best efforts and to work expeditiously following the Auction to execute the Purchase and Sale Agreement, subject only to the Bankruptcy Court entry of the Sale Order with respect to the same.

Debtor shall provide Concierge with official documents of identity (including beneficial owner if applicable) upon request in order to facilitate Concierge's compliance with its anti-money laundering, sanctions and anti-terrorism financing obligations under applicable laws. The official documents of identity if provided in copy shall be certified by a professional reasonably acceptable to Concierge, if Concierge so requests.

3

5.      **CONDITIONS OF SALE.** Concierge agrees and understands that any Sale of the Property shall be subject to the terms and conditions of the Approved Bid Procedures and shall require the Bankruptcy Court's entry of the Sale Order prior to consummation of the Sale. Following the Auction Close Date, the Debtor shall move expeditiously to seek the Sale Order at the Bankruptcy Court's earliest opportunity.  If Debtor intends to consummate a Preemptive Sale, Debtor shall file the applicable motion to seek the Sale Order within two (2) business days following the execution of the applicable purchase and sale agreement.

Debtor is selling the Property in an "as-is" basis by special warranty deed without any representations or warranties whatsoever, including, without limitation, representations or warranties as to oil and mineral rights, city or government agency notifications regarding work to be done, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the Property, nor any assurances regarding the subdividability of the Property, *provided, however*, that the Debtor shall be required to deliver good and marketable title to the buyer(s) of the Property, insurable by Fidelity National Title Insurance Company (the "***Title Company***"). The Property is being sold subject to standard allocations and any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property. Title, however, is to be transferred free and clear of all liens, claims and encumbrances except those non-monetary liens and encumbrances set forth on a recent preliminary title report issued by the Title Company that do not affect the marketability or insurability of the Property.

6.      **REPRESENTATIONS OF THE DEBTOR**.  As of the Effective Date, the Debtor hereby represents and warrants to Concierge, with respect to itself and the Property, that the following statements are true and correct and shall remain true and correct throughout the term of this Agreement: (a) subject to Bankruptcy Court approval, Debtor has the requisite legal power and authority, and the signatory hereto has been validly authorized by the Debtor in accordance with the Debtor's governing documents, to execute this Agreement, to sell the Property, and to consummate the transactions contemplated by this Agreement; (b) this Agreement which is a valid and binding agreement of the Debtor, enforceable against the Debtor in accordance with its terms, and there are no disputes related to ownership of the Property or that would conflict with the terms of this Agreement; (c) this Agreement and the Debtor's obligations hereunder do not conflict with any other agreement to which Debtor is a party; (d) Debtor has not granted any other party a right or option to purchase the Property, in whole or in part; (e) the conveyance of the Property to a third party purchaser in accordance with the Approved Bid Procedures will not require the consent of any affiliate of the Debtor or any other third party, other than the Bankruptcy Court; (f) the Debtor shall at all times maintain its current liability and property insurance coverage at levels consistent with prudent industry standards for properties of similar type, size, and location while this Agreement is in effect; , the Auction, and activities related to the Sale of the Property; (f) the Debtor owns insurable fee simple title (or the equivalent) to the Property; (g) the Debtor has not caused any work or improvements to be performed upon the Property for which there remains outstanding any obligation that could serve as the basis for any lien or encumbrance following the Bankruptcy Court-approved Sale; and (h) no litigation or proceeding is pending against Debtor or the Property, except as provided in the Bankruptcy Case, and that certain premises liability action styled *Luna and Acosta v. 340 Biscayne Owner, et al*., Miami-Dade Circuit Court Case No. 25-11376 CA 01,  and no additional litigation or proceeding has been threatened.

7.      **ACKNOWLEDGEMENTS AND COVENANTS**.

        a.    The Debtor acknowledges and agrees that (a) there is no guarantee that (i) the Property will be sold through the Auction process to any bidder, (ii) any High Bidder can or will perform its obligations or that such High Bidder is qualified or financially able to purchase the Property, and Concierge has no obligation to investigate or to qualify any bidder's ability to consummate a purchase of the Property, or (iii) Debtor will receive any specific amount or sale proceeds from the Auction or otherwise; (b) DEBTOR HAS NOT RECEIVED FROM CONCIERGE OR ANY OF ITS EMPLOYEES OR AGENTS, AND IS NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE SALE PROCEEDS THAT DEBTOR MAY RECEIVE FROM THE AUCTION OR THE QUALIFICATIONS OF ANY BIDDER – ANY SUCH STATEMENTS ARE OPINIONS ONLY AND SHOULD NOT BE CONSTRUED AS PROMISES OR GUARANTEES ABOUT THE AUCTION; (c) Concierge shall have no responsibility whatsoever for any act associated with the closing of the Purchase and Sale Agreement, escrow, or consummation of the Sale of the Property other than as set forth in

4

this Agreement and/or the Approved Bid Procedures, and the Debtor and/or their third party agents are solely responsible for such acts; (d) the Debtor agrees to assist and use good faith and diligent efforts in gaining the cooperation of the Listing Broker for the Auction Process, including cooperation with respect to marketing the Property and reviewing and providing approval of the Marketing Materials by the Marking Materials Review Date; (e) Concierge is acting as an agent for the Debtor only in its capacity as auctioneer and is not acting as its real estate broker

b.    The Parties hereby acknowledge and agree that (i) all title reports, escrow, closing, and post-closing services shall be provided by the an escrow agent acceptable to the Auctioneer and the Debtor (the "***Escrow Agent***"), the cost of which shall be paid from the gross sale proceeds; and (ii) Concierge and Concierge's representatives shall have the absolute right and authority to (A) permit inspections of the Property and enter upon the Property for all purposes related to its services under this Agreement, without charging any fee, subject to the restrictions set forth in Paragraph 4, above (B) disseminate the Marking Materials regarding the Property or information regarding the Auction to any third-party, (C) subject to the Approved Bid Procedures, Auction the Property for Sale to bidders, and (D) disclose the identity of the Debtor, and (E) following the conclusion of the Auction, publicly announce and publicize all aspects of the Auction, including details concerning Concierge's marketing efforts and the amount of any successful bid.

c.    Potential Bidders are responsible for due diligence regarding the accuracy of the information about the Property provided to Concierge and the Debtor expressly waives any claims that the Debtor may have against Concierge related to information disseminated in connection with the Sale of the Property if such information was provided by the Debtor or Debtor's agents.

**8.     SERVICES OF CONCIERGE**. Beginning on the Effective Date, Concierge will use commercially reasonable efforts to coordinate with the Listing Broker to (a) market the Property for Sale by Auction consistent with the Approved Bid Procedures and (b) solicit and accept bids in accordance with the Approved Bid Procedures, including the registration of bidders on the Digital Bidding Platform.

**9.     COMPENSATION**.

a.    *Buyer's Premium.*

i.    <u>Collection of Buyer's Premium</u>.  Subject to any Starting Bid Incentive Credit, as part of any closing of the Sale of the Property by Auction or by Preemptive Sale (the "***Closing***" or such other capitalized term that is a derivation of the word Closing), the High Bidder (including any backup bidder) shall pay an amount equal to six percent (6%) of the successful High Bid amount or, in the case of a Preemptive Sale, of the agreed purchase price (such amount, the "***Purchase Price***"), which 6% shall be in addition to the full amount of the Purchase Price, as a buyer's premium owed to Concierge for Concierge's services provided and as further detailed hereunder (the "***Buyer's Premium***"). The High Bidder, or purchaser pursuant to the Preemptive Sale,  shall be obligated to pay the Buyer's Premium in cash at Closing, and such payment shall be a condition precedent to the Closing.

ii.   <u>Payment to Listing Broker, Buyer's Broker</u>. The following parties shall be paid the following amounts from the Buyer's Premium: (A) one percent (1%) of the Purchase Price to the High Bidder's broker, if any, as documented in the bidder registration materials submitted to Concierge prior to bidding ("***Buyer's Broker***" and such commission, the "***Buyer's Broker Commission***"); and (B) one percent (1%) of the Purchase Price to the Listing Broker.  For the avoidance of doubt, there shall be no commission paid to any Buyer's Broker representing a Secured Creditor.

iii.  <u>Credits to the Debtor's Estate from the Buyer's Premium</u>. The following amounts shall be credited from the Buyer's Premium to the Debtor's estate:

      1.   If no Buyer's Broker was engaged and paid in accordance with <u>Section 9.a.ii.</u>, an amount equal to the Buyer's Broker Commission; and

      2.   After Concierge receives partial payment of the Buyer's Premium equal to three percent (3%) of the Purchase Price (after all other payments and credits Concierge is required to provide from the Buyer's Premium in accordance with this Section 9.a. are made), the balance of the Buyer's Premium.

b.    *Sale to Secured Creditor*.  Notwithstanding <u>Section 9.a.i.</u>, if a Secured Creditor is the High Bidder at the Auction in any capacity, including whether as a backup bidder, or otherwise, pursuant to a Credit Bid, there shall be no Buyer's Premium owed and in lieu thereof, such Secured Creditor shall pay a flat fee of Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) in cash directly to Concierge, regardless of whether such Secured Creditor's Credit Bid results in any net sale proceeds being distributed to the Debtor or the bankruptcy estate.

c.    *Private Sale*.  If the Debtor sells the Property through a Private Sale by the Private Sale Deadline to a Carveout Private Sale Party, no Buyer's Premium shall be owed.  For the avoidance of doubt, in the event of a Private Sale, the provisions of <u>Section 9.a.</u> shall not apply.

d.    *Reimbursable Expenses*. Concierge shall have a marketing and expense budget of one hundred and fifty thousand and 00/100 Dollars ($150,000.00)(the "***Reimbursable Expense Budget***"). Concierge shall be entitled to reimbursement of its reasonable out-of-pocket, documented third party expenses incurred in marketing the Property and conducting the Auction of up to the Reimbursable Expense Budget (the "***Reimbursable Expenses***"). Concierge shall be entitled to payment of its Reimbursable Expenses from Debtor upon the closing of the sale of the Property (whether by auction, Private Sale, Preemptive Sale, or otherwise); <u>*provided however*</u>, that if a sale is not consummated, Concierge shall be entitled to payment of its Reimbursable Expenses as a Chapter 11 Administrative Expense Claim (as such term is defined in Debtor's Third Amended Joint Plan of Reorganization).

e.    <u>Settlement Statement</u>.  Any Buyer's Premium, flat fee owed by a Secured Creditor, Reimbursable Expenses, or other amount due to Concierge pursuant to this Agreement, and the respective disbursements therefrom, as applicable, shall be reflected on any settlement statement issued for the Property regardless of who is paying the Buyer's Premium, flat fee or Reimbursable Expenses. The Debtor hereby authorizes Concierge to provide the Escrow Agent with a breakdown of all fees and commissions to be paid. The Debtor also authorizes the Escrow Agent to provide Concierge with a copy of the settlement statement for the Property without any further instructions or authorizations.

f.    <u>Distribution</u>. The distributions required pursuant to this Section shall be paid at Closing from the gross sale proceeds prior to the distribution of any sale proceeds to the Debtor. With respect to any Credit Bid that is the High Bid, the Buyer's Premium shall be paid within two days following the Auction Close Date by wire transfer of immediately available funds pursuant to wire instructions provided by Concierge.

    i.   <u>Protection Period</u>.  In the event that the Property (i) is not sold at Auction, (ii) fails to close due to a default by Debtor as seller or the High Bidder as buyer, (iii) Debtor does not authorize Concierge to commence the Auction, or (iv) this Agreement is otherwise terminated and the Property is contracted to be sold or otherwise Transferred to any party by the Debtor within the 60-day period following expiration, earlier termination of this Agreement (the "***Tail Period***"), on or before the closing of such Tail Period Transfer, Debtor shall pay Concierge a fee equal to (1) one percent (1%) of the purchase price paid by such Tail Period buyer, if the Tail Period buyer was a registered to bidder at the Auction as provided by Concierge pursuant to written documentation of the same, or (2) an amount equal to half of a percent (.5%) of the purchase price paid by such Tail Period

6

buyer, if the Tail Period buyer is any other party.    Notwithstanding the foregoing, no Tail Period fee shall be owed to Concierge under any circumstances if the Tail Period buyer is a Carveout Private Sale Party.

ii.  "**Transferred**" as used in this paragraph shall mean the sale or transfer of any part of the Property, including, without limitation, any long-term lease or other form of conveyance by Debtor intended to accomplish the substantial equivalent of a sale of the Property. The Debtor shall be obligated to provide Concierge with a copy of the purchase and sale agreement promptly following the Debtor's execution thereof.

g.  <u>Bidder's Auction Deposits</u>. Debtor acknowledge and agrees that (i) Escrow Agent shall hold any amounts which bidders place on deposit in order to bid for the Property, (the "**Bidder Deposit(s)**", which, for the avoidance of doubt is distinct from any earnest money deposit provided in accordance with the terms of the Purchase and Sale Agreement (the "**Earnest Money Deposit**") and (ii) any Bidder Deposit held on behalf of a winning bidder shall be released to Concierge immediately following the conclusion of the Auction, and in no event later than the closing of the Property Sale following Auction, and shall be applied to the applicable Buyer's Premium, subject to any Buyer default provision contained herein.

**10.    BUYER DEFAULT**.  If the Auction is conducted and the winning bidder (the "**Buyer**") defaults, whether or not the parties enter into the Purchase and Sale Agreement, then, subject to the provisions below applicable to the Back-Up Buyer, if applicable, Concierge and Debtor shall equally (50% to Concierge and 50% to Debtor) any Earnest Money Deposit made by the Buyer in connection with the sale of the Property (or any other amounts collected from the Buyer) (collectively the **"Deposit Amount"**) (subject to applicable laws) and subject to Concierge first making adjustments and concessions if the Property is then sold to a Back-Up Buyer, after any attorney's fees and other expenses incurred by Concierge in connection with the original Buyer's default have been deducted by Concierge. Concierge shall have the right to declare the second highest bidder as the back-up bidder and the buyer of the Property (the **"Back-Up Buyer"**) and the Back-Up Buyer shall be required to keep its bid open and irrevocable and to allow the Escrow Agent to maintain any deposits made by the Back-Up Buyer in connection with the sale of the Property (or any other amounts collected from the Buyer) (collectively the **"Back-Up Deposit Amount"**) (subject to applicable laws) in accordance with the Approved Bid Procedures. If after the Auction, the Buyer defaults under the Approved Bid Procedures or under the Purchase and Sale Agreement, Concierge shall declare the Back-Up Buyer to be the buyer of the Property in accordance with the Approved Bid Procedures, provided that (i) the Court approves the Back-Up Buyer as the buyer of the Property and (ii) such back-up bid will result in Debtor receiving net proceeds at least equal to the net proceeds Debtor would have received in a sale of the Property to the winning Buyer (after considering Debtor's retention of the Deposit Amount).  In the event (i) Concierge declares the Back-Up Buyer to be the buyer of the Property, (ii) the Court approves the sale of the Property to the Back-Up Buyer, and (iii) the sale of the Property to the back Back-Up Buyer closes, then, notwithstanding anything to the contrary in this <u>Section</u>, Debtor acknowledges that Concierge will be permitted to apply any Deposit Amount or to rebate a portion of its Buyer's Premium in order to make-up any difference between the Buyer and Back-Up Buyer's high bid, and so long as Debtor is made whole (meaning that the sale of the Property to the Back-Up Bidder is financially equivalent (in terms of sale proceeds) to the sale to the defaulted Buyer), Debtor shall have no additional right to any portion of the defaulting Buyer's Deposit Amount. In that case, Debtor shall comply with the terms of this Agreement and the Purchase and Sale Agreement as to such back-up bidder. In the alternative, Concierge shall have the right at no additional cost, in its sole discretion, with the approval of the Bankruptcy Court, to conduct another Auction of the Property after Concierge determines that Buyer has defaulted pursuant to the Approved Bid Procedures and Conditions or the Purchase Contract. Debtor acknowledges and agrees that the subsequent Auction shall automatically open if a new or additional bid is received by Concierge at or above the high bid amount contained in the prior-authorized Auction Open Acknowledgement. Notwithstanding the foregoing, Concierge shall have no obligation to initiate legal action or otherwise to pursue any action to enforce Buyer's or Back-Up Buyer's obligations under any Purchase and Sale Agreement and shall not have any liability whatsoever for Buyer's failure to perform thereunder.

