UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

BH DOWNTOWN, LLC and
340 BISCAYNE OWNER LLC

        Debtors.

Case No. 24-23028-LMI

Chapter 11

(Jointly Administered)

_____ /

**OBJECTION TO: (I) DEBTOR'S APPLICATION TO EMPLOY CONCIERGE
AUCTIONS, LLC AS AUCTIONEER AND (II) DEBTOR'S MOTION TO
APPROVE (A) SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(F) AND 105, (B) AUCTION
PROCEDURES, (C) CLOSING OF HOTEL OPERATIONS, (D) APPROVING FORM
OF PURCHASE AND SALE AGREEMENT; (E) SCHEDULING DATES TO CONDUCT
AUCTION AND HEARING TO CONSIDER FINAL APPROVAL OF SALE AND (F)
<u>FOR RELATED RELIEF</u>**

Cirrus Real Estate Funding LLC and Cirrus 340BB Lender LLC (collectively,

"**Cirrus**") submits this objection (the "**Objection**") to the *Debtor's Application to Employ*

*Concierge Auctions, LLC as Auctioneer* [ECF No. 196] (the "**Retention Application**") and

*Debtor's Motion to Approve (A) Sale of Assets Free and Clear of all Liens, Claims and*

*Encumbrances Pursuant to 11 U.S.C. §§ 363(F) and 105, (B) Auction Procedures, (C)*

*Closing of Hotel Operations, (D) Approving Form of Purchase and Sale Agreement; (E)*

*Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale and*

*(F) for Related Relief* [ECF No. 197] (the "**Sale Motion**")[1] filed by the above-captioned

debtors and debtors in possession (collectively, the "**Debtors**").  In support of this Objection,

Cirrus respectfully states as follows:

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Retention Application or Sale Motion, as applicable.

## PRELIMINARY STATEMENT

1.      Debtors have repeatedly praised their original broker, Hilco, touting to the Court the stellar job the broker has done to date, yet, they nevertheless chose to abandon Hilco and retain Concierge Auctions as the Auctioneer – a company partially owned by Sotheby's. The problem, however, is that the Auctioneer specializes in the sale of luxury homes, not hotels or development properties.  Likewise, Sotheby's, which describes itself as "the world's premier destination for art and luxury" that "promotes access to and ownership of exception art and luxury objects"[2] is ill-suited for this assignment – the Property is not a painting or luxury residence.   There is simply no world in which Concierge (or Sotheby's) is the preeminent auctioneer for this type of asset.  Yet, the Debtors selected the Auctioneer without even testing the market or seeking out a firm experienced in this space and expect the proposed buyer, and not the Debtors, to pay the Auctioneer a rate that is more than three times what the Debtors were planning on paying Hilco.

2.      To make matters worse, the proposed Bidding Procedures are unnecessarily complex and confusing, leaving potential bidders uncertain about the qualifications required to participate and the timing and manner for submitting bids.  In today's digital age – where buyers from across the globe can meet in a single forum, either in person or virtually, on one day – the Debtors instead propose a cumbersome, multinational auction process stretched over several weeks.

3.      Although the $100,000 Initial Deposit may appear attractive and inviting to potential bidders, it is far too low for a transaction of this magnitude.  Such a minimal deposit allows unqualified or unserious parties to attain Qualified Bidder status.  When it comes time

---

[2] https://www.sothebys.com/en/about?locale=en

to close and pay the balance of the purchase price, these bidders may walk away, leaving the Debtors scrambling to secure alternative buyers long after the auction has concluded.

4.       Cirrus would be far less concerned if it were permitted to credit bid.  However, under the current structure, the Debtors seemingly seek to deprive Cirrus of its rights under Section 363(k), creating a very real risk that the Property could be sold for a price far below Cirrus' secured claim, while preventing Cirrus from credit bidding to protect its interests.

5.       If the Court allows the Debtors to retain the Auctioneers and proceed with the auction, the Debtors – not the bidders – should bear the cost of the Auctioneer's fees, which should be set at a reasonable market rate.  Additionally, the Bidding Procedures must be revised to establish a streamlined, transparent process that allows the auction to be completed within a day or two and preserves Cirrus' right to credit bid.

