UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

BH DOWNTOWN MIAMI, LLC and
340 BISCAYNE OWNER LLC

   Debtors.
_____/

Case No. 24-23028-LMI

Chapter 11

(Jointly Administered)

**OBJECTION TO 340 BLUE SKY, LLC'S EXPEDITED MOTION TO (I) APPROVE SALE OF PROPERTY PURSUANT TO 11 U.S.C. §§ 363(B) AND 363(F), (II) GRANT RELATED RELIEF, AND (III) REQUEST FOR A HEARING**

Cirrus Real Estate Funding LLC and Cirrus 340BB Lender LLC (collectively, "**Cirrus**") submits this objection (the "**Objection**") to *340 Blue Sky, LLC's Expedited Motion to (i) Approve Sale of Property Pursuant to 11 U.S.C. §§ 363(b) and 363(f), (ii) Grant Related Relief, and (iii) Request for a Hearing* [ECF No. 374] (the "**Motion**")[1] filed by 340 Blue Sky, LLC ("**Losing Bidder**"). In support of this Objection, Cirrus respectfully states as follows:

**PRELIMINARY STATEMENT**

The Losing Bidder's Motion is meritless and sanctionable. If the Orders of this Court are going to have any meaning, the games need to stop.

With the purchase and sale agreement sitting on Debtor's desk for execution, the Losing Bidder (who conferred extensively with Debtor during the live auction) miraculously appears and now outrageously claims that the second Court-ordered auction should be completely disregarded in favor of its belated offer by which, of course, it would now – weeks after the Resumed Auction – gain ownership of the Property.

In support of this sanctionable application, the Losing Bidder states that "*it did not increase*

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

*its bid because it lost confidence in the auction process after being asked at the inception for its highest bid and being told that the Lender was going to bid its full credit bid.*" Motion, ¶ 9.

Even if some unidentified person made those unremarkable statements, neither those statements nor the Losing Bidder's alleged 'loss of confidence' come close to showing the "inherent fairness" required to give a prospective purchaser such as the Losing Bidder standing to challenge the auction results. Cirrus's $101,500,000.00 credit bid was publicly ordered by the Court and well known at the time of the Resumed Auction, and the Losing Bidder was free to bid $107,000,000.00 then as it claims to be prepared to do now. The Losing Bidder chose not to do so, and bidder's remorse is not a basis to disturb the results of a bankruptcy auction.

The Losing Bidder's narrative is also squarely refuted by sworn testimony. The Auctioneer's CEO, Chad Roffers, attested that the Losing Bidder, after being given an additional five minutes to consider whether it wanted to make another bid, "**explicitly indicated that he had finished and had reached his limit.**" That testimony is irreconcilable with the Losing Bidder's post-hoc claim of supposed "loss of confidence."

The Motion is also a brazen affront to this Court's authority and clear and unequivocal directives. At the December 23 hearing, the Court made eminently clear that "**the only thing I'm going to approve is to have this auction reset, that's it. . . . Either we reset the auction, or you close with Cirrus. That's the decision tree, okay?**" Hr'g Tr. 22:24–23:1; 25:6–25:8 (December 23, 2025). The Court reaffirmed that directive in its December 31, 2025 ruling, emphasizing that the Resumed Auction was the prospective buyers' "**last chance**." Hr'g Tr. 81:8 (December 31, 2025). Having made a strategic decision to stop bidding, the Losing Bidder now seeks to treat the Court's orders, including the auction rules, as irrelevancies.

The Losing Bidder also offers no explanation for its three-week delay in filing the Motion,

2

nor does it identify a single irregularity in the Resumed Auction that could justify unraveling the results.

By contrast, since the close of the Resumed Auction, Cirrus has fully complied with the Court's directives, immediately delivering a signed purchase and sale agreement and paying the Buyer's Premium, and since has negotiated in good faith to complete amendments to the PSA to account for the pending adversary proceeding and that this is a cashless sale.

This is now the **second time** the Losing Bidder has interfered with the auction process in this case – the initial auction was continued in part based on allegations from the Losing Bidder's supposed broker (Edward J. Rodriguez of BPN Capital Group) about the registration process leading up to the first auction. The Losing Bidder's Motion – who is plainly operating at the behest and in coordination with Debtor – is yet another futile, last-ditch effort to overturn an auction process that proceeded strictly in accordance with this Court's directives. The Motion should be denied.