**11.    INDEMNIFICATION; LIMITATION OF LIABILITY**.  The Debtor shall indemnify, defend (by counsel reasonably satisfactory to Concierge) and hold harmless Concierge and its members, officers, employees, agents and

representatives (collectively, the "*Concierge Indemnitees*," and each an "*Concierge Indemnitee*"), against any claim, demand, cause of action, loss, liability, deficiency, fine, penalty, damage or expense (including, without limitation, reasonable attorney's fees and costs and including interest and penalties) (each, a "*Loss*") that any Concierge Indemnitee may suffer, incur, sustain or become subject to, as a result of or in connection with: (i) any material breach by the Debtor of any representation, warranty, obligation or covenant set forth in this Agreement; (ii) any material breach by the Debtor of any Purchase and Sale Agreement entered into with any High Bidder that results in a Sale approved by the Bankruptcy Court not closing, (iii) any breach by any Debtor of the listing agreement with the Listing Broker; or (iv) any claim from any third party related to the condition of the Property or damage or injury sustained by the third party on, or with respect to, the Property; *provided*, *however*, that to the extent that the Debtor does not consummate a Sale, or, alternatively, consummates a Sale to a Secured Creditor comprised entirely of Secured Creditor's Credit Bid, Secured Creditor shall assume liability to Concierge for the indemnification obligations of Debtor hereunder – the Debtor having no further liability with respect to the same. Notwithstanding the foregoing, Concierge shall not be responsible for damage or injury to the Property resulting from or arising in connection with the sale of the Property, and Debtor acknowledges and agrees to the same, except to the extent that such damage or injury is caused by Concierge's gross negligence or willful misconduct (or the gross negligence or willful misconduct by individuals or entities for whom Concierge is legally responsible). Except as set forth herein, Concierge shall not be liable for any loss suffered by the Debtor relating to the Property, including but not limited, to a High Bidder that refuses to enter into a Purchase and Sale Agreement or to perform its obligations.

Concierge shall indemnify, defend (by counsel reasonably satisfactory to Debtor) and hold harmless the Debtor and its members, officers, employees, agents and representatives (collectively, the "*Debtor Indemnitees*," and each an "*Debtor Indemnitee*"), against any Loss that any Debtor Indemnitee may suffer, incur, sustain or become subject to, as a result of or in connection with: (i) any material breach by Concierge of any representation, warranty, obligation or covenant set forth in this Agreement; and (ii) any damage or injury to the Property or to any third party that is proximately caused by Concierge's gross negligence or willful misconduct.  Concierge's maximum liability for the breach of any obligation in connection with this Agreement, the Auction and the sale of the Property, and damages of any type or nature (whether in contract or in tort, compensatory, consequential or punitive in nature) sustained or claimed by the Debtor or any other person in connection with this Agreement, even if such party shall have been informed of the possibility of such damages or could have foreseen such damages, shall be limited to the greater of (i) the compensation actually received by Concierge under this Agreement; and (ii) the limits of liability insurance available to Concierge. Debtor hereby agrees and acknowledges that in no event shall Concierge be liable to any Debtor for any indirect, incidental, consequential, special or punitive damages under this Agreement or at law arising out of any breach of Concierge's obligations in connection with this Agreement.

Any claim either party may have arising from, or in connection to this Agreement, the Property or the Auction shall be commenced against the other party within two (2) years from the date when the cause of action accrued. Any claim made after two (2) years from the date when the cause of action accrued shall be permanently barred.

**12.**     **CANCELLATION, TERMINATION & SURVIVAL**.   This Agreement shall terminate on the earlier of the following (i) the date of the Closing of the sale of the Property including the remittance of the amounts due under Section 9 of this Agreement); or (ii) the date of delivery of written notice of termination to the other Party. Either party may elect to terminate this Agreement at any time, provided written notice of termination is delivered to the other party, and this Agreement shall terminate on the date provided in the notice and Concierge shall promptly inform all registered and prospective bidders of such termination. The obligations and representations contained in Sections 4, 6, 7(a), 7(b), 9, 10, 11, 12, 13, 15, 17, 18, 19, 20, 21, 22, 24, 25, 26, 27, and 29 shall survive the termination of this Agreement for any reason.

**13.**     **NOTICES**. Any notice under this Agreement (including but not limited to notice of cancellation) shall be in writing and shall be delivered to each of the following:

Concierge Auctions, LLC
notices@conciergeauctions.com

8

(or by facsimile at 888-317-9503)

*-and-*

Anthony Capobianco and Nicole King
Capobianco Law Offices, PC
41990 Cook Street, Suite F2006
Palm Desert, California 92211
Email: Nking@capobiancolaw.com
Email: Acapobianco@capobiancolaw.com

*-and-*

340 Biscayne Owner, LLC
4045 Sheridan Avenue, Suite 301
Miami Beach, FL 33140
Attention: Cristiane Bomeny
Telephone: 305-680-6919
Email: Corporate.goldenbeachmanager@gmail.com
*-and-*

Pardo Jackson Gainsburg & Shelowitz, PL
100 Southeast 2nd Street, Suite 2050
Miami, Florida 33131
Attention: Linda W. Jackson
Telephone: 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
Facsimile: 305-358-2001
Email: LJackson@pardojackson.com

To the extent that a physical address and an email address are provided above, delivery shall be by overnight delivery, with confirmation of delivery, by United States mail or any nationally recognized commercial carrier. Any notice hereunder shall be deemed to have been given upon the later of (i) dispatch, if transmitted by electronic mail or facsimile; and (ii) upon delivery, if delivered by physical mail.

**14.** **ENTIRE AGREEMENT**. This Agreement and the related Exhibits/Addenda contain the complete and final obligation and understanding among the Parties relating to the subject matter hereof and merge all prior discussions, negotiations and agreements between them, whether written or oral, and the parties shall not be bound by any representations, warranties, covenants, or other understandings, except as expressly provided or referred to herein.

**15.** **ASSIGNMENT**. This Agreement may not be assigned by any Party without the prior written consent of all of the other Parties hereto, except that Concierge may assign this Agreement at any time to any of its affiliates. This Agreement shall be binding upon and inure to the benefit of the Parties and their successors, heirs, representatives, and permitted assigns.

**16.** **AMENDMENT**. This Agreement may be amended or modified only in writing signed by both Parties and approved by the Bankruptcy Court, if necessary.

**17.** **TECHNOLOGY**. The Debtor acknowledges that the Auction may be conducted, at least in part, online over the internet, through Concierge's Digital Bidding Platform and that it may utilize third party technology in order to conduct the Auction and/or to accept bids. CONCIERGE DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN ITS WEBSITE OR ANY AUCTION PLATFORM, APPLICATION OR BIDDING SOFTWARE, INCLUDING, WITHOUT LIMITATION, ANY THIRD-PARTY SOFTWARE, TECHNOLOGY, PRODUCTS OR OTHER MATERIALS

USED IN CONNECTION WITH THE AUCTION, WILL BE TIMELY, SECURE, UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS WILL BE CORRECTED.

18.     **VENUE; PREVAILING PARTY**. The Parties agree to submit all controversies, disputes, claims and matters of difference arising out of or relating to this Agreement, including but not limited to its enforcement, scope and/or interpretation, as a core proceeding exclusively in the Bankruptcy Court and agree to submit to personal jurisdiction in the Bankruptcy Court, sitting without a jury, which is expressly waived. In the event of any such legal action, the prevailing Party shall be entitled to reimbursement from the non-prevailing Party of all reasonable attorney's fees and costs/expenses of the prevailing Party and any award of the Bankruptcy Court will include costs and reasonable attorneys' fees to the prevailing party.

19.     **SEVERABILITY**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

20.     **GOVERNING LAW**.  This Agreement has been entered into and shall be construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles.

21.     **FORCE MAJEURE.** Neither Concierge nor the Debtor will be liable or responsible nor be deemed to have defaulted or breached this Agreement for any failure or delay in performance under this Agreement when and to the extent such failure or delay is materially interrupted or caused by or results from acts or circumstances beyond Concierge's or the Debtor's reasonable control, including, without limitation, acts of God, flood, hurricane, typhoon, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest, national emergency, revolution, insurrection, pandemic (other than COVID-19 or any related strain of similar virus), epidemic, lockouts, strikes or other labor disputes (whether or not relating to our workforce), or restraints or delays affecting carriers or inability or delay in obtaining supplies of adequate or suitable materials, materials or telecommunication breakdown or power outage, linking to the website and social media features (each such event, a "***Force Majeure Event***"). Upon the occurrence of a Force Majeure Event, the party hereto experiencing such Force Majeure Event shall be extended for a reasonable time necessary to accommodate for the duration of such Force Majeure Event.

22.     **LICENSING/BONDING**. Licenses and bonds are routinely updated. For Concierge's current licensing and bonding information, follow the following weblink: www.ConciergeAuctions.com/licenses, or contact compliance@conciergeauctions.com.

23.     **COUNTERPARTS AND EXECUTION**. This Agreement, including any riders, amendments, and/or additions, may be executed by electronic, facsimile, or PDF signature and/or in any number of counterparts and each of such electronic, facsimile, or PDF signature and/or counterpart shall for all purposes be deemed to be an original; and all such electronic, facsimile, or PDF signatures and/or counterparts shall together constitute but one and the same Agreement.

24.     **JOINT DRAFTING.**  The Parties have been given the opportunity to seek legal advice and to have this Agreement reviewed by an independent attorney prior to signing it. This Agreement shall be construed as if it has been jointly drafted by both Parties.  Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in interpreting this Agreement.

25.     **WAIVER.** No delay or omission to exercise any right, power, or remedy accruing to Concierge or the Debtor under this Agreement shall impair any right, power, or remedy of Concierge or the Debtor, nor shall it be construed as a waiver of, or consent to, any breach or default. No waiver of any breach, any failure of a condition, or any right or remedy under this Agreement (1) shall be effective unless it is in writing and signed by Concierge and the Debtor; (2) shall be deemed to be a waiver of, or consent, to any other breach, failure of a condition, or right or remedy, or (3) shall be deemed to constitute a continuing waiver unless the writing expressly so states.

**26.**     **TIME OF THE ESSENCE.** Time is of the essence in respect to all provisions of this Agreement that specify a time for performance.

**27.**     **FURTHER ASSURANCES**. Each of the Parties shall take such other actions and execute such documents consistent with this Agreement as may be reasonably requested to do any of the following: market the Property for Sale, conduct the Auction, complete the Sale of the Property and transfer ownership of the Property to the High Bidder at Closing. In furtherance of the foregoing, the Debtor hereby grants Concierge permission to engage with the Debtor's representatives, at the Debtor's sole cost and expense, to prepare the Purchase and Sale Agreement consistent with the terms of this Agreement and the Approved Bid Procedures.

**28.**     **INDEPENDENT LEGAL ADVICE; CONSTRUCTION**.  This Agreement is an important legal document. Each Party acknowledges that it has been advised to consult legal counsel before signing this Agreement and has signed this Agreement after having the opportunity to consult with legal counsel of its choosing. No Party has provided legal advice (including but not limited to tax advice) to another Party or acted as legal counsel to another Party. Each Party hereby confirms that it has carefully read this Agreement in its entirety and that it understands all of its terms, and knowingly and voluntarily agrees to all of the terms and conditions contained herein.

**29.**     **CONTRIBUTION TO KEY-FOR-KEY.** Concierge engages in charitable giving via its Key-For-Key® program through Giveback Homes https://givebackhomes.com/. For every property Concierge auctions, it makes a donation to help build a home for those in need. Debtor may elect to donate to Concierge's Key-For-Key® program by selecting an amount on the signature page below. By making an election, Debtor acknowledges and instructs Escrow Agent to direct that portion of the Debtor's proceeds at closing to Key-For-Key® and Giveback Homes.

*[**Signature Page Follows**]*

11

**IN WITNESS WHEREOF,** the Parties hereto have signed this Agreement, subject to approval by the Bankruptcy Court, as of the Effective Date**.**

**CONCIERGE :**

CONCIERGE AUCTIONS, LLC

By:    Chad Roffers (Oct 10, 2025 15:54:16 EDT)
Name: Chad Roffers
Title:   CEO

**DEBTOR:**

340 BISCAYNE OWNER LLC

By:  Winterland Property, LLC
Its:   Manager

By:    cristiane bomeny (Oct 10, 2025 17:02:40 EDT)
Name: Cristiane Bomeny
Title:    President

<u>EXHIBIT A</u>

BIDDER TERMS AND CONDITIONS



**CONCIERGE AUCTIONS, LLC**
**UNIVERSAL BIDDER TERMS AND CONDITIONS**

**Rev 3-1-25**

Concierge Auctions, LLC and/or its affiliates or subsidiaries (if any Property is located in Canada then, Concierge Auctions, ULC) (collectively, "*Concierge*," "*we*," "*us*") through the www.conciergeauctions.com website and Concierge's digital bidding platform, including any third-party software Concierge utilizes to operate its website, bidding and other services (collectively, the "*Website*") or any services provided in connection with the Website (the "*Services*") and the use of the Website including any content, functionality on or through the Website, whether as a guest or a registered user, are governed by these Terms and Conditions (together with all separate documents/pages linked to these terms and incorporated by reference, the "*Terms and Conditions*" or "*Agreement*"). By accessing or using the Website or the Services, you ("*Bidder*" or "*you*") agree that:

    (1.) You have read and familiarized yourself with these Terms and Conditions;
    (2.) You understand the Terms and Conditions; and
    (3.) You agree to and are bound by the Terms and Conditions in your use of the Website and the Services.