## OBJECTION

### I.       The Terms of the Auctioneer's Retention are Unreasonable and Will Discourage Competitive Bidding

6.       On March 30, 2025, the Debtors filed the *Debtors' Application to Employ Hilco Real Estate, LLC as Real Estate Agents* [ECF No. 77] (the "**Hilco Application**") seeking to employ Hilco Real Estate, LLC ("**Hilco**") as the Debtors' real estate agents to market and sell the Property or find a third party to refinance the Cirrus debt.  As the Debtors noted, "Hilco has an excellent reputation as a leader in the real estate field and has an experienced term of real estate brokers and analysts."  Hilco Application, ¶ 7.

7.       Hilco was set to earn a fee equal to 1.5% of the Gross Sale Proceeds for all sales of less than $200 million and a fee equal to 2% of the Gross Sale Proceeds for any amount exceeding $200 million.  The fee was to be paid by the Debtors.  *Id.* ¶ 10.

8.      Hilco's fee structure is standard in the market (in fact, Hilco was to be paid fees far in excess of similar, high value, single-asset bankruptcies[3]), especially considering the value of the Property, which Debtors claim to be $200 million.  Accordingly, Cirrus did not object to the Hilco Application.

9.      The Debtors repeatedly complimented Hilco, with counsel noting "hiring Hilco was one of our better decisions, because they've done a great job.  We've gotten a number of different offers from perspective buyers, investors."  Hr'g Tr. 40:3 – 40:6 (June 30, 2025).

10.      Despite that sentiment, Debtors allowed their agreement with Hilco to expire on August 2, 2025 (*see* Retention Application, ¶ 4) and now seek approval to engage the Auctioneer on vastly different and non-market terms: the Auctioneer is slated to be paid 3-4 times as much – 6% of the Purchase Price – and the Winning Buyer, rather than the Debtors, are required to bear the cost through a Buyer's Premium.  *See* Sale Motion, Ex. B ¶ 21.

11.      The proposed Buyer's Premium is excessive and will not benefit the sale process.  The outsize Buyer's Premium will deter potential buyers and stifle competitive bidding, invariably leading to a lower sale price as potential bidders factor the Buyer's Premium into their underwriting.  For example, if the Property sells for its purported $200M value, the Winning Bidder would be forced to pay an additional $12 million in Buyer's Premium.

12.      The cases cited in the Sale Motion in support of the 6% Buyer's Premium are all distinguishable as all those premiums were for residential properties and paid by the debtor seller, not the buyer.  *See id.* ¶ 23.   These authorities underscore that Debtors are

---

[3] *See*, *e.g.*, *In re Wardman Hotel Owner, L.L.C.*, Case No. 21-10023 (Bankr. D. Del.), Dkt. No. 46 (engaging Eastdil to market property with a fee of 0.65% of the first $128.1 million of the gross sale proceeds, plus 2% of gross sale proceeds exceeding $12.1 million, capped at $1.75 million in fees).

inappropriately seeking permission to hire a residential broker, and to pay a market commission rate for residential home sales, to conduct the sale of a commercial development property (and to – unlike a residential sale – shift the obligation to pay the commission onto the buyer).

13.     While the Debtors boldly assert that the fees are reasonable, they admittedly made no effort to test the market or seek competing proposals, acknowledging "[t]he Debtor did not seek competitive bids for the auctioneer." *Id.* ¶ 9.

14.     If the Debtors believe a 6% fee is reasonable, they should bear the cost themselves rather than imposing it on the Winning Bidder.  However, if they insist on passing the expense to the buyers, the Buyer's Premium should be reduced to a more reasonable rate consistent with the Hilco Application, specifically 1.5% – 2%.

**II.     The Bidding Procedures Cannot be Approved in Its Current Form**

15.     The Bidding Procedures in their current form are unacceptable.  They are confusing and difficult to understand and leave a potential buyer confused as to what it needs to do to qualify as a bidder, how, when and where to submit a bid and how much the bid needs to be (or how much higher it needs to be than a current bid).  The Auction is also unnecessarily complex and elongated with three live auctions in three different cities around the world and an online portion continuing for more than two weeks.  Instead of encouraging a competitive bidding process, the Bidding Procedures will do the exact opposite.

16.     The Initial Deposit is also unreasonably low for a sale of this size – 0.05% of the purported $200 million value.  Rather than attracting serious, qualified bidders, it invites unqualified participants who lack the financial capacity or genuine interest to close on the Property.  By contrast, it is highly common in sales of this magnitude for prospective bidders

to deposit several hundreds of thousands of dollars – if not millions of dollars – to ensure those bidding have the financial capacity to close. As a result, the auction is not set up for success, with the Debtors (and its creditors) at risk of finding themselves months after its conclusion dealing with a winning bidder drawn in by the low buy-in and unable to close.