## RELEVANT FACTS

### THE FIRST COURT-ORDERED AUCTION

1. On December 13, 2024, Debtor 340 Biscayne Owner LLC ("340") filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code. [ECF No. 1.] 340 is operating its business and managing its affairs as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2. After nearly a year of unsuccessful efforts by 340 to complete a private sale of the Property, the Court directed that the Property be sold by public auction. By order dated November 17, 2025, the Court approved Debtor's sale procedures and directed that an auction was to be open and active for two weeks, commencing virtually on December 3, 2025 and remaining open online

throughout that period before concluding with a live auction in New York City on December 17, 2025 (the "**First Auction**"). [ECF 238.]

3. At the conclusion of the First Auction, Cirrus was named the winning bidder, with a winning bid of $77 million. [ECF 304.]

4. Nine days after the conclusion of the First Auction, and only after Cirrus filed a motion to compel Debtor to comply with the terms of the Sale Order and execute the PSA, Debtor filed the *Debtor's Motion to Reopen and Reschedule Auction* (the "**Reschedule Motion**") [ECF No. 310], asserting various alleged technical issues with the First Auction and seeking authorization to conduct a Resumed Auction.

5. In support of the Reschedule Motion, Debtor submitted a declaration from Edward J. Rodriguez, identified as the CEO of BPN Capital Group, in which Mr. Rodriguez claimed technical issues with the auction registration process and stated that he represents an unidentified buyer interested in acquiring the Property for $100 million (and had retained Reed Smith LLP to prepare a purchase agreement). (Reschedule Motion Ex. B, Declaration of BPN Capital Group, ¶¶ 7, 20.)

6. Mr. Rodriguez then appeared at the December 31, 2025 hearing and stated that his client was willing and ready to submit an offer for $105 million. Hr'g Tr. 28:20 – 28:23 (December 31, 2025).

7. The Court granted the Reschedule Motion over Cirrus's objection and scheduled the Resumed Auction for January 28, 2026, to be conducted in-person in Miami. *Order Granting Debtor's Motion to Reopen and Reschedule Auction* [ECF No. 323].

8. In determining the Reschedule Motion, the Court made clear that it would not consider a private sale, informing Debtor that "**[e]ither we reset the auction, or you close with**

**Cirrus. That's the decision tree, okay?**" Hr'g Tr. 22:24–23:1; 25:6–25:8 (December 23, 2025). The Court reaffirmed that directive in its December 31, 2025 ruling, emphasizing that the Resumed Auction was the prospective buyers' "**last chance**." Hr'g Tr. 81:8 (December 31, 2025).

## THE SECOND COURT-ORDERED AUCTION

9. As set forth in the Auctioneer's Declaration submitted after the Resumed Auction, two bidders registered for and participated (both in person) in the Resumed Auction – Cirrus and the Losing Bidder. *Declaration of Chad Roffers in Support of Confirmation of Auction Results* (the "**Roffers Declaration**") [ECF No. 347], ¶¶ 5, 6.

10. At the conclusion of the Resumed Auction, Cirrus was named the winning bidder with a bid of $95 million, and the Losing Bidder was named the backup bidder with a backup bid of $91 million. *Id.* ¶ 7; *Notice of Filing (1) Auction Results and (2) Auction Summary Report* [ECF No. 351], ¶ 3.

11. The Losing Bidder was given every opportunity to bid at the Resumed Auction, and it opened the bidding with an $82 million bid. Roffers Declaration, ¶¶ 6, 8. In fact, as explained in the Roffers Declaration, "even after [the Losing Bidder] indicated he was finished bidding, we took a five-minute recess to allow the bidder to reconsider his position. Following the recess, the [Losing Bidder] was given another opportunity to bid. He **explicitly** indicated he was finished and had reached his limit. The auction thereupon concluded" with Cirrus declared the winning bidder. *Id.* ¶¶ 8, 9 (emphasis added).

12. Following the conclusion of the Resumed Auction, Cirrus immediately delivered to the Auctioneer (a) an executed purchase and sale agreement in the form annexed to the Bidding Procedures and (b) the Buyer's Premium commission payment due to the Auctioneer.

13. Thereafter, because the form purchase and sale agreement anticipated a cash buyer

5

rather than a credit bidder, and in light of the pending adversary proceeding, Cirrus worked with Debtor to revise the PSA. The revised PSA is now in substantially final form.