IF YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, DO NOT USE THE WEBSITE OR THE SERVICES AND DO NOT PARTICIPATE IN ANY CONCIERGE AUCTION. YOUR USE OF THE WEBSITE AND/OR YOUR PARTICIPATION IN ANY AUCTION, CONSTITUTES YOUR ACCEPTANCE OF AND AGREEMENT TO COMPLY WITH THESE TERMS AND CONDITIONS. These Terms and Conditions constitute a binding contract and the entire agreement between you and Concierge regarding their subject matter and supersede and replace any and all prior or contemporaneous agreements between the parties regarding such subject matter.

1.  **CHANGES TO WEBSITE AND TERMS AND CONDITIONS.** Concierge may revise and update these Terms and Conditions and the content on the Website from time to time in its sole discretion. All changes are effective immediately when posted and apply to all access to and use of the Website and the Services thereafter. We also reserve the right to withdraw or amend the Website, and any Service we provide, in our sole discretion without notice. Any of the material on the Website may be out of date at any given time, and we are under no obligation to update such material. Your continued use of the Website and the Services following the posting of revised Terms and Conditions means that you accept and agree to the changes. You are expected to review these Terms and Conditions periodically, so you are aware of any changes, as they are binding on you. If at any time you find these Terms and Conditions unacceptable, you must immediately leave the Website and cease all use of the Services and the Website. In the event that you have executed a prior version of the Terms and Conditions, the most recent version of the Terms and Conditions as evidenced by the Rev Date and posted to the Website prior to your continued use of the Website or Services shall be deemed accepted by Bidder and shall be controlling.

2.  **REGISTRATION AND ELIGIBILITY.** The Website and the Services are only available to persons with the legal capacity to enter into this Agreement, to be bound by these Terms and Conditions, and to purchase real estate. The Website is intended for use only by persons over 18 years of age. Concierge may, at its sole and absolute discretion, refuse to accept your registration, and may, at any time after accepting registration, refuse to permit a Bidder's continuing use of the Website or the Services for any reason or no reason at all. Tampering with the Website, misrepresenting the identity of a Bidder or conducting fraudulent activities on the Website are prohibited.

    You may also be required to provide Concierge official documents showing your identity (including your beneficial owners if applicable) to facilitate Concierge's compliance with its anti-money laundering, sanctions and anti-terrorism financing obligations. Those official documents of identity shall be certified by a professional acceptable to Concierge, if Concierge so requests. If Concierge has not completed its inquiries in respect of anti-money laundering, sanctions and anti-terrorism financing or other checks as it considers appropriate at its discretion, Concierge shall be entitled to deny your registration without any liability to you.

3.  **ACCESSING THE WEBSITE AND ACCOUNT SECURITY.** We will not be liable if for any reason all or any part of the Website is unavailable at any time or for any period. From time to time, we may restrict access to some parts of the Website, or the entire website, to users, including registered users. You are responsible for:

    3.1.  Making all arrangements necessary for you to access the Website.
    3.2.  Ensuring that all persons who access the Website through your internet connection or using your personal information are aware of these Terms and Conditions and comply with them.

    To access the Website or some of the resources it offers, you may be asked to register by providing certain personal details or other information. It is a condition of your use of the Website that all the information you provide on the Website is correct, current and complete. You agree that all information you provide to register with this Website, to use the Services or otherwise, including through the use of any interactive features on the Website, is governed by our Privacy Policy, and you consent to all actions we take with respect to

1

your information consistent with our Privacy Policy. Our Privacy Policy is expressly incorporated into these Terms and Conditions by this reference.

If you choose, or are provided with, a username, password or any other piece of information as part of our security procedures, you must treat such information as confidential, and you must not disclose it to any other person or entity. You also acknowledge that your account is personal to you and agree not to provide any other person with access to this Website or portions of it using your username, password or other security information. You may be held liable for any losses incurred by Concierge, its affiliates, officers, directors, employees, consultants, agents, and representatives due to someone else's use of your account or password. You agree to notify us immediately of any unauthorized access to or use of your username or password or any other breach of security. You also agree to ensure that you exit from your account at the end of each session. You should use particular caution when accessing your account from a public or shared computer so that others are not able to view or record your password or other personal information. You may not use the account, username, or password of someone else at any time.

We have the right to disable any username, password or other identifier, whether chosen by you or provided by us, at any time in our sole discretion for any or no reason, including if, in our opinion, you have violated any provision of these Terms and Conditions.

4.  **ELECTRONIC COMMUNICATIONS.** When you visit the Website or send e-mails to us, you are communicating with us electronically and you consent to receive electronic communications from us. We will communicate with you by e-mail or by posting notices on this Website. You agree that all agreements, notices, disclosures and other communications that we provide to you electronically satisfy any legal requirement that such communications be in writing.

5.  **PROPERTY AUCTION DETAILS.** From time to time, Concierge will present certain properties (each, a "*Property*") for sale by auction through the Website or Concierge's digital bidding platform (an "*Auction*") on behalf of the seller of each Property (each, a "*Seller*"). The Terms and Conditions and all other publicized elements of the Auction are subject to amendment by the posting of notices or by oral announcements made before or during the Auction. By participating in the Auction, you acknowledge and agree that you are bound by any additional terms that may be imposed by Concierge and the Property Seller and announced prior to or at the Auction either on the Property specific web page for the particular Auction, or otherwise. Please refer to each Property-specific web page on the Website for the following Auction-specific details, among others:

> Auction Method (absolute or reserve, subject to confirmation, etc.);
> Auction commencement date and duration;
> Amount of Buyer's Premium;
> Starting Bid Incentive, if any;
> Broker compensation arrangement(s);
> Due diligence materials and other Property information;
> The form of Purchase and Sale Contract that you are required to sign if you are the winning bidder.

The information on the Property web page may be updated regularly so please check back to that page on a regular basis to be sure you are reviewing the most recent information regarding the Property Auction. Concierge's verbal or written announcements made at the Auction will take precedence over all printed material or other previously made statements. In the event of any conflict between these Terms and Conditions and the Property web page for the Auction, the Property web page shall prevail and control.

6.  **BIDDING.** Bidders act as principal unless they have Concierge's prior written consent to bid as agent for another party. Bidders are personally liable for their bids and are jointly and severally liable with their principal if bidding as an agent for another party. All Auction bidding is open to the public without regard to race, color, sex, religion, familial status, disability or national origin. Concierge controls all aspects of the bidding process and reserves the right to reject any bid in its sole but reasonable discretion. The Bidder who submits the highest bid acknowledged by Concierge, (the "*High Bid*") or any Back-up Bidder as described below if the primary buyer defaults, will be the buyer of the subject Property, (the "*Buyer*"). By participating in the Auction, you represent, warrant and covenant that any bid you make constitutes an irrevocable offer to purchase the Property for the full amount of the bid and that once a High Bid is accepted, you are obligated to purchase such Property for the amount of the High Bid. In the event of any dispute among Bidders, or in the event of doubt on the part of Concierge as to the validity of any bid, Concierge will have the final discretion to determine the High Bid, the successful Buyer, to cancel the Auction, or to re-auction the subject Property, subject to any necessary court approval. If any dispute arises after the Auction, Concierge's Auction record shall determine conclusively all bidding issues, including but not limited to the High Bid and the Buyer. You may wish to consult with a licensed real estate broker, adviser, attorney, contractor or other expert prior to your participation in any auction.

Concierge may allow telephonic, electronic, absentee or proxy bids as a convenience to Bidders who are not present at the Auction and/or are not able to use the Website. Concierge is not responsible for any errors or omissions in connection with such bids, including, without limitation, poor connections, Internet outages, poor reception, dropped calls, recording failures, busy signals and missed calls. Furthermore, Concierge does not represent or warrant that the functions, features or content contained in any telephonic bidding, electronic bidding, internet bidding Website or any third-party software, products, or other materials used in connection with internet or electronic bidding, will be timely, secure, uninterrupted or error-free, and Concierge does not represent or warrant that defects will be corrected.

6.1.    **TELEPHONIC, ELECTRONIC, ABSENTEE OR PROXY BIDS.** With prior written approval, Concierge may allow telephonic, electronic,

absentee or proxy bids as a convenience to Bidders who are not present at the Auction and/or are not able to use the Website. Concierge is not responsible for any errors or omissions in connection with such bids, including, without limitation, poor connections, Internet outages, poor reception, dropped calls, recording failures, busy signals and missed calls. Where you are bidding on behalf of another person or acting as agent for another party, you represent in your own capacity that your principal(s) is not a Sanctioned Person(s) (as defined below) nor owned (or partly owned) or controlled by Sanctioned Person(s) and that the funds used for purchase of the Property and the purchase of the Property are not connected with, nor have any link to any criminal activity, including without limitation tax evasion, money laundering, terrorist activities or other criminal activity. By participating in telephonic bidding either as a bidder or through a proxy you expressly consent to those telephonic calls and messages being recorded and by executing these Terms and Conditions you are providing your express written consent and acknowledgement of telephonic phone recording.

7.  **BIDDER REQUIREMENTS**. To qualify to bid at Auction, you must (1) agree to be bound by these Terms and Conditions and any required deposit escrow agreement (the "*Deposit Escrow Agreement*") and (2) pay the sum shown on the applicable Property web page by wire transfer, (the "*Bidder's Deposit*"), into the deposit escrow agent's or notary's, (the "*Deposit Escrow Agent*") bank account per the instructions set forth on the applicable Property web page. The Deposit Escrow Agent shall be set forth on the applicable Property web page or registration documents. If Bidder is the Buyer, the Bidder's Deposit shall be handled in accordance with these Terms and Conditions, the Deposit Escrow Agreement, and the Purchase and Sale Contract. If Bidder is not the Buyer or the Back-up Bidder, then the Bidder's Deposit shall be refunded by 5:00 p.m. local time in the time zone where the Property is located ("*Local Time*") on the third business day following the conclusion of the Auction, except as otherwise provided herein or on the applicable Property web page. Wires must be received in US Dollars and will be returned in US Dollars. You acknowledge that foreign currency exchange rates may go up or down over time and that you shall bear the risk and uncertainty associated with currency rate fluctuations. Concierge shall have no liability whatsoever for any shortfall due to foreign currency exchange rate fluctuations.

8.  **BUYER'S PREMIUM**. For each Property purchased, Buyer shall pay to Concierge a "*Buyer's Premium*" generally calculated as a percentage of the High Bid. To determine the amount of the Buyer's Premium for a particular property, please visit the applicable property web page at www.conciergeauctions.com. Buyer acknowledges and agrees that the Buyer's Premium is deemed earned upon conclusion of the Auction and shall be held by the escrow agent or applicable closing agent listed in the Purchase and Sale Contract (the "*Escrow Agent*"), and disbursed to Concierge by Escrow Agent at, or prior to closing. If the sale of the Property is not consummated for any reason other than default by the Seller, the Buyer's Premium shall nonetheless be due and payable to Concierge and this Agreement constitutes a joint written irrevocable instruction to the Escrow Agent to disburse those funds to Concierge and to pay on your behalf any VAT or other tax due in connection with the Buyer's Premium.

    8.1.  **ACKNOWLEDGMENT OF NO FIDUCIARY DUTY.** The Buyer's Premium is not a real estate commission; it is the fee that Concierge charges to bidders for bringing the Property to auction. Any applicable real estate commissions will be determined by the parties in a separate agreement in escrow. You agree and acknowledge that Concierge is acting solely in its capacity as an auctioneer and does not have a duty to act, nor will it act, in a fiduciary capacity to any Bidder. Concierge is not acting as a real estate agent or broker in any capacity for any party, including any Bidder or for the Seller; and Concierge is not involved in any way or in connection with the closing or completion of any real estate transaction and all such real estate brokerage, closing, and escrow functions will be handled exclusively by third-party real estate brokers or other professionals.

    8.2.  **PAYMENT OF TAXES.** If any VAT (value added tax), General Excise Tax (GET), or similar tax is due in connection with the payment of the Buyer's Premium, it shall be Buyer's sole obligation to pay all taxes. If the Property is located in the state of Hawaii, Concierge shall add any Hawaii GET tax to the total of the Buyer's Premium at the then-applicable maximum pass-on rate(s) as promulgated by the state and local jurisdictions, found here: https://tax.hawaii.gov/geninfo/countysurcharge/.

    8.3.  **SPECIAL PROVISIONS RELATED TO PROPERTIES LOCATED OUTSIDE OF THE UNITED STATES.** If the Property which is being Auctioned is located outside of the United States, the ("*Global Properties*") The Buyer acknowledges and agrees that the Buyer's Premium plus any VAT or applicable Excise taxes on the Buyer's Premium shall be due and payable at the end of the Auction. The Buyer shall arrange a wire transfer to Concierge of the amount of the Buyer's Premium converted and denominated in US Dollars (with such conversation rate as of the date of the Auction closing), less the Bidder's Deposit, by no later than 5:00 p.m. Local Time two Business Days following the end of the Auction. If closing does not occur as a result of the Buyer's default, the Buyer's Premium shall nonetheless be due and payable by the Buyer to Concierge.

9.  **SAVE ON BUYER'S PREMIUM: STARTING BID INCENTIVE.** If you submit a starting bid for a Property, and you are the high bidder at the Auction, you may qualify for an incentive from Concierge in the form of a credit to reduce the Buyer's Premium by 50% on the Buyer's Premium related to the Starting Bid Amount. To determine whether there is a Starting Bid Incentive for a particular property, please visit the applicable property web page on the Website.

    a.  In order to qualify for the Starting Bid Incentive, your starting bid must be submitted in writing via email to Concierge at register@conciergeauctions.com, fax at 888-317-9503, or directly to a Concierge representative, and must be received prior to 5:00 p.m. Local Time on the day before the scheduled Auction date. Concierge may, in its discretion, accept pre- auction bids after the deadline described above. Concierge may also, in its discretion, offer additional incentives to one or more pre-auction bidders, including but not limited to guarantees and purchase terms that differ from the Purchase and Sale Contract.

    b.  A Starting Bid shall be considered the Bidder's initial bid at the Auction. Bidder understands that any Starting Bid is legally binding and irrevocable.

    Bidder further understands that a Bidder who submits a Starting Bid that qualifies for the Starting Bid Incentive may be required to complete and sign the purchase and sale contract form and any other documents related to the sale of the Property provided on the

3

applicable Property web page (the "***Purchase and Sale Contract***") in the Purchase Price amount of such Starting Bid prior to Auction Day. You hereby acknowledge that you have reviewed the applicable Purchase and Sale Contract, you agree to execute the Purchase and Sale Contract upon request, to make any additional earnest money deposits required under the Purchase and Sale Contract, and further understand that the Purchase and Sale Contract will be legally binding once executed by you.

   c.   The Starting Bid Incentive shall not apply to any Purchase and Sale Contract executed other than to the Purchase and Sale Contract between Buyer and Seller executed on or about the date of the Auction, including a back-up buyer contract.

If the same Starting Bid Amount has been submitted by more than one Bidder, the first qualifying form received by Concierge will be given precedence as determined by Concierge.