17.     Worse still, the Debtors seek to strip Cirrus of its credit bidding rights under Section 363(k) of the Bankruptcy Code, yet they failed to set a reserve price or designate a stalking horse bidder. As a result, under the current proposed Procedures, the Property could be sold for an amount far lower than it should and below Cirrus' claim, leaving Cirrus unable to credit bid to protect its interest.

18.     The fact that Cirrus's claim has been objected to does not automatically disqualify Cirrus's right to credit bid. "In fact, some courts have explicitly held that a disputed lien can be used to credit bid under Section 363(k)." *Reynolds v. Servisfirst Bank (In re Stanford)*, 17 F.4th 116, 125 (11th Cir. 2021) (citing *In re Charles St. Afr. Methodist Episcopal Church*, 510 B.R. 453, 458 (Bankr. D. Mass 2014)); *In re Miami Gen. Hosp., Inc.*, 81 B.R. 682, 687–88 (S.D. Fla. 1988) (holding that the successful bidder was permitted to credit bid the amount of its disputed claim).

19.     Before and after the Debtors filed the Sale Motion, Cirrus engaged in discussions with the Debtors regarding its right to credit bid and the requirement to submit a deposit. While Cirrus remains committed to continuing those discussions in the hope of reaching a resolution, if the parties cannot agree, the Bidding Procedures must be amended accordingly.

20.     As currently drafted, the Bidding Procedures are fundamentally unfair. They treat Cirrus – the sole secured creditor, who undisputably loaned the Debtors $70 million and is owed tens of millions of dollars in accrued interest – worse than an unrelated buyer off the street. Whereas a Winning Bidder is only required to post a 10% non-refundable deposit <u>after</u>

being selected, the Debtors demand that Cirrus post substantially more <u>before</u> it is even permitted to place its first bid.

21.     Cirrus, like any bidder, should only be required to demonstrate its financial ability to close on any portion of the purchase price exceeding its credit bid and submit a deposit <u>only if</u> it is selected as a Winning Bidder – and then, on the same 10% basis (of the amount exceeding its credit bid, if any) applicable to all other bidders.  Absent those modifications, the Court is respectfully requested to deny the Sale Motion and the Bidding Procedures.

## **<u>RESERVATION OF RIGHTS</u>**

22.     Cirrus reserves all rights with respect to the Retention Application and Sale Motion and any proposed final order, including the right to supplement and amend this Objection, participate in additional briefing and seek additional discovery with respect to the Retention Application and Sale Motion.

23.     Nothing contained herein shall constitute a waiver of any of the claims, rights or remedies of Cirrus, each of which is hereby expressly reserved.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**CONCLUSION**

24.　　For the reasons set forth herein, Cirrus respectfully requests that the Court deny the

Retention Application and Sale Motion in their entirety.  To the extent the Court does not deny the

Retention Application and Sale Motion, Cirrus respectfully requests the Court direct the Debtors

to reduce the Auctioneer's Buyer's Premium and include Cirrus' credit bidding rights in the

Bidding Procedures, together with such other and further relief as this Court deems just and proper

under the circumstances.

Dated: October 16, 2025

Respectfully submitted,

s/ Daniel N. Gonzalez
Daniel N. Gonzalez, Esq.
Florida Bar No. 0592749
dgonzalez@melandbudwick.com
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

-and-

**PRYOR CASHMAN LLP**
Todd E. Soloway, Esq. (admitted *pro hac vice*)
Bryan T. Mohler, Esq. (admitted *pro hac vice*)
Andrew S. Richmond, Esq. (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
Email: tsoloway@pryorcashman.com
　　　　bmohler@pryorcashman.com
　　　　arichmond@pryorcashman.com

*Counsel to Cirrus Real Estate Funding, LLC and
Cirrus 340BB Lender LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 16, 2025, a true and correct copy of the foregoing

was served to all parties receiving CM/ECF notification via the Court's CM/ECF system.


                                s/ Daniel N. Gonzalez
                                Daniel N. Gonzalez, Esquire
                                Florida Bar No. 592749
                                dgonzalez@melandbudwick.com
                                MELAND BUDWICK, P.A.
                                3200 Southeast Financial Center
                                200 South Biscayne Boulevard
                                Miami, Florida 33131
                                Telephone: (305) 358-6363
                                Telecopy: (305) 358-1221