14. Three weeks after the Resumed Auction – and with the PSA sitting on Debtor's desk for execution – the Losing Bidder filed the Motion seeking approval of a sale outside the Court-ordered auction process on terms and in accordance with a purchase and sale agreement that is <u>substantially different</u> from the Court-approved form purchase and sale agreement annexed to the Bidding Procedures to which every other potential bidder agreed to be bound as a condition of participating in the auction.

## **LEGAL ARGUMENT**

### A. The Losing Bidder Lacks Standing to Make this Motion

15. "As a general rule, a prospective purchaser of assets from a bankruptcy estate is not within the zone of interests intended to be protected by the Bankruptcy Code and, therefore, does not typically have standing to challenge a sale of the assets to another party." *In Re Murphy*, 288 B.R. 1, 4 (D. Me. 2002) (citing *In re NEPSCO, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983)); *see In re Fairfield Sentry Ltd.*, 539 B.R. 658, 666 (Bankr. S.D.N.Y. 2015).

16. While the Losing Bidder argues it has standing, relying on cases that "recognize[] an exception in cases where an unsuccessful bidder challenges the underlying fairness of the sale," the Losing Bidder makes no allegation (nor could it) "of bad faith, collusion, fraud, mistake or other similar grounds questioning the intrinsic fairness or structure of the" auction. *In Re Murphy*, 288 B.R. at 4-5 (collecting cases).

17. As in *In re Murphy*, the Losing Bidder's scant allegations do not come close to meeting the standing benchmark. The Losing Bidder's alleged 'loss of confidence' due to a vague

6

(and unsworn) assertion[2] that "the resumed auction was plagued with the same issues that it had faced the first time" falls well short of demonstrating any inherent unfairness, as does its claims regarding alleged statements (of unknown origin) regarding "how high they were willing to bid" and "that the Lender was going to bid its entire credit bid."

18. Since the Losing Bidder identifies no bad faith, collusion, fraud, mistake or similar grounds to question the fairness of the Resumed Auction, it lacks standing to challenge the results.[3]

B. **In Any Event, There is No Basis To Disturb the Auction Results**

19. As a matter of longstanding public policy, it is an "abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed." *In re Gil-Bern Indus., Inc.*, 526 F.2d 627, 629 (1st Cir. 1975) (internal citations omitted).

20. The rationale for this policy is maintaining public confidence, as "[i]t might not only be thought improper for a bankruptcy court to proceed in an irregular fashion merely to gain a few extra dollars in one case, but in the long run such a practice would be penny wise and pound foolish. Creditors in general would suffer if unpredictability discouraged bidders altogether." *Id.* "[I]t is important that the bidder receive what he had reason to expect, and that nothing impair public confidence in the regularity of judicial sales." *Id.* at 628.

---

[2] The Motion is also fatally defective on its face. Despite advancing numerous factual assertions, it is unsupported by a sworn declaration. Counsel – who was not present at the Resumed Auction – possesses no personal knowledge of the events described. This failure alone is dispositive and warrants denial of the Motion.

[3] If there is any collusion that occurred related to the Resumed Auction, it appears to be between Debtor and the Losing Bidder, not Cirrus. The Losing Bidder represents in the Motion that it has "presented a Purchase and Sale Agreement to the Debtor" and further that "the Debtor has not been able to reach an agreement with the Lender for the purchase of the Property." Motion p. 2, ¶ 18. While untrue, it is unclear and suspicious as to how the Losing Bidder would have any information about those negotiations other than from Debtor – since Cirrus has never spoken to the Losing Bidder or any of its representatives.

7

21. Moreover, "important notions of finality and regularity in judicial auctions are appeased if the court acts consistently with the rules by which the particular sale is conducted and in compliance with the bidders' reasonable expectations." *In re Food Barn Stores, Inc.*, 107 F.3d 558, 565 (8th Cir. 1997) (citing *Consumer News & Bus. Channel P'ship v. Fin. News Network, Inc. (In re Fin. News Network, Inc.)*, 980 F.2d 165, 170 (2d Cir. 1992)).

22. For these reasons, Florida courts set aside execution sales on the basis that the sale resulted in an inadequate price only if it is shown that "the inadequate price is connected with or is shown to result from a mistake, accident, surprise, fraud, misconduct or irregularity upon the part of the purchaser or another person connected with the sale, with resulting injustice to the complaining party." *In re King*, 463 B.R. 555, 566 (Bankr. S.D. Fla. 2011) (citing *Arlt v. Buchanan*, 190 So.2d 575, 577 (Fla. 1966)).