10. **BID ACCEPTANCE; COMPLETION; AUCTION METHODS.** Once bidding is complete and the Buyer is identified by Concierge, Buyer will be required immediately to execute the Purchase and Sale Contract, Escrow Instructions, and other documents required by the escrow or closing agent or otherwise in connection with the purchase of the Property, if Buyer has not previously done so as part of the bidder registration process. The Buyer of a Property shall initiate and deliver a wire transfer to Escrow Agent for its earnest money deposit of up to fifteen percent (15.00%) of the Purchase Price (the "***Deposit***"), along with the executed Purchase and Sale Contract, escrow instructions, and other documents reasonably required by the Escrow Agent on or before 5:00 p.m. Local Time on the second business-day following the date Concierge names the Bidder the winning Bidder and Buyer of the Property. For the exact amount of the Deposit, please consult the relevant Property Purchase and Sale Contract. Concierge may, in its discretion, extend this deadline. Bidder acknowledges that its failure to execute the Purchase and Sale Contract or any other closing documents, or to pay the full Deposit is a material breach of this Agreement that will result in the immediate forfeiture of the Bidder's Deposit, amongst other remedies in law and equity.

  10.1.  **NO RESERVE AUCTION.** The Property will be offered for sale at Auction without reserve and will be sold to the Bidder who made the High Bid.

  10.2.  **CREDITOR APPROVALS AND CONFIRMATIONS.** The sale of certain Properties may require post-auction court or lender approval or confirmation. To determine whether the sale of the Property on which you are bidding requires approval or confirmation, please visit the applicable Property web page and reference the Property's Purchase and Sale Contract. If you are the high bidder on any such Property, your bid remains irrevocable while the Seller seeks approval or confirmation of your High Bid. Concierge shall have no liability if you have placed a bid for the Property, or you are the winning Bidder, without having first satisfied yourself as to whether the sale of the Property requires post-auction court or lender approval or confirmation.

  10.3.  **BACK-UP BIDDER; IRREVOCABLE BID.** Concierge shall have the right to declare any bidder including you, who has submitted a binding and irrevocable bid to be (the "***Back-up Bidder***") at the conclusion of the Auction. If the initial Buyer defaults under these Terms and Conditions and/or the applicable Purchase and Sale Contract, Concierge shall have the right to declare the Back-up Bidder to be the Buyer of the Property on or before the Closing of the Sale of the Property (the "***Post-Auction Window***"). All bids shall remain effective and irrevocable during the Post Auction Window. Once the Back-up Bidder has been declared the Buyer, it shall immediately execute all documents pursuant to these Terms and Conditions and the applicable Purchase and Sale Contract.

11. **OPERATION OF PURCHASE AND SALE CONTRACT.** Specifically and exclusively related to the governance of the relationship between Buyer and Seller, the Purchase and Sale Contract supersedes any and all other documents or information (including without limitation these Terms and Conditions) and serves as the definitive document for the purchase and sale of the Property as between Buyer and Seller. Concierge is not a party to the Purchase and Sale Contract. Concierge does not guarantee that the sale of any Property will be consummated or that any party will perform its obligations under the Purchase and Sale Contract.

  11.1.  **PURCHASE PRICE; AMOUNT DUE FROM BUYER.** The term "***Purchase Price***" shall mean the High Bid, excluding other amounts payable by the Buyer in connection with closing, including but not limited to, customary closing costs, escrow/closing fees, VAT, property taxes, insurance, transfer fees/taxes in accordance with the Purchase and Sale Contract. Buyer's total obligation toward the purchase of the Property is equal to the Purchase Price, the Buyer's Premium and those customary closing costs, including without limitation payment of any VAT in connection with Buyer's purchase and the Buyer's Premium. All Bidders are strongly encouraged to review the Purchase and Sale Contract prior to bidding and to consult with an attorney or other professionals.

  11.2.  **CLOSING.** Closing will take place in accordance with the Purchase and Sale Contract, any related documents and all Bankruptcy Court approvals and requirements. Unless otherwise stated on the applicable Property web page, escrow and closing services shall be provided exclusively by the third parties listed on the applicable Property web page or in the Purchase and Sale Contract.

    11.2.1.  **CLOSING DATE.** The date of closing or completion of the purchase of the Property between Buyer and Seller shall be the "***Closing Date***" set forth in the applicable Purchase and Sale Contract. In certain cases, Seller may extend the Closing Date pursuant to the Purchase and Sale Contract or as otherwise negotiated between Seller and Buyer.

12. **DEFAULT.** Your failure to comply with these Terms and Conditions will result in a default being declared and the Bidder's Deposit, the Deposit and Buyer's Premium shall be forfeited and retained by Seller and/or Concierge in addition to other equitable and legal remedies under applicable law all of which are reserved. In addition, to mitigate potential damages, Concierge and the Seller reserve the right to declare any other bidder to be the Back-up Bidder and Buyer on or before the fifth business day following the completion of the Auction, as set forth above and declare such Back-Up Bidder to be the Buyer of the Property on or before the closing of the sale to Winning Bidder.

13. **AUCTION PROCEDURES.** Concierge reserves the right to waive or modify any previously announced requirements. Concierge reserves the right in its sole discretion to accept or reject any bids made before the Auction begins. Method of the Auction, order of Auction, and bidding increments shall be determined by Concierge in its sole but reasonable discretion, including, without limitation, Concierge's right to pause and resume bidding during the Auction. Concierge reserves the right to reject any bid that is only a minimal increase over the

4

preceding bid, or that Concierge reasonably believes was made illegally or in bad faith. All decisions of Concierge are final as to bidding issues, cancellation or any other matters that may arise before, during or after the Auction. If Concierge perceives attempted collusion, Concierge will cancel the Auction or refuse to accept a bid. Collusion between bidders is prohibited by various applicable laws. Concierge reserves the right to deny any person admittance to the Auction or expel anyone who Concierge believes may disrupt, cause any nuisance or interfere with the Auction in any way or for any other reason in Concierge's discretion. The Auction does not begin until Concierge accepts the first bid on the day of the Auction and acknowledges the Auction opening.

Concierge reserves the right to modify or amend any terms of the Auction, the Auction method or particular conditions of the Auction upon announcement prior to or during the course of the Auction. You should regularly consult the applicable Property web page prior to the date of the Auction for the most up to date information regarding any Property and the Auction, and the Auction method, applicable disclosures and disclaimers, and terms and conditions.

14. **PROPERTY INSPECTION AND DUE DILIGENCE**. Prior to the commencement of the Auction, it is the Bidder's sole responsibility to perform any inspections and due diligence Bidder deems pertinent to the purchase of the Property, to be satisfied as to the condition of the Property prior to bidding and to review all due diligence materials provided with respect to the Property. **Each Bidder assumes any and all** risks **associated with any such inspection and its due diligence activities. The Property, both real and personal (if any), is being sold in its existing "AS IS, WHERE IS, WITH ALL FAULTS" condition, with no expressed or implied guarantees, representations or warranties whatsoever, unless required by law.** Personal on-site inspection of the Property is strongly recommended, and you are advised to independently verify all information about the Property and the Auction that you deem important. Bidder acknowledges that it has reviewed the diligence materials and disclosures provided on the applicable Property web page; however, Concierge assumes no liability for errors or omissions in these disclosures or any other property listings or advertising, promotional or publicity statements and materials which is why it is important to verify independently all such information. Although information has been obtained from resources deemed reliable, Concierge does not make any guarantee as to the accuracy of any such information.

   14.1. **OPEN HOUSE**. Each Property is scheduled to have one or more open houses, and/or showings upon request, pursuant to the schedule posted on the applicable Property web page. Open house events are hosted solely by third-party real estate agents and brokers acting on behalf of Seller; Concierge has no responsibility for such open houses, including but not limited to cancellations or changes in time or duration.

   14.2. **FIRST AND THIRD PARTY INSPECTION.** In connection with any due diligence, inspection, visit and/or investigation of the Property by you and or any person, entity, or representative acting on your behalf (the "***Inspectors***"), you and the Inspectors shall;

   14.2.1. Ensure that the Property is kept free and clear of liens and encumbrances;

   14.2.2. Ensure that any such inspection does not interfere with the operation of the hotel or the guests at the hotel;

   14.2.3. Ensure that any and all damage arising from such inspection is repaired; and

   14.2.4. Indemnify, defend and hold Seller and Concierge harmless from all liability, claims, demands, damages and/or costs directly or indirectly arising therefrom. Inspectors shall carry, and require anyone acting on Inspector's behalf to carry, policies of liability insurance, property damage insurance, workers' compensation and other applicable insurance with adequate limits, defending and protecting Seller and Concierge from liability for any injuries to persons or property damage occurring during any inspection of the Property.

15. **DISCLAIMER.** WITHOUT LIMITING ANY OTHER PROVISION OF THESE TERMS AND CONDITIONS OR THE PURCHASE AND SALE CONTRACT, ALL BIDDERS ACKNOWLEDGE AND AGREE THAT THEY ARE BIDDING FOR AND, IF THEY ARE IDENTIFIED AS THE HIGH BIDDER BY CONCIERGE, WILL ACQUIRE THE PROPERTY, INCLUDING THE IMPROVEMENTS CONSTRUCTED ON THE PROPERTY AND ANY APPLIANCES AND BUILDING SYSTEMS, IN ITS "AS IS, WITH ALL FAULTS" CONDITION AS OF AUCTION DAY, WITH ALL DEFECTS, BOTH PATENT AND LATENT, AND WITH ALL FAULTS, WHETHER KNOWN OR UNKNOWN, PRESENTLY EXISTING OR THAT MAY HEREAFTER ARISE (TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW). ALL PROSPECTIVE BIDDERS ACKNOWLEDGE AND AGREE THAT CONCIERGE HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATION, WARRANTY, PROMISE, COVENANT, AGREEMENT OR GUARANTY OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY, INCLUDING WITHOUT LIMITATION: (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY; (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, IF ANY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL PURPOSES, ACTIVITIES AND USES WHICH BIDDER MAY CONDUCT THEREON; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (H) THE EXISTENCE OF ANY VIEW FROM THE PROPERTY OR THAT ANY EXISTING VIEW WILL NOT BE OBSTRUCTED IN THE FUTURE; (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, (J) THE STRUCTURAL INTEGRITY OF ANY IMPROVEMENTS ON THE PROPERTY, (K) THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY THAT MAY BE PROVIDED TO BIDDER, (L) THE CONFORMITY OF THE PROPERTY TO APPLICABLE ZONING OR BUILDING CODE REQUIREMENTS, (M) THE EXISTENCE OF SOIL INSTABILITY, PAST SOIL REPAIRS, SUSCEPTIBILITY TO LANDSLIDES, SUBSIDENCE, SUFFICIENCY OF UNDER-SHORING, SUFFICIENCY OF DRAINAGE, OR ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE LAND OR ANY BUILDINGS OR IMPROVEMENTS SITUATED THEREON, (N) WHETHER THE PROPERTY IS LOCATED IN A SPECIAL STUDIES ZONE UNDER THE PUBLIC RESOURCES CODE OR A SEISMIC HAZARDS ZONE OR A STATE FIRE RESPONSIBILITY AREA, OR A

SPECIAL FLOOD HAZARD ZONE OR (O) THE PRESENCE OF TERMITES OR OTHER PESTS AND ANY DAMAGE TO THE PROPERTY AND/OR ITS IMPROVEMENTS THAT MAY HAVE OCCURRED AS A RESULT. BIDDER ACKNOWLEDGES THAT THE PROPERTY AND ITS IMPROVEMENTS MAY NOT BE IN COMPLIANCE WITH APPLICABLE ZONING, BUILDING, HEALTH OR OTHER LAWS OR CODES, AND NEITHER SELLER, CONCIERGE NOR ANY OF ITS REPRESENTATIVES OR AGENTS HAVE OCCUPIED THE PROPERTY AND THE PROPERTY MAY NOT BE IN HABITABLE CONDITION. ALL PROSPECTIVE BIDDERS FURTHER ACKNOWLEDGE AND AGREE THAT, WITHOUT LIMITATION, SELLER AND CONCIERGE HAVE NOT MADE, DO NOT MAKE, AND SPECIFICALLY DISCLAIM ANY REPRESENTATIONS REGARDING COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT OR WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, AS DEFINED BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS OR THE DISPOSAL OR EXISTENCE, IN OR ON THE PROPERTIES, OF ANY HAZARDOUS SUBSTANCE, AS DEFINED BY APPLICABLE LAW, INCLUDING THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, AND REGULATIONS PROMULGATED THEREUNDER. EACH PROSPECTIVE BIDDER AND ANYONE CLAIMING BY, THROUGH OR UNDER THE SAME HEREBY FULLY AND IRREVOCABLY RELEASE SELLER AND CONCIERGE, AND THEIR RESPECTIVE AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS, FROM ANY AND ALL CLAIMS THAT HE/SHE/IT OR THEY MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLERS AND/OR CONCIERGE, AND/OR THEIR RESPECTIVE AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS, FOR ANY COST, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATING TO THE CONDUCT OF THE AUCTION AND/OR THE CONDITION OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO ANY CONSTRUCTION DEFECTS, ERRORS, OMISSIONS OR OTHER CONDITIONS, INCLUDING BUT NOT LIMITED TO ENVIRONMENTAL MATTERS, AFFECTING THE PROPERTY, OR ANY PORTION THEREOF. THIS RELEASE INCLUDES CLAIMS OF WHICH PROSPECTIVE BIDDER IS PRESENTLY UNAWARE OR DOES NOT PRESENTLY SUSPECT TO EXIST IN HIS/HER/ITS FAVOR WHICH, IF KNOWN BY PROSPECTIVE BIDDER, WOULD MATERIALLY AFFECT PROSPECTIVE BIDDER'S RELEASE OF SELLERS AND CONCIERGE. EACH PROSPECTIVE BIDDER SHOULD CONSIDER THESE MATTERS WHEN REGISTERING AS A BIDDER AND BEFORE PARTICIPATING IN ANY AUCTION AND PLACING BIDS.

YOU ACKNOWLEDGE AND AGREE THAT THIS RELEASE AND DISCLAIMER IS INTENDED TO BE VERY BROAD AND YOU HEREBY WAIVE AND RELINQUISH ANY RIGHTS OR BENEFITS YOU MAY HAVE UNDER ANY STATE OR FEDERAL LAW OR LEGAL PRINCIPLE DESIGNED TO INVALIDATE RELEASES OF UNKNOWN OR UNSUSPECTED CLAIMS TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW.