23. Again, the Losing Bidder cannot demonstrate any such injustice here.

24. The Losing Bidder was present at the Resumed Auction, actively bid at the Resumed Auction, made a deliberate and explicit decision to stop bidding at the Resumed Auction, and now – three weeks after losing – proposes to abandon the entire Court-approved process in favor of a back-door private sale on terms that are fundamentally different from the terms set forth in the Bidding Procedures to which every other prospective purchaser was held. This is an effort not to correct an injustice, but to end-run the Court's orders.

25. The Losing Bidder's explanation for walking away is not merely unpersuasive – it is illogical, inaccurate, and flatly contradicted by the record. The Motion claims the Losing Bidder declined to increase its bid because it allegedly "lost confidence in the auction process after being asked at the inception for its highest bid and being told that the Lender was going to bid its full credit bid." Motion, ¶ 9. That excuse collapses under even minimal scrutiny.

26. If the Losing Bidder had actually lost confidence in the auction process, it could have raised those concerns immediately and on the record at the Resumed Auction. It did not. It could have promptly sought relief from this Court. It did not. Silence in the moment followed by litigation is evidence only of bidder's remorse. But bidder's remorse is not a basis to upset a properly and meticulously conducted court-ordered bankruptcy auction.

27. The Losing Bidder (1) fully participated in the Resumed Auction and submitted a final bid of $91 million, *see id.* ¶ 8, and (2) waited three weeks before filing the Motion – timing its challenge only after Cirrus and Debtor finalized negotiations and are preparing to execute the PSA. This is gamesmanship, not grievance.

28. The Losing Bidder's story – advanced in a legal pleading without any accompanying sworn declaration – is also squarely refuted by sworn testimony. Mr. Roffers attested that the Losing Bidder "**explicitly indicated that he had finished and had reached his limit**." Roffers Declaration, ¶ 9 (emphasis added). That testimony is irreconcilable with the Losing Bidder's post-hoc narrative of supposed "loss of confidence."

29. The Motion similarly fails to explain who allegedly asked the Losing Bidder for its highest bid or how such a question – if it even occurred – could legitimately undermine confidence in a robust, Court-supervised auction.

30. That the Losing Bidder was allegedly told Cirrus "was going to bid its entire credit bid" – if that occurred, as it certainly was not told that by Cirrus – is also a red herring. The credit bid amount was publicly known, and Cirrus was fully within its rights to bid the entirety of its credit bid (and more). Notably, the Motion now claims that the Losing Bidder is prepared to pay $107 million – $5.5 million more than Cirrus' credit bid. Nothing prevented the Losing Bidder from making that higher bid when it mattered – at the Resumed Auction.

## CONCLUSION

31. The Motion is the Losing Bidder's **second** attempt to evade this Court's orders and subvert the orderly auction process. The Losing Bidder identifies no inherent unfairness or injustice warranting a departure from the auction process this Court ordered and through which Cirrus was the winning bidder. The pattern is unmistakable: the Losing Bidder seeks endless do-overs until it obtains the outcome it wants. The Court should not entertain these frivolous efforts any longer.

## RESERVATION OF RIGHTS

32. Cirrus reserves all rights with respect to the Motion, including the right to supplement and amend this Objection, participate in additional briefing and oral arguments and seek additional discovery with respect to the Motion. Nothing contained herein shall constitute a waiver of any of the claims, rights or remedies of Cirrus, each of which is hereby expressly reserved.

WHEREFORE, Cirrus respectfully requests that the Court deny the Motion in its entirety, award it sanctions in the amount of its attorneys' fees and costs for responding to the Motion, together with such other and further relief as this Court deems just and proper under the circumstances.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: February 23, 2026.