16. **BIDDER'S REPRESENTATIONS**. By registering as a Bidder and bidding at the Auction or by using the Website or the Services, you represent, warrant, and agree with respect to each Property you bid on that:

   16.1. You have reviewed all due diligence materials related to the Property, you have inspected the Property, you are familiar and satisfied with the condition of the Property and you have conducted such investigation of the Property as you deemed appropriate;

   16.2. Neither Concierge nor Seller, nor any affiliate, agent, officer, employee or representative of either of them, has made any verbal or written representation, warranty, promise or guarantee whatsoever to you, expressed or implied, and in particular, that no such representations, warranties, guarantees, or promises have been made with respect to the condition, operation, or any other matter or thing affecting or related to the Property or the offering or sale of the Property;

   16.3. You have not relied upon any representation, warranty, guarantee or promise or upon any statement made or any information provided concerning the Property, including but not limited to information made available on-line at the Website, in Auction advertising, in the Auction brochure, or provided or made available by Concierge or by Seller, or their respective affiliates, agents, officers, employees or representatives;

   16.4. You have made your bid after having relied solely on your own independent investigation, inspection, due diligence, analysis, appraisal and evaluation of the Property and the facts and circumstances related thereto;

   16.5. You have full power and authority to agree to these Terms and Conditions and to perform the obligations contemplated herein and in the Purchase and Sale Contract, which are valid and binding agreements, enforceable against you in accordance with their respective terms;

   16.6. If you are the representative of an entity, such entity is duly organized, validly existing and in good standing in the jurisdiction where such qualification is required and has full corporate power and authority to execute, deliver and perform your obligations under these Terms and Conditions and the Purchase and Sale Contract;

   16.7. You have the capacity to close the transaction pursuant to the Purchase and Sale Contract;

   16.8. You acknowledge and agree any information provided or to be provided by or on behalf of the Seller with respect to the Properties including, without limitation, all information contained on the Website, in Auction advertising, or any other printed or online materials being made available to you by Seller and Concierge, was obtained from Seller and/or Seller's agents, and Concierge has not made any independent investigation or verification of such information, and makes no representations as to the accuracy or completeness of such information;

   16.9. Without limiting the generality of the foregoing, you acknowledge and agree that Concierge shall not have any obligation to disclose to any Bidder, and shall have no liability for its failure to disclose to any Bidder, any information known to Concierge relating to any

Property except as may be required by law;

**16.10.**    You acknowledge and agree that Concierge is not liable or bound in any manner by any oral or written statements, representations or information pertaining to the Property, or the operation thereof, made or furnished by any real estate broker, agent, employee, or other person;

**16.11.**    You are not subject to trade sanctions, embargoes or any other restriction on trade in the jurisdiction in which you do business as well as under the laws of the European Union, the laws of England and Wales, or the laws and regulations of the United States, and you are not owned (nor partly owned) or controlled by such sanctioned person(s) (collectively, "***Sanctioned Person(s)***");

**16.12.**    The funds used to purchase the Property are not connected with nor have any link to nor are derived from any criminal activity, including without limitation tax evasion, money laundering, terrorist activities or other criminal activity, and you are neither under investigation, nor have been charged with or convicted of without limitation, tax evasion, money laundering, terrorist activities or other criminal activity.

**17.    SALES ASSOCIATE/BROKER COMPENSATION**. In some cases, a commission/referral fee will be paid by Seller and/or Concierge to a properly registered and licensed real estate Sales Associate or Broker in the jurisdiction in which the Property is located whose client is the successful Buyer at the Auction and whose client completes the purchase of the Property. For more details regarding applicable commissions and referral fees, please visit the applicable Property's web page. Title to the Property must be transferred, and the client must pay the Purchase Price for the Property for such commission or referral fee to be paid.

**17.1.**    In order to be entitled to any commission or referral fee, Bidder's Real Estate Broker must:

**17.1.1.**    Register his or her client whereby the client agrees to these Terms and Conditions;

**17.1.2.**    The client must submit a starting bid form via email to Concierge at register@conciergeauctions.com, or directly to a Concierge representative, identifying the client's Sales Associate or Broker, prior to 5:00 p.m. Local Time on the business day before the scheduled Auction close date.  Concierge may, in its discretion, extend this deadline;

**17.1.3.**    Agree to be bound by these Terms and Conditions;

**17.1.4.**    The Real Estate Broker's client must close the purchase of the Property in accordance with the Purchase and Sale Contract;

**17.1.5.**    Comply with all applicable laws and regulations relating to broker duties and commissions;

Please note the amount or rate of any real estate commission is not fixed by law. They are set by each broker individually and may be negotiable between the client and broker.

**18.    FURNISHINGS**. To determine whether a Property is being sold furnished or unfurnished, please refer to the Property web page. Please consult the Purchase and Sale Contract for a list of items included or excluded in the purchase of the Property and other terms and conditions related to the purchase of the Property.

**19.    TITLE**. Seller will convey good and marketable title to the Property free and clear of all liens and encumbrances, except as set forth in the Purchase and Sale Contract and subject to the preliminary title report, (the "***Preliminary Title Report***") related to the Property. You are advised to review the Purchase and Sale Contract and the Preliminary Title Report  and title commitment, if applicable, for the Property prior to participating in any Auction.

**20.    NO CONTINGENCIES; CASH TRANSACTION**. Buyer's purchase of the Property shall be in all instances, a cash transaction and is not subject to or dependent upon any contingencies or conditions of any kind, including, without limitation, a contingency for financing, due diligence or inspections.

**21.    DISPUTE AND WITHDRAWAL.** Concierge may, in the event of any dispute between Bidders, determine the successful Bidder, reopen the auction, or re-offer the subject Property for auction. Should there be any dispute after the Auction, Concierge's record of the High Bid, and the Purchase Price shall be conclusive to resolve the dispute. Concierge and Seller reserve the right to withdraw the Property before or at the Auction in its sole discretion and shall have no liability whatsoever for such withdrawal.

**22.    CANCELLATION OR POSTPONEMENT OF AUCTION**. Concierge reserves the right to cancel, postpone or withdraw the Property(s) up to the start of the Auction. Seller reserves the right to sell the Property(s) prior to the start of the Auction. Should Concierge choose to postpone the Auction, any Starting Bid shall remain active and irrevocable for a period not to exceed the scheduled dosing to the high bidder.

**23.    GOVERNING LAW**. The rights and obligations of the parties with respect to these Terms and Conditions and the conduct of the Auction shall be governed, enforced and interpreted under the laws of the state of New York, without regard for conflicts of law principles.

**24.    PRESS RELEASES AND PROMOTION.** Each attendee of the Auction shall be deemed to have consented to the issuance of press releases and other public communications by Seller, Concierge and/or their agents regarding the Auction and the Property offered or sold at the Auction.  By executing these Terms and Conditions each attendee of the Auction authorizes and consents to the recording of such attendee's participation and appearance on video tape, audio tape, film, photograph or any other medium and the exhibition or distribution of such recording without restrictions or limitation for any promotional purpose which Concierge and those acting pursuant to its authority, deem appropriate. Bidder hereby releases and discharges Concierge, its members, officers, employees, representatives and agents, from any and all claims and demands arising out of or in connection with the use of such photographs, film or tape, including but not limited to any claims for defamation or invasion of privacy or rights to publicity.

25. **NO WARRANTIES**. CONCIERGE HEREBY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES. CONCIERGE IS MAKING THE WEBSITE AVAILABLE "AS IS" WITHOUT WARRANTY OF ANY KIND. YOU ASSUME THE RISK OF ANY AND ALL DAMAGE OR LOSS FROM USE OF, OR INABILITY TO USE, THE WEBSITE OR THE SERVICES. TO THE MAXIMUM EXTENT PERMITTED BY LAW, CONCIERGE EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE WEBSITE, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. YOU ACKNOWLEDGE AUCTIONS WILL BE CONDUCTED ONLINE THROUGH CONCIERGE'S DIGITAL BIDDING APPLICATION AND THAT CONCIERGE MAY UTILIZE THIRD PARTY TECHNOLOGY IN ORDER TO CONDUCT THE AUCTION AND/OR TO ACCEPT BIDS, ALL IN CONCIERGE'S DISCRETION. CONCIERGE DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN ITS WEBSITE, THE SERVICES OR ANY AUCTION PLATFORM, APPLICATION OR BIDDING SOFTWARE, INCLUDING, WITHOUT LIMITATION, ANY THIRD-PARTY SOFTWARE, TECHNOLOGY, PRODUCTS OR OTHER MATERIALS WILL MEET YOUR REQUIREMENTS OR THAT THE OPERATION OF THE WEBSITE OR THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE OR THAT DEFECTS WILL BE CORRECTED IN A TIMELY MANNER.

26. **INDEMNIFICATION**. Bidder shall indemnify, defend (by counsel satisfactory to Seller and Concierge) and hold harmless Seller and Concierge and their officers, employees, agents and representatives (collectively, the "***Indemnitees***"), against any claim, demand, cause of action, loss, liability, deficiency, fine, penalty, damage or expense (including reasonable attorney's fees, costs, disbursements, interest and penalties) (a "***Loss***") which any Indemnitee may suffer, incur, sustain or become subject to, as a result of or in connection with: (i) any breach by Bidder of its obligations under these Terms and Conditions, and any representation, warranty, obligation or covenant set forth in these Terms and Conditions; (ii) any breach by Bidder of any Purchase and Sale Contract; and (iii) any damage to person or property caused by Bidder in connection with the Property or the Auction.

27. **LIMITATION OF LIABILITY**. You agree that neither Seller nor Concierge shall be liable for any damages of any type or nature (whether in contract, tort or otherwise) sustained or claimed by any Bidder or any other person or entity in connection with the Website, the Services, the Auction and/or the sale of any Property and/or the failure of any party to complete the sale of any Property including but not limited to legal fees, costs and disbursements. Without limiting the foregoing, in no event shall Concierge's liability to any Bidder for any act or omission occurring in connection with the Website, the Services or the Auction exceed the amount that you have actually paid to Concierge as compensation in connection with your purchase of any particular Property at Auction. In no event will Seller or Concierge be liable for any direct, indirect, incidental, special, punitive, exemplary or consequential damages, losses related to business interruption, loss of business information or lost profits arising out of or in connection with the Website, the sale of any Property, the Services or the Auction, or out of any breach of warranty, even if Concierge has been advised of the possibility of such damages. This limitation shall apply regardless of whether the damages arise out of breach of contract, tort, or any other legal theory or form of action.

28. **LIMITATION ON TIME TO FILE CLAIMS**. Any cause of action or claim you may have arising out of or relating to these Terms and Conditions, the Website, the Services or an Auction must be commenced within one (1) year after the cause of action accrues, otherwise, your cause of action or claim is permanently barred.

29. **NOT AN OFFER TO SELL, SOLICITATION ONLY**. Any information on any website, in any brochure, e-mail or postcard and any and all information available regarding the Properties shall not constitute an offer to sell or a solicitation of any offer to buy any Property. In addition, and without limiting the foregoing, any website, advertisement or brochure shall not constitute an offer to sell or a solicitation of any offer to buy nor shall there be any Auction of any Property in any state in which such offer, solicitation, or Auction would be unlawful. Offers made at the Auction are void where prohibited by law.

30. **LICENSING**. Concierge's current licensing and bonding information can be found at conciergeauctions.com. For information about Concierge's licensing and bonding, please contact Concierge or visit www.ConciergeAuctions.com/licenses.

31. **THIRD PARTIES**. Concierge and Seller may provide or designate certain third parties to provide ancillary services in connection with a Property Auction or links to the websites or products or services of others ("***Third-Party Services***"). Concierge and Seller have no control over, and no liability for any such Third-Party Services. Any such designations do not constitute an endorsement by Concierge or Seller of such third-party service providers, or the Third-Party Services. These third parties operate independently of Concierge and Seller and have established their own terms and conditions and policies. Bidder acknowledges and agrees that Concierge and Seller are not responsible for any damages or losses caused or alleged to have been caused by the use of any Third-Party Services.

32. **SEVERABILITY; WAIVER**. If any provision of these Terms and Conditions is held by a court of competent jurisdiction to be invalid or unenforceable, then such provision shall be enforced to the maximum extent permissible to affect the intent of these Terms and Conditions, and the remainder of these Terms and Conditions shall continue in full force and effect. No waiver of any breach of any provision of these Terms and Conditions shall constitute a waiver of any prior, concurrent, or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

33. **ENTIRE AGREEMENT**. These Terms and Conditions, together with any additional terms and conditions specific to a particular auction (which are incorporated herein by reference and can be found through one or more links on the detail page for the auction in question), constitute the entire agreement between Concierge and Bidder regarding its subject matter and supersede and replace any and all prior or contemporaneous agreements between the parties regarding such subject matter.

34. **LITIGATION; VENUE; PREVAILING PARTY**. The parties agree to submit all controversies, disputes, claims and matters of difference arising out of or relating to these Terms and Conditions, including but not limited to its enforcement, scope and/or interpretation, exclusively to the jurisdiction of the US Bankruptcy Court in and for the Southern District of Florida. By bidding at an auction, whether present in person, or by agent, by proxy, by written bid, telephone bid, internet bid, or other means, the Bidder shall be deemed to consent to the jurisdiction of the Bankruptcy Court located in the County of Miami-Dade, State of Florida in any such action or proceeding and waives any objection to venue. Process in any action or proceeding may be served personally or by registered mail anywhere in the world. In the event of any permitted court action, the prevailing party shall be entitled to reimbursement from the non-prevailing party of all reasonable attorney's fees and costs/expenses of the prevailing party and any award of the court will include costs and reasonable attorneys' fees to the prevailing party.

35. **INDEPENDENT LEGAL ADVICE; CONSTRUCTION.** This Agreement is an important legal document. The Bidder acknowledges that it has been advised by Concierge to consult legal counsel before signing this Agreement and has signed this Agreement after having the opportunity to consult with legal counsel of its choosing. Concierge has not provided legal advice (including but not limited to tax advice), and no one at Concierge has acted as the Bidder's legal counsel. The Bidder hereby confirms to have carefully read this Agreement in its entirety, understand all of its terms, and knowingly and voluntarily agrees to all of the terms and conditions contained herein. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply when interpreting this Agreement.

36. **FORCE MAJEURE**. We will not be liable or responsible to you, nor be deemed to have defaulted or breached these Terms and Conditions, for any failure or delay in our performance under these Terms and Conditions when and to the extent such failure or delay is caused by or results from acts or circumstances beyond our reasonable control, including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest, national emergency, revolution, insurrection, epidemic, pandemic, lockouts, strikes or other labor disputes (whether or not relating to our workforce), or restraints or delays affecting carriers or inability or delay in obtaining supplies of adequate or suitable materials, materials or telecommunication breakdown or power outage.

37. **TIME OF THE ESSENCE**. You acknowledge and agree that TIME IS OF THE ESSENCE with respect to your performance of all obligations and actions required or permitted to be taken under this Agreement. In the event you fail to complete such actions within the time prescribed under this Agreement, you shall be deemed in default, and in addition to other remedies available at law, equity, or under this Agreement.

38. **INTENTIONALLY OMITTED**.

39. **INTELLECTUAL PROPERTY RIGHTS**. The Website and its entire contents, features and functionality (including all information, software, text, displays, images, video and audio, and the design, selection and arrangement thereof), are owned by Concierge, its licensors or other providers of such material and are protected by United States and international copyright, trademark, patent, trade secret and other intellectual property or proprietary rights laws.

These Terms and Conditions permit you to use the Website for your personal, noncommercial use only. You must not reproduce, distribute, modify, create derivative works of, publicly display, publicly perform, republish, download, store or transmit any of the material on our Website, except as follows:

39.1. Your computer may temporarily store copies of such materials in RAM incidental to your accessing and viewing those materials. You may store files that are automatically cached by your Web browser for display enhancement purposes. You may print or download one copy of a reasonable number of pages of the Website for your own personal, noncommercial use and not for further reproduction, publication or distribution.