Respectfully submitted,

s/ *Daniel N. Gonzalez*
Daniel N. Gonzalez, Esq.
Florida Bar No. 0592749
dgonzalez@melandbudwick.com
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

-and-

**PRYOR CASHMAN LLP**
Todd E. Soloway, Esq. (admitted *pro hac vice*)
Bryan T. Mohler, Esq. (admitted *pro hac vice*)
Andrew S. Richmond, Esq. (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
Email: tsoloway@pryorcashman.com
　　　bmohler@pryorcashman.com
　　　arichmond@pryorcashman.com

*Counsel to Cirrus Real Estate Funding, LLC and Cirrus 340BB Lender LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 23, 2026, a true and correct copy of the foregoing was served via the Court's CM/ECF system upon all registered users listed on the attached Exhibit 1 and served via U.S. Mail upon the parties listed on the Manual Notice List.

s/ *Daniel N. Gonzalez*
Daniel N. Gonzalez, Esquire
Florida Bar No. 592749
dgonzalez@melandbudwick.com
MELAND BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

**EXHIBIT 1**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Geoffrey S. Aaronson**     gaaronson@aspalaw.com, 5408891420@filings.docketbird.com;lbenavides@aspalaw.com
- **Patricia M Arias**     parias@miamigov.com, esq874@aol.com
- **Rachamin Cohen**     Rocky@lawcls.com, alex@lawcls.com
- **Lara Roeske Fernandez**     lfernandez@trenam.com, mmosbach@trenam.com;mwoods@trenam.com;lfernandez@ecf.courtdrive.com;mwoods@ecf.courtdrive.com;mmosbach@ecf.courtdrive.com
- **Joseph D Garrity**     jgarrity@loriumlaw.com, gtservice@garritytraina.com
- **Dan L Gold**     Dan.L.Gold@usdoj.gov
- **Daniel N Gonzalez**     dgonzalez@melandbudwick.com, ltannenbaum@melandbudwick.com;mrbnefs@yahoo.com;gonzalez@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- **Douglas J Harris**     douglas.harris@alston.com, melanie.mizrahie@alston.com
- **Linda W Jackson**     LJACKSON@PARDOJACKSON.COM, sramos@pardojackson.com;mfuentes@pardojackson.com
- **Linsey M Lovell**     llovell@pardojackson.com, mfuentes@pardojackson.com;sramos@pardojackson.com
- **Office of the US Trustee**     USTPRegion21.MM.ECF@usdoj.gov
- **Francisco A Rodriguez**     francisco.rodriguez@reedsmith.com
- **Michael D. Seese**     mseese@seeselaw.com, sseward@seeselaw.com
- **Jeffrey P Shapiro**     jps@shapiroramos.com, mr@shapiroramos.com
- **Paul Alan Shelowitz**     pshelowitz@pardojackson.com, cfernandez@pardojackson.com

**Manual Notice List**

The following is the list of **parties** who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service).

    **BDO USA, P.C.**
    515 Las Olas Boulevard, 5th Floor
    Fort Lauderdale, FL 33301

    **Conrad K Chiu**
    7 Times Square, 40th Floor
    New York, NY 10036

    **Joel D. Glick**
    Berkowitz Pollack Advisors and CPA
    200 S Biscayne Blvd., 7 floor
    Miami, FL 33131

    **Douglas J Harris**
    ALSTON & BIRD LLP
    350 South Grand Avenue, 51st Fl.
    Los Angeles, CA 90071

    **Meghan E. Hill**
    Pryor Cashman
    7 Times Square, 40th Floor
    New York, NY 10036

    **Frank Hornstein Mai**
    AppraisalFirst, LLC
    8101 Biscayne Blvd Ste R-516
    Miami, FL 33138

    **Eric W Kaup**
    Hilco Real Estate, LLC
    5 Revere Drive, #206
    Northbrook, IL 60062

    **Michael H. Levison**
    Pryor Cashman
    7 Times Square, 40th Floor
    New York, NY 10036

**Todd Marcus**
Pryor Cashman
7 Times Square, 40th Floor
New York, NY 10036

**Miami-Dade Office of the Tax Collector (Rogers)**
200 NW 2nd Avenue
Suite 430
Miami, FL 33128

**Bryan T. Mohler**
Pryor Cashman
7 Times Square, 40th Floor
New York, NY 10036

**Michael D. Pakter**
Gould & Pakter Associates
203 North LaSalle Street, Suite 2100
Chicago, IL

**Andrew S Richmond**
7 Times Square, 40th Floor
New York, NY 10036

**Neil Rollnick**
Hinshaw & Culbertson LLP
2811 Ponce de Leon Blvd., 10th Floor
Coral Gables, FL 33134

**Jessica Rosen**
7 Times Square, 40th Floor
New York, NY 10036

**Todd E. Soloway**
Pryor Cashman
7 Times Square, 40th Floor
New York, NY 10036

**Staff Pro, LLC**
1077 NE 96 St
Miami Shores, FL 33138