39.2. If we provide desktop, mobile or other applications for download, you may download a single copy to your computer or mobile device solely for your own personal, noncommercial use, provided you agree to be bound by our end user license agreement for such applications.

39.3. If we provide social media features with certain content, you may take such actions as are enabled by such features. You must not:

   39.3.1. Modify copies of any materials from this site.

   39.3.2. Use any illustrations, photographs, video or audio sequences or any graphics separately from the accompanying text.

   39.3.3. Delete or alter any copyright, trademark or other proprietary rights notices from copies of materials from this site.

   39.3.4. Access or use for any commercial purposes any part of the Website or any services or materials available through the Website.

If you print, copy, modify, download or otherwise use or provide any other person with access to any part of the Website in breach of the Terms and Conditions, your right to use the Website will cease immediately and you must, at our option, return or destroy any copies of the materials you have made. No right, title or interest in or to the Website or any content on the Website is transferred to you, and all rights not expressly granted are reserved by the Company. Any use of the Website not expressly permitted by these Terms and Conditions is a breach of these Terms and Conditions and may violate copyright, trademark and other laws.

39.4. **TRADEMARKS**. Concierge's name and its logos and all related names, logos, product and service names, designs and slogans are

trademarks of Concierge or its affiliates or licensors. You must not use such marks without the prior written permission of Concierge. All other names, logos, product and service names, designs and slogans on this Website are the trademarks of their respective owners. Copyright Policy.

40. **WEBSITE PROHIBITED USES**. You may use the Website only for lawful purposes and in accordance with these Terms and Conditions. You agree not to use the Website:

40.1. In any way that violates any applicable federal, state, local or international law or regulation (including any laws regarding the export of data or software to and from the US or other countries).

40.2. For the purpose of exploiting, harming or attempting to exploit or harm minors in any way by exposing them to inappropriate content, asking for personally identifiable information or otherwise.

40.3. To transmit, or procure the sending of, any advertising or promotional material, including any "junk mail," "chain letter" or "spam" or any other similar solicitation.

40.4. To impersonate or attempt to impersonate Concierge, its employees, another user or any other person or entity (including by using email addresses or screen names associated with any of the foregoing).

40.5. To engage in any other conduct that restricts or inhibits anyone's use or enjoyment of the Website, or which, as determined by us, may harm Concierge or users of the Website or expose them to liability.

Additionally, you agree not to:

40.6. Use the Website in any manner that could disable, overburden, damage or impair the site or interfere with any other party's use of the Website, including their ability to engage in real time activities through the Website.

40.7. Use any robot, spider or other automatic device, process or means to access the Website for any purpose, including monitoring or copying any of the material on the Website.

40.8. Use any manual process to monitor or copy any of the material on the Website or for any other unauthorized purpose without our prior written consent.

40.9. Use any device, software or routine that interferes with the proper working of the Website.

40.10.   Introduce any viruses, trojan horses, worms, logic bombs or other material that is malicious or technologically harmful. • Attempt to gain unauthorized access to, interfere with, damage or disrupt any parts of the Website, the server on which the Website is stored, or any server, computer or database connected to the Website.

40.11.   Attack the Website via a denial-of-service attack or a distributed denial-of-service attack.

40.12.   Otherwise attempt to interfere with the proper working of the Website.

Concierge reserves the right to terminate your use of the Services and/or the Website. To ensure that Concierge provides a high quality experience for you and for other users of the Website and the Services, you agree that Concierge or its representatives may access your account and records on a case-by-case basis to investigate complaints or allegations of abuse, infringement of third party rights, or other unauthorized uses of the Website or the Services. Concierge does not intend to disclose the existence or occurrence of such an investigation unless required by law, but Concierge reserves the right to terminate your account or your access to the Website immediately, with or without notice to you, and without liability to you, if Concierge believes that you have violated any of the Terms and Conditions, furnished Concierge with false or misleading information, or interfered with use of the Website or the Services by others.

41. **RELIANCE ON INFORMATION POSTED**. The information presented on or through the Website is made available solely for general information purposes. We do not warrant the accuracy, completeness or usefulness of this information. Any reliance you place on such information is strictly at your own risk. Concierge disclaims all liability and responsibility arising from any reliance placed on or use of such materials by you or any other visitor to the Website, or by anyone who may be informed of any of its contents.

This Website may include content provided by third parties, including materials provided by other users, bloggers and third-party licensors, syndicators, aggregators and/or reporting services. All statements and/or opinions expressed in these materials, and all articles and responses to questions and other content, other than the content provided by Concierge, are solely the opinions and the responsibility of the person or entity providing those materials. These materials do not necessarily reflect the opinion of Concierge. We are not responsible, or liable to you or any third party, for the content or accuracy of any materials provided by any third parties.

42. **INFORMATION ABOUT YOU AND YOUR VISITS TO THE WEBSITE**. All information we collect on this Website is subject to our Privacy Policy. By using the Website, you consent to all actions taken by us with respect to your information in compliance with the Privacy Policy.

43. **LINKING TO THE WEBSITE AND SOCIAL MEDIA FEATURES**. You may link to our homepage, provided you do so in a way that is fair and legal and does not damage our reputation or take advantage of it, but you must not establish a link in such a way as to suggest any form of association, approval or endorsement on our part.

This Website may provide certain social media features that enable you to:

43.1. Link from your own or certain third-party websites to certain content on this Website.

43.2. Send emails or other communications with certain content, or links to certain content, on this Website.

43.3. Cause limited portions of content on this Website to be displayed or appear to be displayed on your own or certain third-party websites. You may use these features solely as they are provided by us solely with respect to the content they are displayed with and otherwise in accordance with any additional terms and conditions we provide with respect to such features. Subject to the foregoing, you must not:

**43.4.** Establish a link from any website that is not owned by you.

**43.5.** Cause the Website or portions of it to be displayed, or appear to be displayed by, for example, framing, deep linking or in- line linking, on any other site.

**43.6.** Link to any part of the Website other than the homepage.

**43.7.** Otherwise take any action with respect to the materials on this Website that is inconsistent with any other provision of these Terms and Conditions.

The website from which you are linking, or on which you make certain content accessible, must comply in all respects with these Terms and Conditions. You agree to cooperate with us in causing any unauthorized framing or linking immediately to cease. We reserve the right to withdraw linking permission without notice. We may disable all or any social media features and any links at any time without notice in our discretion.

44.   **LINKS FROM THE WEBSITE.** If the Website contains links to other sites and resources provided by third-parties, these links are provided for your convenience only. This includes links contained in advertisements, including banner advertisements and sponsored links. We have no control over the contents of those sites or resources and accept no responsibility for them or for any loss or damage that may arise from your use of them. If you decide to access any of the third-party websites linked to this Website, you do so entirely at your own risk and subject to the terms and conditions of use for such websites.

45.   **YOUR COMMENTS AND CONCERNS**. All feedback, comments, requests for technical support and other communications relating to the Website should be directed to clientservices@conciergeauctions.com.

**EXHIBIT B**
**SALES PROCEDURES**

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

|  |  |
|---|---|
| In re:<br><br>BH DOWNTOWN MIAMI, LLC and<br>340 BISCAYNE OWNER LLC<br><br>Debtors. | Case No. 24-23028-LMI<br><br>Chapter 11<br><br>(Jointly Administered) |

## SALE PROCEDURES

## TERMS, CONDITIONS, AND PROCEDURES FOR THE SALE OF THE PROPERTY BEING OFFERED BY 340 BISCAYNE OWNER LLC

1.  **Definitions**

(a)     "***Auction***" shall mean the auction of the Property conducted in accordance with these Sale Procedures.

(b)     "***Auctioneer***" shall Concierge Auctions, LLC.

(c)     "***Backup Bid***" shall have the meaning ascribed to such term in Section 11(b) of these Sale Procedures.

(d)     "***Backup Bidder***" shall mean a Registered Bidder that is the holder of a Backup Bid.

(e)     "***Bankruptcy Code***" means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the Petition Date.

(f)     "***Bankruptcy Court***" shall mean the United States Bankruptcy Court for the Southern District of Florida.

(g)     "***Bankruptcy Case***" *In re: 340 Biscayne Owner LLC* (Case No. 24-23025-CLC).

(h)     "***Bankruptcy Rules***" shall mean, collectively, the Federal Rules of Bankruptcy Procedure, as the same may be amended from time to time, effective on the Petition Date, each such individual rule being a "***Bankruptcy Rule***."

(i)     "***Bid Procedures***" means the Concierge Auctions, LLC Universal Bidder Terms and Conditions, a copy of which is attached hereto as Appendix B, to the extent the same are not inconsistent with the Plan and/or these Sale Procedures; *provided that*, for the avoidance of doubt,

to the extent such Universal Bidder Terms and Conditions are inconsistent with the Plan or these Sale Procedures, the terms of the Plan and these Sale Procedures shall govern.

(j)      "***Buyer***" shall mean a Winning Bidder that consummates a Sale of the Property.

(k)      "***Buyer's Broker***" has the meaning ascribed to such term in Section 21(a)(i) of these Sale Procedures.

(l)      "***Buyer's Broker Commission***" has the meaning ascribed to such term in Section 21(a)(i) of these Sale Procedures.

(m)      "***Carveout Private Sale Deadline***" shall mean, with respect to any Proposed Sale to a Carveout Private Sale Party, that both of these events shall occur by the following dates: (1) by 11:59 p.m. eastern on November 15, 2025, Debtor shall have submitted a motion to the Bankruptcy Court requesting Sale confirmation; and (2) by 11:59 p.m. eastern on November 25, 2025, the Bankruptcy Court shall have issued a Sale Confirmation Order.

(n)      "***Carveout Private Sale Party***" shall mean and refer to any one of the three parties disclosed in writing to Concierge before the Carveout Private Sale Deadline.

(o)      "***Closing***" shall mean the action of consummating a Sale of the Property for which a Winning Bid has been declared in accordance with the terms of these Sale Procedures, including, without limitation, the final and unconditional transfer of the Purchase Price and the Buyer's Premium to the Escrow Agent by the Winning Bidder and the final and unconditional transfer of the ownership of the Property to the Buyer, and the full and authorized execution of any documents with respect thereto.

(p)      "***Closing Deadline***" shall have the meaning ascribed to such term in Section 17(c) of these Sale Procedures.

(q)      "***Counsel for Debtor***" shall mean Linda Worton Jackson, Esq. of Pardo Jackson Gainsburg & Shelowitz, PL. Counsel for Debtor who may be contracted at ljackson@pardojackson.com.

(r)      "***Credit Bid***" shall have the meaning ascribed to such term in Section 13 of these Sale Procedures.

(s)      "***Credit Bidding***" shall mean the process of submitting one or more Credit Bids.

(t)      "***Debtor***" means 340 Biscayne Owner LLC, a debtor-in-possession under the Bankruptcy Code in its Bankruptcy Case, which is being jointly administered as *In re BH Downtown Miami, LLC and 340 Biscayne Owner LLC*, Case No. 24-23028-LMI, pending before the Honorable Judge Laurel M. Isicoff in the United States Bankruptcy Court for the Southern District of Florida.

(u)      "***Defaulting Bidder***" means a Registered Bidder, including any Winning Bidder and Backup Bidder, that (i) breaches its obligations under a Purchase and Sale Agreement; or (ii) attempts to revoke its bid (including any Winning Bid and/or Backup Bid) after or prior to the

execution of a Purchase and Sale Agreement; or (iii) refuses to execute a Purchase and Sale Agreement, and/or any other agreement reasonably required to consummate the Sale of the Property.

(v)  "*Deposit*" and "*Deposits*" shall have the meanings ascribed to such terms in Section 9(b) of these Sale Procedures.

(w)  "*Digital Bidding Platform*" means Auctioneer's digital bidding platform, which is at available at www.conciergeauctions.com.

(x)  "*Due Diligence*" shall have the meaning ascribed to such term in Section 10 of these Sale Procedures.

(y)  "*Due Diligence Materials*" shall have the meaning ascribed to such term in Section 10 of these Sale Procedures.

(z)  "*Escrow Agent*" shall mean an escrow agent acceptable to the Auctioneer and the Debtor .

(aa)  "*Estate*" means the bankruptcy estate of Debtor, as created on the Petition Date pursuant to section 541 of the Bankruptcy Code.

(bb)  "*Estate Professional*" a professional retained by the Estate.

(cc)  "*Gross Sale Proceeds*" means the proceeds of a Sale, prior to the deduction of the Sale Transaction Costs and any other costs and expenses incurred in connection with a Sale traditionally chargeable to the seller; provided that, nothing contained herein shall require Debtor or any other person to pay any Transfer Taxes where such payment is otherwise excused by the Bankruptcy Code.

(dd)  "*Initial Deposit*" shall have the meaning ascribed to such term in Section 9(a) of these Sale Procedures.

(ee)  "*Listing Broker*" means a local broker Concierge may engage for the purpose of marketing the sale of the Property.

(ff)  "*Net Sale Proceeds*" means the Gross Sale Proceeds, less the Sale Transaction Costs and any other costs and expenses incurred in connection with a Sale traditionally and actually chargeable to the seller, including without limitation, applicable listing broker compensation, any closing costs (including any fees of an Escrow Agent), and documentary costs, if any; *provided that*, for the avoidance of doubt, Net Sale Proceeds shall not include the non-cash amount of any Credit Bid made pursuant to the terms of these Sale Procedures; and *further provided that*, nothing contained herein shall require Debtor or any other person to pay any Transfer Taxes where such payment is otherwise excused by the Bankruptcy Code.

(gg)  "*Notice of Proposed Sale*" shall mean that notice of a proposed Sale in that form and substance as has been approved by the Bankruptcy Court.

(hh)    "***Plan***" means Debtor's and BH Downtown Miami, LLC's *Second Amended Joint Plan of Reorganization of 340 Biscayne Owner LLC and BH Downtown Miami, LLC* (ECF 188).

(ii)    "***Potential Purchaser***" means a person that has become a Registered Bidder or that has otherwise satisfied Debtor and Auctioneer that such person has the financial wherewithal to consummate a Sale of the Property.

(jj)    "***Proposed Sale***" shall mean a proposed transfer of ownership, possession, control, and use of the Property that has not yet been fully consummated.

(kk)    "***Purchase and Sale Agreement***" shall have the meaning ascribed to such term in Section 8 of these Sale Procedures.

(ll)    "***Purchase Price***" shall have the meaning ascribed to such term in Section 7 of these Sale Procedures.

(mm)   "***Registered Bidders***" shall mean those persons that have registered to bid at the Auction in accordance with the terms, conditions, and processes set forth in the Bid Procedures and these Sale Procedures, each being a "***Registered Bidder***."

(nn)    "***Retention Agreement***" shall mean an agreement between a Professional and an Estate, which has been approved by the Bankruptcy Court, pursuant to which the Professional has agreed to provide certain services to such Estate in return for the compensation set forth therein.

(oo)    "***Retention Order***" an order of the Bankruptcy Court approving the terms of a Retention Agreement and authorizing Debtor to enter into the same.

(pp)    "***Sale***" shall mean a fully consummated transfer of the ownership, possession, control, and use of the Property, which, to the extent required by these Sale Procedures, has been approved by the Bankruptcy Court through the entry of a Sale Confirmation Order, in return for good and valuable consideration from a Buyer in accordance with a duly executed Purchase and Sale Agreement.

(qq)    "***Sale Confirmation Hearing***" shall have the meaning ascribed to such term in Section 17(c) of these Sale Procedures.

(rr)    "***Sale Confirmation Order***" shall mean an order of the Bankruptcy Court authorizing and directing Debtor to consummate a Sale of the Property to a Buyer pursuant to 11 U.S.C. § 363.

(ss)    "***Sale Transaction Costs***" shall mean (i) any closing costs associated with the Sale of the Property, including costs, fees, expenses, recording fees, title expenses, and commissions payable by Debtor; (ii) any taxes due and payable with respect to the Property; and (iii) subject to and without waiving section 1146(a) of the Bankruptcy Code, any documentary and Transfer Taxes.

(tt)    "***Sale Procedures***" shall mean these *Terms, Conditions, and Procedures for the Sale of Certain Property Being Offered by 340 Biscayne Owner LLC*.

(uu)    "**_Secondary Deposit_**" shall have the meaning ascribed to such term in Section 9(b) of these Sale Procedures.

(vv)    "**_Secured Creditor_**" shall mean Cirrus 340BB Lender LLC and Cirrus Real Estate Funding LLC, collectively.

(ww)    "**_Transfer Taxes_**" means, without limitation, (a) any tax imposed by Florida Statutes § 201.02 et seq., and (b) any and all other stamp taxes or similar taxes, which, but for the exemption provided under § 1146(a) of the Bankruptcy Code, would be applicable to any transfer made in accordance with, pursuant to, or in furtherance of this Plan.

(xx)    "**_Transferred Encumbrances_**" has the meaning ascribed to such term in Section 5 of these Sale Procedures.

(yy)    "**_Winning Bid_**" shall have the meaning ascribed to such term in Section 11(a) of these Sale Procedures.

(zz)    "**_Winning Bidder_**" shall have the meaning ascribed to such term in Section 11(a) of these Sale Procedures.

**2.    _[Reserved]_**

**3.    _[Reserved]_**

**4.    <u>Auction Format</u>.**

(a)    <u>Auction</u>.  Debtor will offer the Property for Sale via a no reserve auction conducted by Auctioneer pursuant these Bid Procedures (the "**_Auction_**"). Bidding for the Auction will open on or before the live auction commencement at Sotheby's Abu Dhabi on **December 1, 2025**, at which point, all then-current bids will be unveiled, and following the Abu Dhabi live auction, the auction for the Property will remain open to bidders through the Digital Bidding Platform until the Auction Close Date (defined below). The Property will again be featured at live auction in Dubai on **December 5, 2025**, and the Auction will conclude when the gavel falls on **December 17, 2025** (the "**_Auction Close Date_**"), live at Sotheby's Breuer Building in New York City (simulcasting live at in Miami, Florida). For the avoidance of doubt, nothing contained herein shall prevent Auctioneer, in consultation with Debtor, from revising the Auction dates so long as in no event shall the auction close later than **December 22, 2025**.

(b)    <u>No Reserve</u>.  The Auction shall be conducted as a no reserve auction, subject to Bankruptcy Court approval.

(c)    <u>Winning Bid</u>. Auctioneer will offer the Property for Sale at auction as follows:

(i)    No Winning Bid will be announced until bidding has commenced and Auctioneer and the Debtor are satisfied that they have the information

necessary to identify the bid that will result in the greatest overall recovery for the Estate.

    (ii)    After all bidding has concluded, Auctioneer will identify the Winning Bid and a Backup Bid pursuant to the terms of Section 11 of these Sale Procedures.

    (iii)    No Property will be subject to more than one Winning Bid.

    (d)    <u>Starting Bid Incentive Credit</u>.   The amount of any Registered Bidder's starting bid submitted on or before 11:59 pm ET on November 30, 2025 is a "***Starting Bid***". To encourage Starting Bids, each Registered Bidder that submits a Starting Bid shall be entitled to a credit against the Buyer's Premium (as defined below) in an amount equal to one-third (33.33%) of the Buyer's Premium applicable to such Starting Bid (the "***Starting Bid Incentive Credit***") which shall be credited against the amount of Buyer's Premium due in connection the Property sale; provided that, for the avoidance of doubt, the Starting Bid Incentive Credit shall only apply with respect to the amount of the Starting Bid. To the extent that the Winning Bid exceeds the amount of the Starting Bid, the Winning Bidder will pay the full Buyer's Premium on the portion of the Winning Bid that exceeds the Starting Bid.

**5.**    **<u>No Representations or Warranties</u>.**  The Property shall be sold "AS IS", "WHERE IS", "WITH ALL FAULTS", without representations, warranties, covenants or guarantees of any kind, nature, or description whatsoever; *provided that* nothing contained herein shall limit the relief that may be granted with respect to the Property by the Bankruptcy Court pursuant to 11 U.S.C. § 363. The Property shall be conveyed to the Winning Bidder free and clear of all liens, claims, and encumbrances of any kind or nature whatsoever (collectively, the "***Transferred Encumbrances***"), with such Transferred Encumbrances to attach to the Net Sale Proceeds generated with the same validity and in the same order of priority as existed on the Property prior to the Sale. The Winning Bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and information in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Property, or the completeness of any information provided in connection with any Property and/or the Sale Process (including each and every aspect thereof). Without limiting the "AS IS, WHERE IS" nature of the Sale, and without limiting the relief that may be granted with respect to the Property by the Bankruptcy Court pursuant to 11 U.S.C. § 363, the Sale shall be subject to, among other things, (a) any state of facts that an accurate survey may show, (b) any covenants, restrictions and easements of record, (c) any state of facts a physical inspection may show, (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof, and (e) environmental conditions, including without limitation, the Property's compliance or lack of compliance with environmental laws, and the presence or absence of underground fuel storage tanks, any hazardous materials or asbestos anywhere on the subject Property.

6. **Registered Bidders.** Only a Registered Bidder may bid on the Property. To become a Registered Bidder, a bidder must (a) comply with all of the Bid Procedures (to the extent not inconsistent with these Sale Procedures); and (b) agree to be bound by the terms of these Sale Procedures; (c) submit an Initial Deposit (as that term is defined herein) to Escrow Agent; (d) provide Debtor and Auctioneer with information that may be reasonably requested to confirm each such bidder's financial wherewithal to consummate the Proposed Sale.

7. **Submission of Bids.** Each bid submitted by a Registered Bidder shall be an unqualified, irrevocable offer to purchase Property in the amount of Cash identified in such bid (the "***Purchase Price***"), without any contingencies or conditions other than as expressly permitted hereby, subject only to being deemed Winning Bid by Auctioneer and the entry of any Sale Confirmation Order required by the terms of these Sale Procedures.

8. **Purchase and Sale Agreement.** The submission of a bid shall be deemed an irrevocable and binding commitment by the Registered Bidder to execute an agreement in a form and substance substantially similar to that attached hereto as <u>Appendix A</u> for the Property (a "***Purchase and Sale Agreement***") immediately upon such Registered Bidder's bid being deemed the highest bid for the Property, as announced by Auctioneer in consultation with Debtor, and shall be further agreement that the failure of the Registered Bidder to immediately execute such Purchase and Sale Agreement shall result in the immediate and permanent forfeiture of all Deposits in accordance with the terms of Section 9(c) of these Sale Procedures; *provided that,* notwithstanding the foregoing, Debtor and the Registered Bidder shall be permitted to jointly make modifications to the Purchase and Sale Agreement as each may expressly agreed to in writing; *but further provided that* any modifications to the Purchase and Sale Agreement must comply and be consistent with these Sale Procedures; *and further provided that*, for the purpose of determining whether a Purchase and Sale Agreement is substantially similar to that attached as Appendix A, the determination of such issue by Debtor, in its sole and absolute discretion, shall be binding on all persons. To the extend the Purchase and Sale Agreement and these Bid Procedures conflict, the terms of the Purchase and Sale Agreement shall control.

9. **Deposits.**

    (a)   <u>Initial Deposit</u>. Except as provided in Section 13(a), each bidder that desires to become a Registered Bidder must remit a good faith deposit in the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) (each, an "***Initial Deposit***") to Ultra Escrow, a division of Fidelity National Title. At Closing, the Initial Deposit submitted by the Winning Bidder will be applied to the amount due from the Winning Bidder as a credit towards the closing on the Sale. Each Initial Deposit submitted by a Registered Bidder that is not the Winning Bidder or the Backup Bidder will be returned to such Registered Bidder on or before the third (3rd) Business Day following the identification of the Winning Bidder and the Backup Bidder; *provided that*, notwithstanding the foregoing, no breaching or defaulting Winning Bidder, which shall include breaching or defaulting Winning Bidder that was previously a Backup Bidder, shall be entitled to a return of their Initial Deposit, such breaching or defaulting Winning Bidder having completely and permanently relinquished, released, and waived any right to its Initial Deposit pursuant to

Section 9(c) hereof. Any person required to submit a Cash Initial Deposit pursuant to this Section 9(a) that fails to remit such Cash Initial Deposit shall forfeit their rights as a Registered Bidder and/or Winning Bidder and shall further be liable to Debtor if the requirement to submit a Cash Initial Deposit occurs post-Auction, for the full amount of such Initial Cash Deposit, plus interest at the same rate as applied to post-judgment interest under 28 U.S.C. § 1961 and all attorney fees incurred by Debtor in seeking recovery of the same.

(a)    <u>Secondary Deposit</u>.  Except as provided in Section 13(b), a Registered Bidder that is named the Winning Bidder shall remit to the Escrow Agent within two (2) Business Days of being so notified, a good faith deposit in the amount equal to ten percent (10.00%) of its Winning Bid, less the Initial Deposit (each, a "***Secondary Deposit***" and, collectively with the Initial Deposit, the "***Deposits***," each a "***Deposit***"). At Closing, the Secondary Deposit submitted by the Winning Bidder will be applied to the amount due from the Winning Bidder to consummate the Sale of the Property. In the situation where the Bankruptcy Court conducts and finally concludes a Sale Confirmation Hearing and a Sale Confirmation Order is not subsequently entered, the Escrow Agent shall return the Deposit paid by the Winning Bidder to such Winning Bidder within three (3) Business Days of the order denying confirmation of the Sale becoming a Final Order; *provided that*, notwithstanding the foregoing, no breaching or defaulting Winning Bidder, which shall include breaching or defaulting Winning Bidder that was previously a Backup Bidder, shall be entitled to a return of their Secondary Deposit, such breaching or defaulting Winning Bidder having completely and permanently relinquished, released, and waived any right to its Initial Deposit pursuant to Section 9(c) hereof. Any person required to submit a Cash Secondary Deposit pursuant to this Section 9(b) that fails to remit such Cash Secondary Deposit shall forfeit their rights as a Winning Bidder and shall further be liable to the Estate for the full amount of such Cash Secondary Deposit, plus interest at the same rate as applied to post-judgment interest under 28 U.S.C. § 1961 and all attorney fees incurred by Debtor in seeking recovery of the same.

(b)    <u>Deposits of Winning Bidder and Backup Bidder</u>.  The Initial Deposit from the Winning Bidder and Backup Bidder shall be transferred to the Escrow Agent.

(c)    <u>Forfeiture of Deposits</u>.  Notwithstanding anything to the contrary herein, including the naming of a Backup Bidder as the Winning Bidder after a breach by the prior Winning Bidder, any Registered Bidder, including any Winning Bidder and Backup Bidder, that (i) breaches its obligations under a Purchase and Sale Agreement; or (ii) attempts to revoke its bid (including the Winning Bid and/or Backup Bid) after or prior to the execution of a Purchase and Sale Agreement; or (iii) refuses to execute a Purchase and Sale Agreement, and/or any other agreement reasonably required to consummate the Sale of the Property, shall completely and permanently relinquish, release, and waive any right that such Registered Bidder had with respect to any Deposits remitted in connection with the Auction. Any Deposits forfeited pursuant to this Section 9(c) shall be remitted as follows:

(i)       Except as described in Section 9(c)(ii) of these Sale Procedures, Auctioneer and Debtor shall equally share (50% to Auctioneer and 50% to Debtor) all Deposits forfeited by a defaulting Winning Bidder;

(ii)     Upon the Closing of a Sale to a Backup Bidder in accordance with the terms of these Sale Procedures, then, notwithstanding anything to the contrary herein, Auctioneer shall rebate that portion of any Deposit that it would otherwise have been entitled to under Section 9(c)(i) to Debtor to make-up any difference between the original Winning Bid and the Backup Bid (i.e., Auctioneer shall rebate any part of the Deposit to which Auctioneer would otherwise be entitled under Section 9(c)(i) of these Sale Procedures to Debtor, up to the amount of the difference between the amount of the defaulted Winning Bid and the amount of the Backup Bid that ultimately closes the Sale of the Property); *provided that*, notwithstanding the foregoing, Auctioneer shall be permitted to retain an amount of any forfeited Deposit equal to the attorney fees and other expenses incurred by Auctioneer as a result of the default of the Winning Bidder. In the event that the Estate receives equivalent Net Sale Proceeds from the Backup Buyer, Debtor acknowledges that the Estate will not be entitled to any rebate of Auctioneer's portion of the Deposit.

Any forfeited Deposit to which Debtor is entitled under these Sale Procedures shall be distributed under the Plan in the same manner as the Net Sale Proceeds of that Property which is the subject of the Defaulted Winning Bid; *provided that* the Defaulting Bidder shall not be permitted to recover any portion of a forfeited Deposit through the Plan and shall be deemed to have waived any right that it would otherwise have under such Plan to recovery of the forfeited Deposit.

10.   **Due Diligence.**  Debtor, and Debtor's agents, representatives, employees, and principals, shall use their best efforts to timely provide information regarding the Property reasonably requested by Auctioneer, a Potential Purchaser, or a Registered Bidder. Due diligence access shall include access to onsite inspections, surveys, title reports, professional property inspections, and such other matters which are reasonably available to Debtor (collectively, the ***Due Diligence Materials***"). All Due Diligence Materials provided to Auctioneer will be posted on Auctioneer's Digital Bidding Platform. The due diligence process shall conclude no later than that date upon which a Registered Bidder submits their Initial Deposit. Notwithstanding the foregoing, as of the commencement of the Auction (i) all Property due diligence shall be deemed fully completed to the full satisfaction of all Registered Bidders; and (ii) Winning Bidder is deemed to have accepted the Property in the condition set forth in Section 5 as of the conclusion of the Auction.

11.   **Selection of Winning Bid and Backup Bids.**

(a)     _Winning Bid_.  Auctioneer and Debtor shall determine the bid expected to result in the highest Net Sale Proceeds being remitted to the Estate, and Auctioneer shall announce the same at the conclusion of the Auction as the highest bid (the

"**Winning Bid**"). The Registered Bidder submitting a Winning Bid shall become a "**Winning Bidder**."

(b)   <u>Backup Bids</u>.  The bids that are not selected as the Winning Bid shall be ranked according to the Net Sale Proceeds expected to be remitted to the Estate from such bid or the combination of such bid with other bids. The highest ranked bid, other than the Winning Bid, shall remain open, valid, and irrevocable until the Closing of the Sale (the "**Backup Bid**"); *provided that* if any other Registered Bidder shall voluntarily designate their own bid as a Backup Bid, such bid shall be deemed a Backup Bid in accordance with the terms of these Sale Procedures and shall rank in priority as determined by Auctioneer in consultation with Debtor.

12.   <u>**Submission to Jurisdiction of the Bankruptcy Court**</u>.  The Bankruptcy Court shall have exclusive jurisdiction over all matters related to the Sale Process, including the Auction, the bids, the Property and Debtor, and all matters arising prior to the Closing of the Sale, and the submission of a bid shall be deemed an agreement by the Registered Bidder to submit itself to such exclusive jurisdiction of the Bankruptcy Court for all such matters.

13.   <u>**Credit Bidding**</u>. If the  Bankruptcy Court enters an order allowing the Secured Creditor  to credit bid (the "**Credit Bid**") in a specified amount (the "**Credit Bid Amount**"), the Secured Creditor shall be entitled to offset the amount of its Credit Bid Amount  against any amount due to Debtor on account of bid(s) submitted by such Secured Creditor, and such Credit Bid shall be made in accordance with the following:

(d)   Subject to Section 13(f), a Secured Creditor may offset the amount due from such Secured Creditor for an Initial Deposit against its Credit Bid Amount, *provided that* all offsets claimed by the Secured Creditor shall not exceed the amount of its Credit Bid Amount. Each Initial Deposit so offset shall be treated the same as an Initial Deposit made in Cash; *provided that* any provisions of these Sale Procedures requiring the return of the Initial Deposit will be deemed to result in the offset being terminated and the offset amount of the Secured Creditor's Credit Bid Amount being reinstated – but shall not result in the return of any cash to the Secured Creditor.

(e)   Subject to Section 13(f), a Secured Creditor may offset the amount due from such Secured Creditor for a Secondary Deposit against its Credit Bid Amount, *provided that* all offsets claimed by the Secured Creditor shall not exceed the amount of its Credit Bid Amount. Each Secondary Deposit so offset shall be treated the same as a Secondary Deposit made in Cash; *provided that* any provisions of these Sale Procedures requiring the return of the Secondary Deposit will be deemed to result in the offset being terminated and the offset amount of the Credit Bid Amount being reinstated – but shall not result in the return of any cash to the Secured Creditor.

(f)   Subject to Section 13(f) and 18(g), a Secured Creditor may offset the amount due from such Secured Creditor at a Closing against its Credit Bid Amount, *provided*

*that* all offsets claimed by the Secured Creditor shall not exceed the amount of its Credit Bid Amount.

(g) Except as otherwise stated herein, each Credit Bid shall be treated in the same manner as a Cash bid. For the avoidance of doubt, the amount of the Credit Bid Amount so bid as a Credit Bid shall be deemed to be the "Purchase Price" with respect to such Credit Bid; *provided that* if the total bid submitted by a Secured Creditor exceeds the Credit Bid portion of such bid, then the "Purchase Price" with respect to such bid shall be the total amount of the bid, including any Cash portion that exceeds the Credit Bid Amount.

(h) The Secured Creditor must register for the Auction to become a Registered Bidder with respect to the Property and once registered, each Credit Bid is automatically deemed to meet all requirements for a valid bid.

(i) The provisions of this Section 13 shall supplement, and shall not in any way limit or reduce, the rights provided to secured creditors under 11 U.S.C. § 363(k).

(j) The Secured Creditor shall be responsible, as a condition of receiving a Sale Confirmation Order, for the direct payment to Auctioneer of its Buyer's Premium..

14. *[Reserved]*

15. *[Reserved]*

16. **No Acceptance of Tardy Bids.**  Absent irregularities in the conduct of the Auction, no bids submitted after the announcement of the Winning Bid shall be considered.

17. **Challenges to Proposed Sale.**

(a) Notice of Proposed Sale.

(i) On or before 3 Business Days following the execution of the Asset Purchase Agreement and receipt of the Secondary Deposit,  Debtor shall file a Motion to approve the Proposed Sale with the Bankruptcy Court. Debtor shall serve the Motion on each of the following: (A) the Winning Bidder, (B) the Back Up Bidder, and (C) any creditor or interested party that has requested a copy of such notice pursuant to Section 17(a)(ii) of these Sale Procedures;  (B) the Office of the United States Trustee; and (C) any creditors and parties in interest entitled to a copy of the Motion under the Bankruptcy Rules.

(ii) Any person that is not signed up to receive email service through the Bankruptcy Court's ECF system may obtain a copy of the Motion to Approve Sale by requesting the same from Counsel for Debtor. Persons requesting the Motion shall receive a copy via email at the email address provided in their request.

(b) <u>Deadline for Filing Objection to Proposed Sale</u>. Any person objecting to the Proposed Sale pursuant to the terms of these Sale Procedures shall file an objection with the Bankruptcy Court at or before two (2) Business Days prior to the hearing on the Motion, or such other date and time as the Bankruptcy Court may be set by subsequent order, and simultaneously serve a copy of the same by email or overnight mail on Debtor (through Counsel for Debtor) and any other persons identified as entitled to notice pursuant to the Notice of Proposed Sale.

(c) <u>Hearing on Objection to Proposed Sale</u>. The Bankruptcy Court will conduct a hearing during which the Bankruptcy Court will consider any objections to, and confirmation of, the Proposed Sale (the "***Sale Confirmation Hearing***"). Debtor's ability to consummate such Proposed Sale will be contingent upon Debtor receiving a Sale Confirmation Order from the Bankruptcy Court after the Sale Confirmation Hearing. Notwithstanding such contingency on the part of Debtor, the Winning Bid and the Backup Bid shall remain irrevocable.

**18.** **<u>Closing of the Sale</u>.**

(a) **<u>Time is of the Essence. Time is of the essence with respect to all of the actions and deadlines set forth in these Sale Procedures, including, without limitation, those actions and deadlines relating to the Closing of the Sale</u>.**

(b) <u>Closing Date and Place</u>. Closing shall take place (i) at the offices of Debtor's counsel in Miami, Florida; and (ii) take place on the later of (a) forty-five (45) Calendar Days of the execution of the Purchase and Sale Agreement or the Auction Close Date, whichever occurs first, and (b) ten (10) Calendar Days after entry of a Sale Confirmation Order, or such later date as may be ordered by the Bankruptcy Court (in either instance, the "***Closing Deadline***").

(c) <u>Sale to Backup Bidder</u>. In the event that the Winning Bidder breaches its obligations under these Sale Procedures and/or the Purchase and Sale Agreement, or otherwise fails to consummate the Proposed Sale, through no fault of Debtor, Debtor shall sell the Property to the Backup Bidder, such Backup Bidder becoming the Winning Bidder and its bid becoming the Winning Bid, without further approval of the Bankruptcy Court. Debtor may exercise their rights under this provision immediately upon a breach or default by the Winning Bidder. Notwithstanding anything to the contrary herein, a bidder's breach of its obligations under the Purchase and Sale Agreement shall result in a complete forfeiture of all rights, claims, and interest in any Deposit submitted by such bidder and shall subject such bidder to such other damages, claims, defenses, and remedies as Debtor may have under the Purchase and Sale Agreement and/or applicable law.

(d) <u>Return of Backup Bidder Initial Deposits</u>. Within three (3) Business Days following Closing the Sale of the Property, Escrow Agent shall return the Initial Deposit submitted by the Backup Bidder; *provided that* any Backup Bidder that was subsequently named a Winning Bidder shall not be entitled to a return of its Initial Deposit.

(e)  <u>Title Insurance</u>.  Debtor shall convey the Property by delivery of a special warranty deed. At Debtor's option, if a Winning Bidder's title company refuses to insure title based upon the Sale Confirmation Order, and any Sale Confirmation Order that may be entered, or makes unreasonable demands as determined by Debtor, Debtor may arrange for the issuance of a title insurance policy by a reputable title company, at the sole cost and expense of such Winning Bidder. Debtor shall provide all documents reasonably required by the Winning Bidder's title company.

(f)  <u>Transfer of Possession</u>.  Debtor shall turnover possession of the Property at the Closing of the Sale to the Buyer or its designee, together with all files and records pertaining to the Property, including, but not limited to construction documents, building permits, violations, architectural plans, leases and repair invoices to the extent that any such documents exist within the possession, custody, or control of Debtor at that time.

(g)  <u>Failure to Deliver Cash</u>.  Any person required to submit Cash in connection with their respective obligations under these Sale Procedures and/or any Purchase and Sale Agreement executed in connection herewith that fails to remit such Cash forfeit their rights as a Winning Bidder and shall further be liable to Debtor for the full amount of Cash due, plus interest at the same rate as applied to post-judgment interest under 28 U.S.C. § 1961 and all attorney fees incurred by Debtor in seeking recovery of the same, as well as any other remedies to which the Debtor is entitled under the Asset Purchase Agreement and relevant state law.

19.  **Modification of Sale Procedures.**  Auctioneer and Debtor shall have the sole right and authority to modify and/or supplement these Sale Procedures, including modifying the timeline and the deadlines with respect thereto, and in any way consistent with the Bid Procedures as modified by these Sale Procedures if they reasonably believe that such supplementation is in the best interest of the Estate and is likely to promote a robust Auction, except with respect to modification of the date of the Auction without approval of the Bankruptcy Court; *provided that* nothing contained herein shall prevent the Bankruptcy Court from entering an order modifying these Sale Procedures. Auctioneer may post notices of modifications and/or supplements on its website.

20.  **Intentionally Omitted**

21.  **Compensation to Professionals.**  Pursuant to Section 506(c) of the Bankruptcy Code, Escrow Agent, shall distribute the Sale Transaction Costs from the Gross Sale Proceeds, which Sale Transaction Costs shall include, but not be limited to, the following costs, commissions, compensation, and reimbursable, each as determined pursuant to the written agreement between Debtor and such Professional, and as set forth in the Sale Confirmation Order**:**

(a)  **Buyer's Premium.** Subject to any Starting Bid Incentive Credit, as part of any closing of the Sale of the Property by Auction or by Preemptive Sale (the "***Closing***") the Winning Bidder (including any backup bidder) shall pay an amount equal to six percent (6%) of the successful High Bid amount or, in the case of a

Preemptive Sale, of the agreed purchase price (such amount, the "**Purchase Price**"), which 6% shall be in addition to the full amount of the Purchase Price, as a buyer's premium owed to Concierge for Concierge's services provided and as further detailed hereunder (the "**Buyer's Premium**"). The Winning Bidder, or purchaser pursuant to the Preemptive Sale, shall be obligated to pay the Buyer's Premium in cash at Closing, and such payment shall be a condition precedent to the Closing.

    (i) **Payment to Listing Broker, Buyer's Broker**. The following parties shall be paid the following amounts from the Buyer's Premium: (A) one percent (1%) of the Purchase Price to the Winning Bidder's broker, if any, as documented in the bidder registration materials submitted to Concierge prior to bidding ("**Buyer's Broker**" and such commission, the "**Buyer's Broker Commission**"); and (B) one percent (1%) of the Purchase Price to the Listing Broker. For the avoidance of doubt, there shall be no commission paid to any Buyer's Broker representing a Secured Creditor.

    (ii) **Credits to the Debtor's Estate from the Buyer's Premium**. The following amounts shall be credited from the Buyer's Premium to the Debtor's estate:

        1. If no Buyer's Broker was engaged and paid in accordance with Section 21(a), an amount equal to the Buyer's Broker Commission; and

        2. After Concierge receives partial payment of the Buyer's Premium equal to three percent (3%) of the Purchase Price (after all other payments and credits Concierge is required to provide from the Buyer's Premium in accordance with this Section 21(a) are made), the balance of the Buyer's Premium.

(b) **Sale to Secured Creditor**. Notwithstanding Section 21(a) hereof, if a Secured Creditor is the Winning Bidder at the Auction in any capacity, including whether as a backup bidder, or otherwise, pursuant to a Credit Bid, there shall be no Buyer's Premium owed and in lieu thereof, such Secured Creditor shall pay a flat fee of Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) in cash directly to Concierge, regardless of whether such Secured Creditor's Credit Bid results in any net sale proceeds being distributed to the Debtor or the bankruptcy estate.

(c) **Sale to a Carveout Private Sale Party**. If the Debtor sells the Property to a Carveout Private Sale Party, (a "**Private Sale**") by the Carveout Private Sale Deadline, no Buyer's Premium shall be owed. For the avoidance of doubt, in the event of such sale, the provisions of Section 21(a) of these Sale Procedures shall not apply.

(d) **Reimbursable Expenses**. Concierge shall have a marketing and expense budget of one hundred and fifty thousand and 00/100 Dollars ($150,000.00)(the

"*Reimbursable Expense Budget*"). Concierge shall be entitled to reimbursement of its reasonable out-of-pocket, documented third party expenses incurred in marketing the Property and conducting the Auction of up to the Reimbursable Expense Budget (the "*Reimbursable Expenses*"). Concierge shall be entitled to payment of its Reimbursable Expenses from Debtor upon the closing of the sale of the Property (whether by auction, Private Sale, Preemptive Sale, or otherwise); provided however, that if a sale is not consummated, Concierge shall be entitled to payment of its Reimbursable Expenses as a Chapter 11 Administrative Expense Claim (as such term is defined in Debtor's Third Amended Joint Plan of Reorganization).

(e) **Escrow Agent**.  The Escrow Agent shall be paid an amount determined by agreement with Debtor; provided that such fee shall not be more than the fee typically charged by such Escrow Agent to its other clients; and as set forth in the Sale Confirmation Order.

22. **<u>Preemptive Sale to a Party Other than a Carveout Private Sale Party</u>.** If Debtor receives an offer from a third party other than a Carveout Private Sale Party that Debtor determines will be the highest and best offer, Debtor may seek a Sale Confirmation Order to sell the Property to such offeror prior to the Auction Close Date.   In such event, the Sale Confirmation Order must provide that Concierge shall terminate the Auction (a "*Preemptive Sale*").  In the event of a Preemptive Sale, Concierge shall terminate the Auction and the purchaser of the Property shall owe the Buyer's Premium provided in Section 21(a) of these Sale Procedures as if such purchaser were the Winning Bidder thereunder and the provisions of Section 21(a) hereunder shall otherwise apply.

# **APPENDIX A**

## **(FORM PURCHASE AND SALE AGREEMENT)**

## **TO BE FILED SEPARATELY**

# **APPENDIX B**

## **(BID PROCEDURES)**